**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF NEW YORK**

IN RE: FISHER-PRICE ROCK 'N PLAY
SLEEPER MARKETING, SALES
PRACTICES, AND PRODUCTS
LIABILITY LITIGATION

MDL No. 1:19-md-2903

Hon. Geoffrey W. Crawford

This Document Relates To: ALL CASES

## PLAINTIFFS' RESPONSE TO DEFENDANTS'
## MOTION TO FILE UNDER SEAL (ECF NO. 169)

Plaintiffs respectfully submit this response to Defendants' Motion to Seal (ECF No. 169) certain exhibits filed in support of Defendants' Opposition to Plaintiffs' Motion for Class Certification (ECF No. 165) and Compendium of Evidence in support thereof (ECF No. 166), filed on June 16, 2021.[1]

1.      In their motion, Defendants move this Court to seal or redact certain documents filed by Defendants and offered in opposition to Plaintiffs' Motion for Class Certification.  As set forth below, while Plaintiffs agree that some of these documents are properly sealed, Defendants have failed to meet the high burden necessary to shield many of these judicial documents from public access.

2.      The common law right of public access to judicial documents has existed for centuries to ensure that the public may "keep a watchful eye on the workings of public agencies" and ensure the proper functioning of the government. *United States v. Amodeo* ("*Amodeo I*"), 44 F.3d 141, 145 (2d Cir. 1995) (quoting *Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597, 98 S.

---

[1] Plaintiffs submit this response within the time specified by Local Rule 7(b)(2)(B).  Plaintiffs' Opposition to Defendants' Motion to strike would also be due on this date by Local Rule, but the parties have submitted a joint schedule to the Court, pursuant to which that response will be filed with Plaintiffs' reply, on September 17, 2021.  *See* ECF No. 170, at *2.

Ct. 1306, 1312, 55 L. Ed. 2d 570 (1978)).  The First Amendment provides additional rights for the press and public to access judicial documents. *See Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 120 (2d Cir. 2006).  The Second Circuit aptly described the importance of public access as follows:

> The presumption of access is based on the need for federal courts, although independent—indeed, particularly because they are independent—to have a measure of accountability and for the public to have confidence in the administration of justice.  Federal courts exercise powers under Article III that impact upon virtually all citizens, but judges, once nominated and confirmed, serve for life unless impeached….  Although courts have a number of internal checks, … professional and public monitoring is an essential feature of democratic control…. [without which] the public could have no confidence in the conscientiousness, reasonableness, or honesty of judicial proceedings. Such monitoring is not possible without access to testimony and documents that are used in the performance of Article III functions.

*United States v. Amodeo* ("*Amodeo II*"), 71 F.3d 1044, 1048 (2d Cir. 1995).

3.     The Second Circuit set out a three-part test in *Lugosch* to determine the weight of the public access presumption to be given to filed documents. 435 F.3d at 119-120.  First, a court must determine whether the documents are judicial documents.  If an item filed is "relevant to the performance of the judicial function and useful in the judicial process," it is considered a judicial document. *Amodeo I*, 44 F.3d at 145.  Second, a court must decide what weight the presumption carries.  "That weight is 'governed by the role of the material at issue in the exercise of the Article III judicial power and the resultant value of such information to those monitoring the federal courts.'"  *Sahrle v. Greece Cent. Sch. Dist.*, No. 10-CV-6631-FPG, 2015 WL 4872410, at *1 (W.D.N.Y. Aug. 13, 2015) (quoting *Lugosch*, 44 F.3d at 119).  "Finally, after the court has determined the weight of the presumption of access, the court must balance competing considerations against it." *Id.* (quoting *Lugosch*, 44 F.3d at 120).

4.      "[T]he normal burden upon the proponent of a protective order to establish good cause for protection is significantly enhanced with respect to 'judicial documents,' as to which 'a common law presumption of access attaches.'" *Standard Inv. Chartered, Inc. v. Fin. Indus. Regulatory Auth., Ind.* 347 F. App'x 615, 616 (2d Cir. 2009) (citations omitted).  "Motions for class certifications, like motions for summary judgment, are part of the Court's core adjudicative function to which a strong presumption of access attaches." *Royal Park Investments SA/NV v. Wells Fargo Bank, N.A.*, No. 14CV09764KPFSN, 2018 WL 739580, at *18 (S.D.N.Y. Jan. 10, 2018) (citations omitted).[2]

5.      Under the *Lugosch* three-part test, the judicial documents addressed below should be disclosed.  First, the documents are filed as evidence in opposition of Plaintiffs' motion for class certification, a ruling on which is a judicial function that cannot be performed without such evidence.   Second, because rulings on class certification "are part of the Court's core adjudicative function," the presumption of disclosure is stronger than it might otherwise be in other proceedings. *Royal Park*, 2018 WL 739580, at *18.  Third, recognizing that Defendants' burden to prevent public disclosure is high, the final remaining step for the Court is to balance Defendants' concerns against this heavy presumption of disclosure.

6.      To overcome this burden, "[t]he reasons for sealing should "be articulated in detail, based on allegations of specific facts, not generalities and conclusions, and [] require that the facts upon which the motion to seal is based be verified by the affidavit or declaration of a person or persons having personal knowledge of the facts." *United States v. Park*, 619 F. Supp. 2d 89, 93 (S.D.N.Y. 2009) (quoting *United States v. Raybould*, 130 F.Supp.2d 829, 833 (N.D. Tex. 2000)); *see also Saraceni v. M&T Bank Corp.*, No. 19-CV-1152, 2019 WL 5784936, at *3

---

[2] The court sealed the documents under the circumstances of that case, for reasons that are not relevant here.

(W.D.N.Y. Nov. 6, 2019) (holding that the affiant/declarant need not have created the document in question, but must be familiar with their use).  "The party opposing disclosure must make a *particular and specific demonstration of fact* showing that disclosure would result in an injury sufficiently serious to warrant protection; broad allegations of harm unsubstantiated by specific examples or articulated reasoning fail to satisfy the test. *In re Parmalat Sec. Litig.*, 258 F.R.D. 236, 244 (S.D.N.Y. 2009) (emphasis added).

7.      Documents that "do not reveal unique or highly unusual methods or procedures, instead suggesting common-sense strategies" are not entitled to protection.  *Dawson v. Merck & Co., No.* 112CV1876BMCPK, 2021 WL 242148, at *10 (E.D.N.Y. Jan. 24, 2021).  "Stale business records cannot support the necessary finding of harm, and therefore 'cannot overcome the public's strong interest in disclosure.'" *Id.*, at *8.[3]

8.      As described below, Defendants' purported justifications do not warrant sealing or redacting certain information that, after careful review, Plaintiffs believe should be disclosed under the applicable law.

9.      Attached as Exhibit A is a table that lists the exhibits Defendants seek to seal or redact from the Marshack Declaration, the Ford Declaration, the Rossi Report, and the Kivetz Report; and sets forth Plaintiffs' position on each proposed request to seal or redact.

10.      Additionally, at the Court's request, Plaintiffs can furnish copies of the exhibits and reports with the proposed redactions applied.

## PLAINTIFFS' POSITIONS ON THE EXHIBITS AT ISSUE

---

[3] The *Dawson* court notes additional cases where documents from eight or as little as three years prior are held to be stale.  One of the cases also notes that discontinued practices will lessen the potential for harm if the documents are disclosed.

11.     **Portions of Exhibit 2 (Sarah Ford Deposition Transcript Excerpts, Volume I,**
**December 11, 2020)** – Plaintiffs respond to Defendants' request to seal portions of Exhibit 2 as
set forth below.

12.     **Page 17, line 23-page 18, line 3 and 20-23 of Exhibit 2 –** Plaintiffs do not object
to sealing this portion of Exhibit 2.

13.     **Page 83, line 1-page 87, line 23; page 136, lines 9-18; page 190, lines 1-23;**
**page 253, line 22-page 256, line 23; page 259, line 1-page 262, line 23; page 276, line 21-280,**
**line 4; page 307, line 1-page 308, line 23 of Exhibit 2 –** These passages do not reveal any
internal procedures that could be considered proprietary or beyond generally known business
practices.  Any discussion of product categorization is in general terms and relates to the
categorization many years ago, of the Rock 'n Play Sleeper (the "Sleeper") that Fisher-Price no
longer manufactures or sells, and whose manufacture and sale has now been banned by the
CPSC[4].  Some of the categorization discussed is not even created by Defendants, but by a third
party who makes such categorization publicly available.  Defendants have failed to articulate any
specific competitive injury that would result from disclosure of this information.  Plaintiffs'
position is that the portions of Exhibit 2 from page 260, lines 2-5, page 262, lines 17-22 may
remain sealed, but the rest should be unsealed.

14.     **Page 91, line 2-page 92, line 5; page 93, lines 9-18; page 104, lines 6-11; page**
**106, lines 7-19; page 110, line 1-114, line 23; page 143, line 1-page 144, line 23; page 154,**
**lines 1-23; page 156, line 1-page 158, line 23; page 166, lines 1-page 180, line 23; page 280,**
**line 13-23 of Exhibit 2 –** There is no discussion of internal strategic considerations or
proprietary methods in these portions of Exhibit 2.  The displays, packaging, and videos were all

---

[4] https://www.cpsc.gov/Newsroom/News-Releases/2021/CPSC-Approves-Major-New-Federal-Safety-Standard-for-Infant-Sleep-Products

publicly released.  The material discussed relates solely to the Sleeper, which is no longer sold, so it cannot be used for competitive advantage.  Additionally, much of the discussion focuses on events from 2011, which means it is stale.  Defendants assertions of harm are boilerplate, and do not specify any particular harm.  Plaintiffs request that these portions of Exhibit 2 be unsealed.

15.     **Portions of Exhibit 3 (Sarah Ford Deposition Transcript Excerpts, Volume II)** – Plaintiffs respond to Defendants request to seal portions of Exhibit 3 as set forth below.

16.     **Page 6, line 5-page 7, line 11; page 16, line 1-page 17, line 25 of Exhibit 3** – There is nothing proprietary about using social media and online marketing.  The use of influencers is ubiquitous in marketing consumer products, and there is no detail about strategy.  Additionally, the discussion is limited to how the Sleeper, which is no longer sold, was marketed.  Defendants have made no specific showing of harm that would come from public disclosure.  Plaintiffs request that all portions of Exhibit 3 be unsealed.

17.     **Portions of Exhibit 4 (Catherine "Kitty" Pilarz Deposition Transcript Excerpts)** – Plaintiffs respond to Defendants request to seal portions of Exhibit 4 as set forth below.

18.     **Page 59, lines 2-23; page 124, lines 9-17; page 126, line 15-page 128, line 17; page 129, line 1-page 130, line 9; page 130, line 20-page 131, line 23; page 132, line 8-page 134, line 18; page 135, line 5-page 136, line 4; page 136, line 14-page 147, line 8; page 147, lines 16-23; page 210, line 3-page 211, line 23 of Exhibit 4** – Nearly every passage in this portion of Exhibit 4 concerns only the discontinued Sleeper, not other products, so disclosure will not provide any advantage to a competitor.  The discussion of recall-related procedures, particularly working with the CPSC and contacting consumers, has been covered by Defendants publicly in their own pleadings. (*See* ECF No. 166-5, Ford Declaration, ¶ 37).  Asking to seal

such material here, while using it elsewhere, is disingenuous and an illegitimate basis to keep information from public view.  Plaintiffs request that all portions of Exhibit 4 be unsealed.

19.      **Exhibit 5 (Chuck Scothon Deposition Transcript Excerpts)** – Plaintiffs respond to Defendants' request to seal portions of Exhibit 5 as set forth below.

20.      **Page 38, line 21-page 42, line 23 of Exhibit 5 –** This portion of Exhibit 5 discusses the use of marketing displays for only the recalled Sleeper.  There is no proprietary method or strategy revealed.  Defendants' boilerplate allegation that disclosure would benefit competitors is not specific and, thus, insufficient. Plaintiffs request that all portions of Exhibit 5 be unsealed.

21.      **Exhibit 6 (Deirdre Stephens Deposition Transcript Excerpts)** - Plaintiffs respond to Defendants request to seal portions of Exhibit 6 as set forth below.

22.      **Page 56, line 1-page 60, line 23; page 61, lines 1-25; page 62, line 1-page 63, line 23; page 64, line 23-page 67, line 25; page 85, line 8-page 86, line 16; page 160, line 21-page 161, line 23, page 162, lines 15-22; page 170, line 1-page 171, line 14; page 189, line 16-page 190, line 25 –** Plaintiffs do not object to the redaction of the following portions of Exhibit 6: page 60, lines 4-23; page 62, lines 7-11; page 67, lines 2-3; page 160, line 21-page 161, line 23.  The rest of the material Defendants seek to seal in Exhibit 6 is common knowledge in marketing.  Product/signage placement in stores and online, and the purpose of signage is obvious in marketing all consumer products – get more eyes and get more sales.  There is no discussion of any proprietary method or strategy.  Defendants' proposed redactions are not narrowly tailored to protect their interests, and include testimony that should not be protected. Defendants' boilerplate assertion of harm does not suffice.  The remaining portions of Exhibit 6 should be unsealed.

23.     **Page 92, line 1-page 93, line 13; page 181, line 1-page 182, line 25 –** No specifics or strategy are mentioned regarding any product other than the Sleeper in this portion of Exhibit 6.  Since the Sleeper is no longer marketed, no competitor will gain any advantage.  The second portion relates to a letter Defendants received from Health Canada in 2011, the existence of which   is publicly-known.[5]  No grounds exist to seal judicial documents that disclose information already publicly available.  For the foregoing reasons, these portions of Exhibit 6 should be unsealed.

24.     **Page 153, lines 19-25; page 154, line 21-page 157, line 25 –** The first excerpt Defendants seek to seal is merely a mention of the existence of emails.  There is nothing about the contents, subject matter, senders, recipients, or dates included.  The second excerpt does discuss the emails in question, however, much of the information discussed is publicly available. Social media marketing posts are, by their very nature, publicly made.  Noting the existence of such posts does not warrant sealing them from public view.  Plaintiffs do not object to sealing the portion from page 156, line 18-page 157, line 9.  The remainder of this portion of Exhibit 6 should be unsealed.

25.     **Page 199, line 2-page 210, line 25 –** The study discussed here is about only the Sleeper, the sale of which is banned.  Additionally, the study itself is from 2011, so the information therein is too stale to warrant protection.  The methods used are not proprietary. These portions of Exhibit 6 should be unsealed.

26.     **<u>Exhibit 31 (Plaintiffs' Deposition Exhibit 11 (FSHR0004127-4149))</u> -**  This Exhibit sets forth the results of a marketing survey from 2011 about how consumers responded to Defendants' marketing of the Sleeper. Conducting surveys is not a trade secret or proprietary

---

[5] https://www.consumerreports.org/recalls/fisher-price-rock-n-play-sleeper-should-be-recalled-consumer-reports-says/

strategy.  Since the survey was conducted 10 years ago, and covered a product that is now banned, it is stale and unlikely to benefit competitors.  Additionally, the study and its results were described in a recently published report from the House Committed on Oversight and Reform setting forth the results of its investigation of the events leading up to the recall of the Sleeper[6]. Because a survey is such a common occurrence in marketing, and because Defendants have made no specific representation as to how they could be harmed, this entire document should be unsealed.

27.   **Exhibit 32 (Plaintiffs' Deposition Exhibit 13 (FSHR0049280-49286))** – Plaintiffs do not object to sealing the internal emails discussing other products, however, disclosure of the attachment will not harm Defendants.  The Sleeper is no longer sold, and the copy contains no strategy or procedure.  The statements on the copy are selling points that Defendants publicized when marketing the Sleeper.  The Court can seal this exhibit from FSHR0049280-49284, but the attachment in FSHR0049285-49286 should be unsealed.

28.   **Exhibit 33 (Plaintiffs' Deposition Exhibit 15 (FSHR0003862-3864))** – These emails note how Defendants planned to market the Sleeper in 2011, but they do not discuss any trade secret or proprietary strategy or method.  Their age and the fact the product is banned means this material is stale. Moreover, consumer research on marketing strategy is ubiquitous within the industry.  No specific harm has been shown by Defendants.  Exhibit 33 should be unsealed in its entirety.

29.   **Exhibits 34 (Plaintiffs' Deposition Exhibit 17 (FSHR0028358-28360, FSHR0028720-28724)) and 45 (Plaintiffs' Deposition Exhibit 84 (FSHR0028720- 28724))** –

---

[6] A copy of the report can be found at:
https://oversight.house.gov/sites/democrats.oversight.house.gov/files/Inclined%20Sleeper%20Report%202021.pdf (last accessed June 26, 2021).

The internal emails in these exhibits list publicly available awards, blogs, influencer posts, and news articles.  Noting the existence of something that is publicly available is not subject to protection over the First Amendment's right to public access.  There is no discussion of procedures or strategy.  Additionally, these emails are more than four years old, which means they are stale.  Defendants have made no specific showing of harm they will suffer if these emails are unsealed.  The entirety of Exhibits 34 and 45 should be unsealed.

30.    **Exhibit 35 (Plaintiffs' Deposition Exhibit 19 (FSHR0024684- 24691))** – Some of these emails address solely the marketing of the Sleeper.  The second email in the chain discusses a retailer that is no longer in business and a product that is no longer sold by Defendants, or anyone else.  The last email in the chain describes concepts for Sleeper in-store displays.  The display design for a product no one sells cannot be used against Defendants by any competitor.  Defendants have made no specific showing of harm from those portions of the exhibit, so sealing the entire exhibit is not a narrowly tailored approach to protect Defendants' interests.  Plaintiffs' position is that the second email in the chain (bottom half of FSHR0024684) and the final email in the chain (FSHR0024690-24691) should be unsealed, but Plaintiffs do not object to the redaction of the remaining portions of Exhibit 35.

31.    **Exhibit 36 (Plaintiffs' Deposition Exhibit 22 (FSHR0047936- 47937))** – This draft of the "A Bedtime Story" piece does not contain any internal edits or comments that could provide any advantage to a competitor.  The two comments total just fourteen words, and nothing remotely close to any strategy or proprietary method is discussed.  Additionally, the document is from 2014 and is only about the banned Sleeper, meaning any potential benefit to competitors is stale, at best.  Defendants' allegation of potential harm contains no specifics.  Exhibit 36 should be unsealed in its entirety.

32. **Exhibit 38 (Plaintiffs' Deposition Exhibit 53 (FSHR0012772))**[7] – The financial data here covers *only* sales of the Sleeper. Since the product is banned, it cannot provide benefit to a competitor. Mattel, as a publicly traded company, releases some financials to the public. Additionally, the total number of Sleepers sold is widely reported. Therefore, the substance of this financial data is already in the public sphere. For these reasons, Exhibit 38 should be unsealed in its entirety.

33. **Exhibit 41 (Plaintiffs' Deposition Exhibit 67 (FSHR0061936- 61968))** – Plaintiffs do not object to Exhibit 41 remaining sealed.

34. **Exhibit 42 (Plaintiffs' Deposition Exhibit 68 (FSHR0058028- 58029))** – Sealing this entire document is not narrowly tailored to protect Defendants interests. Plaintiffs do not object to redacting portions of this email that discuss the other products, but those concerning the Sleeper can provide no advantage to any competitor. Plaintiffs propose redacting one line of text on FSHR0058028 that contains a password, and the portions of FSHR058029 that cover the other two products. The remainder of Exhibit 42 should be unsealed.

35. **Exhibit 43 (Plaintiffs' Deposition Exhibit 81 (FSHR0048655- 48675))** – Exhibit 43 consists of an internal email and two attachments. The portions of the email and attachments that concern the Sleeper cannot give an advantage to Fisher-Price's competitors, because the product is banned. Additionally, the materials are stale because they are ten years old. Exhibit 43 should be unsealed with FSHR0048656, FSHR0048658-48670, and FSHR0048671-48675 redacted.

---

[7] Defendants motion incorrectly notes Exhibit 38 as "FSHR001277," however the correct Bates number is FSHR0012772

36. **Exhibit 79 ("Premium Baby Gear Segmentation – Topline Insights from Phase 1 Qualitative" (December 18, 2018) (FSHR0017737- 17747))** – Plaintiffs do not object to this document remaining under seal.

37. **Exhibit 113 (Advertising Spend Spreadsheet (FSHR0012775))** – Plaintiffs do not object to this document remaining under seal.

38. **Exhibits 7-21 and 23-27 (Plaintiffs' Deposition Transcripts)** – Plaintiffs designated certain portions of the named Plaintiffs' deposition transcripts as confidential or highly confidential where they contained personal identifying information ("PII") of the Plaintiffs, their minor children, or other persons. For the portions of these transcripts submitted in support of Defendants' opposition, the redactions are limited to the names of minor children, birth dates, places of birth, home addresses, email addresses, and telephone numbers. These redactions are very limited. The public disclosure of such PII could subject Plaintiffs to harassment or physical or financial harm if persons were to use it to either locate Plaintiffs or to gain access to their accounts using the information to breach security questions or other protocols. For this reason, Plaintiffs join this part of Defendants' motion and request that these redactions remain in place, but note two differences from Defendants' motion below.

39. **Exhibit 17 Megan Kaden Deposition Transcript Excerpts** – The redactions on page 92 of Exhibit 17 may be removed without releasing any PII.

40. **Exhibit 27 Renee Wray Deposition Transcript Excerpts** – The following portions of Defendants' Exhibit 27 contain PII in the form of child(ren)'s names and/or birthdates, and should be redacted: page 48, line 9; page 49, line 6; page 62, line 17; page 75, line 17; page 77, line 2; page 87, lines 3 & 5; page 91, line 2; page 96, line 14; and page 154, lines 5 & 6.

41.      **Exhibits 47, 50, 52, 54-55, 57-59, 61-62, 64-65, and 67-76 (Defendants'
Deposition Exhibits Consisting of Documents Produced by Plaintiffs)** – These exhibits
consist of photographs and documents produced by Plaintiffs in response to Defendants' request
for production of documents.  Many of these documents contain PII and/or photographs of the
Plaintiffs' minor children.  Releasing such information could subject them to harassment or
physical or financial harm if persons were to use it to locate Plaintiffs or their children, or gain
access to their accounts using the information to breach security questions or other protocols.
For this reason, these documents should remain sealed, with two exceptions noted below.

42.      **Exhibits 64 and 65 (Jacoby0000001-2 and Jacoby0000005-6)** – These exhibits
contain Plaintiff Jacoby's baby registry lists, but do not contain any PII.  Plaintiffs do not object
to these exhibits being unsealed.

43.      **Exhibit 73 (Kaden0000001-2)** – This exhibit contains screenshots of Facebook
marketplace communications related to Plaintiff Kaden's purchase of a Sleeper.  There is no PII
in this exhibit, so Plaintiffs do not object to Exhibit 73 being unsealed.

44.      **Portions of the Rossi Report** – Defendants seek to seal several portions of the
Rossi Report.  Some of these portions are not due the protection that Defendants seek.

45.      **Portion of ¶ 35** – This portion discusses the same study that is discussed in
portions of Exhibits 2, 4, 6, and 33, and is included as Defendants' Exhibit 31.  For the reasons
stated in paragraph 26 of this response, the study itself should not be sealed.  Beyond that, the
discussion in the Rossi Report is so limited in scope (noting responses to a single question,
regarding a product no longer sold) and so stale (from 2011) that it could not possibly provide
any type of market advantage to any of Defendants' competitors.  For these reasons, there is no
justification to seal this portion of the report.  Plaintiffs request that this redaction be removed.

46.     **Portions of ¶ 37 and Footnote 49 and Portions of ¶ 53 and Footnote 70** –
Plaintiffs do not object to the portion of paragraph 37 and footnote 49 remaining redacted.
However, the portions of paragraph 53 and footnote 70 discuss historical prices of two models of
the Sleeper.  As already stated, any claim by Defendants of potential harm from disclosure of
data regarding a product that no one sells, is specious at best.  For this reason, and the reasons
stated in paragraph 32, the redactions to ¶ 53 and footnote 70 should be removed.

47.     **Images in ¶¶ 51 and 52** – The images in paragraphs 51 and 52 reveal nothing
about internal marketing strategy or decision-making.  The text is simply a list of product
features, every one of which was used in marketing the Sleeper, and which Defendants rely on
heavily in their defense.  Defendants have made boilerplate allegations of harm from disclosure,
with no specific showing.  Plaintiffs request that the redaction of these images be removed.

48.     **Portions of the Kivetz Report** - Defendants seek to seal several portions of the
Kivetz Report.  Some of these portions are not due the protection that Defendants seek.

49.     **Portions of ¶¶ 18 and 125, Paragraphs 100, 103-119, and Footnotes 114, 117-
119, and 123** – These portions of the Kivetz Report discuss the 2011 marketing survey noted
numerous times above.  For the reasons stated previously about this stale study, these portions of
the report should not be redacted.

50.     **Portions of ¶¶ 77-78 and Footnote 67** – Defendants seek to redact these portions
of the report, not because they could give any other company a competitive advantage, but
because they directly contradict the history of the Sleeper's development and marketing.  The
discovery in this case consistently shows that the Sleeper was developed, marketed, and sold as a
sleep product, yet deposition testimony from Defendants' witnesses consistently avoided the
focus on sleep.  The intended use of the Sleeper cannot give any advantage to competitors

because the product is no longer sold.  Moreover, other sections of these paragraphs discuss the same type of testimony, but they are not redacted.  One can only assume it is because Defendants think it serves them.  Defendants articulate no specific competitive harm that will befall them if these portions of testimony are released.  For these reasons, these portions of the Kivetz Report should not remain redacted.

## **CONCLUSION**

For the reasons set forth above, Plaintiffs respectfully submit that the Court should enter an order sealing or partially redacting the evidence accompanying Defendants' Opposition to Plaintiffs' Motion for Class Certification as set forth in detail above.

Respectfully submitted this 30th day of June, 2021.

*/s/ James B. Eubank*

**BEASLEY, ALLEN, CROW,
METHVIN, PORTIS & MILES, P.C.**
W. Daniel Miles, III
Demet Basar
Lydia Keaney Reynolds
James B. Eubank
Paul W. Evans
218 Commerce Street
Montgomery, Alabama 36104
Tel:  (334) 269-2343
Fax:  (334) 954-7555
Dee.Miles@BeasleyAllen.com
Demet.Basar@BeasleyAllen.com
Lydia.Reynolds@BeasleyAllen.com
James.Eubank@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com

*Plaintiffs' Lead Counsel*

**CONNORS LLP**

Terrence ("Terry") Connors
Andrew M. Debbins
1000 Liberty Building
Buffalo, NY 14202
(716) 852-5533
tmc@connorsllp.com
amd@connorsllp.com

*Plaintiffs' Liaison Counsel*