# UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE: ROCK 'N PLAY SLEEPER MARKETING, SALES PRACTICES, AND PRODUCTS LIABILITY LITIGATION | MDL No. 1:19-md-2903<br><br>Hon. Geoffrey W. Crawford<br><br>This Document Relates to: ALL CASES |

## PLAINTIFFS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF MOTION FOR CLASS CERTIFICATION

## <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS.................................................................................... i

TABLE OF AUTHORITIES ............................................................................. v

PRELIMINARY STATEMENT ........................................................................ 1

STATEMENT OF FACTS ................................................................................ 3

I.      The U.S House of Representatives Oversight Committee Issues a Scathing Expose into Defendants' Choice to Place Profits over Infant Lives .................................................. 4

II.     The RNPS is Unsafe for Infant Sleep such that it is Worthless .......................................... 5

III.    Experts Confirm Defendants' Marketing was Material to Consumers............................... 6

IV.     Plaintiffs and Class Members All Purchased or Used RNPS Because They Thought it Was Safe for Infant Sleep ............................................................................................. 8

        A.   Purchaser Plaintiffs Purchased the RNPS Believing it was Safe for Infant Sleep.......... 8

        B.   Owner Plaintiffs Would Not Have Used the RNPS had the Dangers Been Disclosed. 10

ARGUMENT .................................................................................................... 11

I.      The Rule 23(a) Requirements Are Satisfied ..................................................... 11

        A.   The Typicality and Adequacy of Most Plaintiffs are Unchallenged............................ 11

        B.   Huey is Typical of the Florida Class............................................................. 13

        C.   Hanson is Typical of the Iowa Class............................................................. 13

        D.   Alfaro is an Adequate Representative Whose Claims are Typical of New York Class 14

II.     The Purchaser Classes Meet the Rule 23(b)(3) Requirements .......................................... 15

A.   All Purchaser Plaintiffs and Class Members Suffered Injury ....................................... 16

B.   Materiality Can Be Determined Using Class-wide Proof ............................................... 18

   1.   Defendants Uniformly Marketed the RNPS as Safe for Infant Sleep .................... 18

   2.   Defendants' "Multi-Use" Argument is Irrelevant to Materiality ........................... 21

   3.   Plaintiffs' Experts Confirm Materiality is Susceptible to Class-wide Proof .......... 24

   4.   Dr. Kivetz's Flawed Survey Actually Supports a Finding of Predominance ......... 26

C.   Defendants' Statute of Limitations Defenses Also Support a Find of Predominance .. 29

   1.   Barton's Claims May Be Tolled Pursuant to the Discovery Rule, Fraudulent
   Concealment, and/or Estoppel ........................................................................... 30

   2.   Hanson's Claims May Be Tolled Pursuant to Continuing Act Tolling, Fraudulent
   Concealment, and/or Estoppel ........................................................................... 30

D.   Purchaser Classes Asserting Consumer Protection Claims Should be Certified .......... 31

   1.   The Arizona Class ................................................................................................. 32

   2.   The Arkansas Class ............................................................................................... 33

   3.   The California Class .............................................................................................. 35

      a.   Flores and Kaden Have Standing Because They Relied on Defendants' Misleading
      Misrepresentations ....................................................................................... 35

      b.   Because Defendants' Misleading Misrepresentations and Omissions were
      Material, Individual Issues Do Not Predominate ......................................... 37

   4.   The Florida Class ................................................................................................. 39

   5.   The Iowa Class ..................................................................................................... 40

6.   The New Jersey Class ................................................................. 41

7.   The New York Class .................................................................... 43

8.   The Texas Class .......................................................................... 45

9.   The Washington Class ................................................................. 47

E.   Negligence Classes Should Be Certified ................................................ 48

1.   Arkansas ...................................................................................... 48

2.   New Jersey .................................................................................. 49

F.   Implied Warranty Classes are Certifiable .............................................. 50

1.   Certification is Proper for the Five States Lacking Privity Requirements .............. 51

2.   A California Breach of Warranty Class is Warranted ............................................ 52

3.   The Privity Defense to the Remaining Claims Turns on Common Issues ............. 53

G.   Unjust Enrichment Classes Can be Certified ........................................... 55

H.   Damages are Capable of Being Calculated on a Class-Wide Basis ............................. 57

1.   Plaintiffs Need Only Demonstrate the Damages are Calculable ........................... 57

2.   Full Refund Damages are Calculable on a Class-wide Basis ................................ 58

3.   Plaintiffs' Proposed Diminution in Value Damages Model Satisfies Comcast ...... 61

a.   Defendants' Supply-Side Factors Argument is Routinely Rejected .................. 62

b.   Defendants' "Overcompensation" Argument Does Not Foreclose Class Certification ............................................................................................ 65

I.   The Class Action is a Superior Means of Resolving This Litigation .......................... 66

1.    Defendants' Manageability Arguments are Irrelevant and Exaggerated ................ 66

2.    Defendants' "Attorney-Driven" Arguments are Irrelevant ..................................... 68

3.    Defendants' Inadequate Recall is Inferior to a Class Action ................................. 70

4.    The Personal Injury Lawsuits Have No Bearing ..................................................... 72

III.    The Injunctive Relief Class Should Be Certified under Rule 23(b)(2) ............................ 73

IV.    Alternatively, the Nationwide Issue Class Should be Certified Under Rule 23(c)(4) ....... 74

CONCLUSION ....................................................................................................................... 75

# TABLE OF AUTHORITIES

**Cases**

*Ackerman v. Coca-Cola Co.*,
  No. 09 CV 395 DLI RML, 2013 WL 7044866 (E.D.N.Y. July 18, 2013) .................. 27, 45, 74

*Ajose v. Interline Brands, Inc.*,
  187 F. Supp. 3d 899 (M.D. Tenn. 2016) ................................................................... 57

*Alford Chevrolet-Geo v. Jones*,
  91 S.W.3d 396 (Tex. App. Ct. 2002) ....................................................................... 45

*Allen v. Hyland's Inc.*,
  300 F.R.D. 643 (C.D. Cal. 2014) ...................................................... 21, 58, 59, 70

*Allen v. Similasan Corp.*,
  306 F.R.D. 635 (S.D. Cal. 2015) ...................................................................... 20, 52

*Alloway v. General Marine Industries, L.P.*,
  149 N.J. 620 (N.J. 1997) ......................................................................................... 50

*All-Tronics, Inc. v. Ampelectric Co.*,
  354 N.Y.S.2d 154 (App. Div. 1974) ........................................................................ 53

*Amchem Prod., Inc. v. Windsor*,
  521 U.S. 591 (1997) ................................................................................................. 72

*AmeriPro Search, Inc. v. Fleming Steel Co.*,
  787 A.2d 988 (Pa. 2001) .......................................................................................... 55

*Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*,
  568 U.S. 455 (2013) ............................................................................................ 50, 59

*Argyle Independent School Dist. ex rel. Board of Trustees v. Wolf*,
  234 S.W.3d 229 (Tex. Ct. App. 2007) ..................................................................... 55

*Associates Commercial Corp. v. Wallia*,
  511 A.2d 709 (N.J. Sup. Ct. App. Div. 1986) ......................................................... 55

*Bailey v. Iowa Beef Processors, Inc.*,
  213 N.W.2d 642 (Iowa 1973) .................................................................................. 54

*Bailie Communications, Ltd. v. Trend Business System, Inc.*,
  810 P.2d 12 (Wash. Ct. App. 1991) ........................................................................ 55

*Baker v. Equity Residential Mgmt., L.L.C.*,
  390 F. Supp. 3d 246 (D. Mass. 2019) ..................................................................... 66

*Ballard v. Amana Soc'y, Inc.*,
   526 N.W.2d 558 (Iowa 1995) ................................................................. 54

*Bearden v. Honeywell Int'l, Inc.*,
   No. 3:09-01035, 2010 WL 1223936 (M.D. Tenn. Mar. 24, 2010) ........................................... 57

*Belfiore v. Procter & Gamble Co.*,
   311 F.R.D. 29 (E.D.N.Y. 2015) ............................................................. 18, 44

*Berni v. Barilla S.p.A.*,
   964 F.3d 141 (2d Cir. 2020) ................................................................ 73

*Berry v. Mega Brands Inc.*,
   2009 WL 233508 (D.N.J. Jan. 30, 2009) ............................................... 43

*Best Buy Co. v. Barerra*,
   248 S.W.3d 160 (Tex. 2007) ............................................................... 56

*Bowe v. Pub. Storage*,
   318 F.R.D. 160 (S.D. Fla. 2015) ....................................................... 39, 41

*Brazil v. Dell Inc.*,
   585 F. Supp. 2d 1158 (N.D. Cal. 2008) ................................................ 46

*Brazil v. Dole Packaged Foods, LLC*,
   No. 12-cv-01831-LHK, 2014 WL 2466559 (N.D. Cal. May 30, 2014) ................... 59

*Brown v. Kerkhoff*,
   279 F.R.D. 479 (S.D. Iowa 2012) ......................................................... 56

*Bunting v. DaimlerChrysler Co., LLC*,
   No. A-3590-07T3, 2009 WL 649570 (N.J. Super. Ct. App. Div. Mar. 16, 2009)................... 51

*Burr v. Sherwin Williams Co.*,
   42 Cal. 2d 682, 268 P.2d 1041 (1954) ................................................ 53

*Cameron v. S. Jersey Pubs, Inc.*,
   213 A.3d 967 (N.J. Super. Ct. App. Div. 2019) ....................................... 43

*Catalano v. BMW of N. Am., LLC*,
   167 F. Supp. 3d 540 (S.D.N.Y. 2016) ................................................... 53

*Chavez v. Blue Sky Nat. Beverage Co.*,
   268 F.R.D. 365 (N.D. Cal. 2010) ..................................................... 22, 31

*Clark v. Daby*,
   300 A.D.2d 732 (N.Y. App. Div. 2002) ................................................ 55

*CLN Properties, Inc. v. Republic Services, Inc.*,
No. CV-09-1428-PHX-DGC, 2010 WL 5146734 (D. Ariz. Dec. 13, 2010) .......................... 56

*Cole v. Blackwell Fuller Music Publ'g, LLC*,
2018 WL 4680989 (S.D.N.Y. Sept. 28, 2012) ......................................................... 12

*Collins v. Quincy Bioscience, LLC*,
No. 19-CV-22864, 2020 WL 3268340 (S.D. Fla. Mar. 19, 2020) .................................... 19, 39

*Comcast v. Behrend*,
569 U.S. 27 (2013) ........................................................................................ 57, 58

*de Lacour v. Colgate-Palmolive Co.*,
No. 16-CV-8364 (KMW), 2021 WL 1590208 (S.D.N.Y. Apr. 23, 2021) .................. 19, 22, 57

*Dugan v. TGI Fridays, Inc.*,
171 A.3d 620 (N.J. 2017) ................................................................................. 42

*Dzielak v. Whirlpool Corp.*,
2017 WL 6513347 (D.N.J. Dec. 20, 2017) ............................................................. 19, 46

*Ebin v. Kangadis Foods Inc.*,
297 F.R.D. 561 (S.D.N.Y. 2014) .......................................................... 19, 42, 44, 67

*Ehrlich v. BMW of N. Am., LLC*,
801 F. Supp. 2d 908 (C.D. Cal. 2010) ................................................................. 52

*Elias v. Ungar's Food Products, Inc.*,
252 F.R.D. 233 (D.N.J. 2008) ..................................................................... 19, 41, 42

*Evans v. U-Haul Co. of Cal.*,
No. CV 07-2097-JFW (JCx), 2007 WL 7648595 (C.D. Cal. Aug. 14, 2007) ...................... 69

*Falco v. Nissan N. Am. Inc.*, No.,
CV1300686DDPMANX, 2016 WL 1327474 (C.D. Cal. Apr. 5, 2016) ................................ 48

*Famular v. Whirlpool Corp.*,
2019 WL 1254882 (S.D.N.Y. Mar. 19, 2019) ............................................... 24, 55, 57

*Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*,
326 F.R.D. 592 (N.D. Cal. 2018) ................................................................... 20, 63

*Fitzpatrick v. Gen. Mills, Inc.*,
263 F.R.D. 687 (S.D. Fla. 2010) ........................................................................ 40

*Foley v. Buckley's Great Steaks, Inc.*,
No. 14-cv-063-LM, 2015 WL 1578881 (D.N.H. April 9, 2015) ...................................... 69

*Forcellati v. Hyland's, Inc.*,
  No. CV 12-1983-GHK MRWX, 2014 WL 1410264 (C.D. Cal. Apr. 9, 2014) ...................... 23

*Fournigault v. Indep. One Mortg. Corp.*,
  234 F.R.D. 641 (N.D. Ill. 2006) ................................................................................. 69

*Frank v. Eastman Kodak Co.*,
  228 F.R.D. 174 (W.D.N.Y. 2005) ........................................................................ 12, 15

*Freeman Industries, LLC, v. Eastman Chemical Co.*,
  172 S.W.3d 512 (Tenn. 2005) ................................................................................... 55

*Friedman v. Dollar Thrifty Automotive Group, Inc.*,
  304 F.R.D. 601 (D. Colo. 2015) ............................................................................... 56

*Geier v. M-Qube Inc.*,
  314 F.R.D. 692 (W.D. Wash. 2016) ......................................................................... 47

*Gen. Motors Corp. v. Bryant*,
  285 S.W.3d 634 (Ark. 2008) ............................................................................... 51, 52

*Gonzalez v. Drew Indus.*,
  750 F. Supp. 2d 1061 (C.D. Cal. 2007 ) ............................................................... 52, 53

*Gordon v. Sig Sauer, Inc.*,
  2019 WL 4572799 (S.D. Tex. Sept. 20, 2019) .......................................................... 46

*Greeley v. KLM Royal Dutch Airlines*,
  85 F.R.D. 697 (S.D.N.Y. 1980) ................................................................................ 14

*Green v. Green Mountain Coffee Roasters, Inc.*,
  279 F.R.D. 275 (D.N.J. 2011) ................................................................................... 57

*Guido v. L'Oreal, USA, Inc.*,
  284 F.R.D. 468 (C.D. Cal. 2012) .............................................................................. 44

*Guippone v. BH S&B Holdings LLC*,
  No. 09 CIV. 1029 CM, 2011 WL 1345041 (S.D.N.Y. Mar. 30, 2011) .................... 31

*Gulino v. Bd. of Educ. Of City School Dist. of City of New York*,
  907 F. Supp. 2d 492 (S.D.N.Y. 2012) ....................................................................... 74

*Guzman v. VLM, Inc.*,
  No. 07-CV-1126 JG RER, 2008 WL 597186 (E.D.N.Y. Mar. 2, 2008) .................. 66

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) ....................................................... 17, 63, 64

*Hall v. David H. Arrington Oil & Gas, Inc.*,
　No. 209-CV-0091 BSM, 2010 WL 1253383 (E.D. Ark. Mar. 25, 2010) ............................... 55

*Hanwha Corp. v. Cedar Petrochemicals, Inc.*,
　760 F. Supp. 2d 426 (S.D.N.Y. 2011) ..................................................................................... 23

*Hardgers-Powell v. Angels in Your Home LLC*,
　330 F.R.D. 89 (W.D.N.Y. 2019) ............................................................................................... 67

*Hasemann v. Gerber Prod. Co.*,
　331 F.R.D. 239 (E.D.N.Y. 2019) ................................................................................. 21, 39, 44, 45

*Henry Schein, Inc. v. Stromboe*,
　102 S.W.3d 675 (Tex. 2003) ...................................................................................................... 46

*Herrera-Amador v. New York City Police Dept.*,
　2021 WL 3012583 (E.D.N.Y. July 16, 2021) ........................................................................ 12

*Hilsley v. Ocean Spray Cranberries, Inc.*,
　2018 WL 6300479 (S.D. Cal. Nov. 29, 2018) ........................................................................ 64

*Hubbard v. Gen. Motors Corp.*,
　No. 95 CIV. 4362, 1996 WL 274018 (S.D.N.Y. May 22, 1996) ............................................. 53

*Iliadis v. Wal-Mart Stores, Inc.*,
　191 N.J. 88 (N.J. 2007) .............................................................................................................. 50

*In re Actiq Sales & Mktg. Practices Litig.*,
　307 F.R.D. 150 (E.D. Pa. 2015) ................................................................................................. 57

*In re Amla Litig.*,
　282 F. Supp. 3d 751 (S.D.N.Y. 2017) ....................................................................................... 59

*In re Amla Litigation*,
　320 F. Supp. 3d 578 (S.D.N.Y. 2018) ....................................................................................... 59

*In re Aqua Dots Prod. Liab. Litig.*,
　654 F.3d 748 (7th Cir. 2011) ................................................................................................. 70, 71

*In re Arizona Theranos, Inc., Litigation*,
　2020 WL 5435299 (D. Ariz. March 6, 2020) .......................................................................... 33

*In re Avon Anti-Aging Skincare Creams and Prods. Mkting. & Sales Pracs. Litig.*,
　2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) ......................................................................... 44

*In re Canon Cameras*,
　237 F.R.D. 357 (S.D.N.Y. 2006) ............................................................................................... 57

*In re ConAgra Foods, Inc.*,
  90 F. Supp. 3d 919 (C.D. Cal. 2015) ..................................................... 20, 25, 46, 56

*In re Dial Complete Mktg. & Sales Pracs. Litig.*,
  312 F.R.D. 36 (D.N.H. 2015) ..................................................................... 34, 36

*In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*,
  No. 16-02709-MD-W-GAF, 2019 WL 1418292 (W.D. Mo. Mar. 21, 2019) ......................... 24

*In re Flag Telecom Holdings, Ltd. Sec. Litig.*,
  574 F.3d 29 (2d Cir. 2009) .......................................................................... 11

*In re Flonase Antitrust Litig.*,
  692 F. Supp. 2d 524 (E.D. Pa. 2010) ............................................................... 13

*In re General Motors LLC Ignition Switch Litigation*,
  407 F. Supp. 3d 212, (S.D.N.Y. 2019) .............................................................. 63

*In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*,
  293 F.R.D. 21 (D. Me. 2013) ....................................................................... 70

*In re Kind LLC "Healthy & All Na*t." Litig.*,
  337 F.R.D. 581 (S.D.N.Y. 2021) ............................................................... passim

*In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*,
  422 F. Supp. 3d 194 (D.D.C. 2019) ................................................................ 25

*In re Morning Song Bird Food Litig.*,
  320 F.R.D. 540 (S.D. Cal. 2017) .................................................................. 58

*In re MyFord Touch Consumer Litig.*,
  46 F. Supp. 3d 936 (N.D. Cal. 2014) .............................................................. 53

*In re MyFord Touch Consumer Litig.*,
  291 F. Supp. 3d 936 (N.D. Cal. 2018) ............................................................. 63

*In re Namenda Indirect Purchaser Antitrust Litig.*,
  2021 WL 509988 (S.D.N.Y. Feb. 11, 2021) .......................................................... 58

*In re Nassau County Strip Search Cases*,
  461 F.3d 219 (2d Cir. 2006) ................................................................... 74, 75

*In re Nexium (Esomeprazole) Antitrust Litig.*,
  297 F.R.D. 168 (D. Mass. 2013) ................................................................... 66

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) ...................................................... 17, 18, 63

*In re NVIDIA GPU Litig.*,
  No. C 08-04312 JW, 2009 WL 4020104 (N.D. Cal. Nov. 19, 2009) ..................................... 52

*In re Polyurethane Foam Antitrust Litig.*,
  2014 WL 6461355 (N.D. Ohio Nov. 17, 2014) .................................................................. 65, 66

*In re POM Wonderful LLC*,
  No. ML 10–02199 DDP (RZx), 2014 WL 1225184 ................................................................ 59

*In re Scotts EZ Seed Litig.*,
  304 F.R.D. 397 (S.D.N.Y. 2015) ............................................................................... passim

*In re Static Random Access memory (SRAM) Antitrust Litig.*,
  264 F.R.D. 603 (N.D. Cal. 2009) .................................................................................... 66

*In re Terazosin Hydrochloride*,
  220 F.R.D. 672 (S.D. Fla. 2004) ..................................................................................... 66

*In re TFT-LCD (Flat Panel) Antitrust Litig.*,
  267 F.R.D. 583 (N.D. Cal. 2010) .................................................................................... 66

*In re Tobacco II Cases*,
  207 P.3d 20 (Cal. 2009) ......................................................................................... passim

*In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*,
  No. CV 2:11-07382, 2018 WL 497071 (D.N.J. Jan. 22, 2018) ......................................... 43, 56

*In re U.S. Foodservice Inc. Pricing Litig.*,
  729 F.3d 108 (2d Cir. 2013) ...................................................................................... 29, 30

*In re Vioxx Class Cases*,
  103 Cal. Rptr. 3d 83 (Ct. App. 2009) ............................................................................... 60

*In re Visa Check/MasterMoney Antitrust Litig.*,
  280 F.3d 124 (2d Cir. 2001) ........................................................................................... 68

*In re Volkswagen Timing Chain Products Liab. Litig.*,
  No. 16-2765 (JLL), 2017 WL 1902160 (D.N.J. May 8, 2017) ............................................... 49

*In re WorldCom, Inc. Sec. Litig.*,
  219 F.R.D. 267 (S.D.N.Y. 2003) ..................................................................................... 30

*In re Zurn Pex Plumbing Products Liability Litigation*,
  644 F.3d 604 (8th Cir. 2011) ......................................................................................... 49

*In re: Lenovo Adware Litig.*,
  2016 WL 6277245 (N.D. Cal. Oct. 27, 2016) ..................................................................... 63

*Johnson v. Mitsubishi Digital Elecs. Am., Inc.*,
  365 Fed. Appx. 830 (9th Cir. 2010) ........................................................ 57

*Joseph v. Gen. Motors Corp.*,
  109 F.R.D. 635 (D. Colo. 1986) ............................................................. 51

*Kaupelis v. Harbor Freight Tools USA, Inc.*,
  2020 WL 5901116 (C.D. Cal. Sept. 23, 2020) .................................. 63, 72

*Keegan v. Am. Honda Motor Co.*,
  284 F.R.D. 504 (C.D. Cal. 2012) ............................................................ 29

*Kelley v. Microsoft Corp.*,
  251 F.R.D. 544 (W.D. Wash. 2008) ........................................................ 47

*Kirkpatrick v. HomeAway.com Inc.*,
  2020 WL 7680558 (W.D. Tex. Apr. 21, 2020) ........................................ 46

*Krommenhock v. Post Foods, LLC*,
  334 F.R.D. 552 (N.D. Cal. 2020) .................................... 21, 25, 38, 63

*Kurtz v. Costco Wholesale Corp.*,
  768 Fed. App'x. 39 (2d Cir. 2019) ......................................................... 62

*Kurtz v. Costco Wholesale Corp.*,
  818 F. App'x 57 (2d Cir. 2020) ........................................................ 16, 62

*Kurtz v. Kimberly-Clark Corp.*,
  414 F. Supp. 3d 317 (E.D.N.Y. 2019) ............................... 16, 22, 23, 44

*Kurtz v. Kimberly-Clark Corp*,
  321 F.R.D. 482, 543 (E.D.N.Y. 2017) ............................... 17, 31, 45, 73

*Lakeside Feeders, Inc. v. Producers Livestock Marketing Ass'n*,
  666 F.3d 1099 (8th Cir. 2012) ................................................................ 55

*Lee v. Carter-Reed Co., L.L.C.*,
  *et al.*, 203 N.J. 496 (N.J. 2010) ............................................................ 50

*Lewis v. Lewis*,
  189 P.3d 1134 (Colo. 2008) ................................................................... 55

*Lohr v. Nissan N. Am., Inc.*,
  2017 WL 1037555 (W.D. Wash. Mar. 17, 2017) .................................... 54

*Marcus v. BMW of North America, LLC*,
  687 F.3d 583 (3rd Cir. 2012) ................................................................. 43

*Martin v. Home Depot U.S.A., Inc.*,
   225 F.R.D. 198 (W.D. Tex. 2004) ........................................................................ 46

*Matter of Cadillac V8-6-4 Class Action*,
   461 A.2d 736 (N.J. 1983)............................................................................... 50, 51

*Maxwell v. Tyson Foods, Inc.*,
   No. 1:08cv00017-JAJ-TJS, 2012 WL 12541110 (S.D. Iowa July 19, 2012) ......................... 56

*Mazza v. Am. Honda Motor Co.*,
   666 F.3d 581 (9th Cir. 2012) .............................................................................. 17

*McMahon v. Novello,*
   192 F. Supp. 2d 54 (S.D.N.Y. 2001)....................................................................... 23

*Meredith v. Medtronic, Inc.*,
   318CV00127RGEHCA, 2019 WL 6330677 (S.D. Iowa Oct. 25, 2019)................................ 54

*Midwest Dredging Co. v. McAninch Corp.*,
   424 N.W.2d 216 (Iowa 1988) ............................................................................. 54

*Minter v. Wells Fargo Bank, N.A.*,
   279 F.R.D. 320 (D. Md. 2012)............................................................................. 13

*Motal v. Allstate Prop. & Cas. Ins. Co.*,
   No. 4:20-CV-01011 KGB, 2021 WL 724564 (E.D. Ark. Feb. 24, 2021) .............................. 34

*Mounce v. CHSPSC, LLC*, 5:15-CV-05197,
   2017 WL 4392048 (W.D. Ark. Sept. 29, 2017)...................................................... 33, 34

*Murphy v. Gospel for Asia, Inc.*,
   327 F.R.D. 227 (W.D. Ark. 2018) ......................................................................... 34

*Nabisco v. Warner-Lambert Co.*,
   32 F. Supp. 2d 690 (S.D.N.Y. 1999)....................................................................... 28

*Nilon v. Nat.-Immunogenics Corp.*,
   No. 312CV00930LABBGS, 2014 WL 12570897 (S.D. Cal. Apr. 15, 2014)...................... 22, 38

*Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*,
   No. 0:17-CV-62051-UU, 2018 WL 3109632 (S.D. Fla. Apr. 5, 2018)................................. 54

*Pefanis v. Westway Diner, Inc.*,
   No. 08 CIV 002 DLC, 2010 WL 3564426 (S.D.N.Y. Sept. 7, 2010)................................... 29

*Perth Amboy Iron Works, Inc., v. American Home Assurance Co.*,
   226 N.J. Super. 200 (N.J. App. Div. 1988) ............................................................... 43

*Peterson v. Cellco Partnership*,
   164 Cal. App. 4th 1583 (2008) ........................................................ 55

*Pettit v. Procter & Gamble Co.*,
   No. 15-CV-02150-RS, 2017 WL 3310692 (N.D. Cal. Aug. 3, 2017) ...................................... 36

*Philip Morris Companies, Inc. v. Miner*,
   462 S.W.3d 313 (Ark. 2015).......................................................... 34, 35

*Praxair, Inc. v. Gen. Insulation Co.*,
   611 F. Supp. 2d 318 (W.D.N.Y. 2009) ................................................ 53

*Price v. L'Oreal USA, Inc.*,
   No. 17 CIV. 614 (LGS), 2018 WL 3869896 (S.D.N.Y. Aug. 15, 2018).................... 26, 27, 65

*Price v. L'Oreal USA, Inc.*,
   No. 17 CIV. 614 (LGS), 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020)................................ 26

*Red v. Kraft Foods, Inc.*,
   No. CV 10–1028–GW(AGRx), 2012 WL 8019257 (C.D. Cal. Apr. 12, 2012) ...................... 59

*Rexall Sundown, Inc. v. Perrigo Co.*,
   651 F. Supp. 2d 9 (E.D.N.Y. 2009) .................................................. 24

*Ries v. Arizona Beverages USA LLC*,
   287 F.R.D. 523 (N.D. Cal. 2012)....................................... 22, 36, 38, 73

*Rikos v. Procter & Gamble Co.*,
   799 F.3d 497 (6th Cir. 2015) ........................................................ 58

*Roach v. T.L. Cannon Corp.*,
   778 F.3d 401 (2d Cir. 2015)...................................................... 57, 58

*Robidoux v. Celani*,
   987 F.2d 931 (2d Cir. 1993)........................................................ 12

*Robinson v. Metro-North Commuter R.R.*,
   267 F.3d 147 (2d Cir. 2001)...................................................... 74, 75

*Rodriguez v. It's Just Lunch Int'l*,
   No. 07-CV-9227 (SHS), 2018 WL 3733944 (S.D.N.Y. Aug. 6, 2018)................................ 58

*Rougier v. Applied Optoelectronics, Inc.*,
   2019 WL 6111303 (S.D. Tex. Nov. 13, 2019) ........................................ 66

*Saavedra v. Eli Lilly and Co.*,
   2014 WL 7338930 (C.D. Cal. Dec. 18, 2014) ........................................ 63

*Samuel-Bassett v. Kia Motors Am., Inc.*,
  34 A.3d 1 (Pa. 2011) ................................................................................ 51

*Sanders v. Apple Inc.*,
  672 F. Supp. 2d 978 (N.D. Cal. 2009) ...................................................... 13

*Schering Corp. v. Pfizer Inc.*,
  189 F.3d 218 (2d Cir. 1999)................................................................. 28, 61

*Scott v. Dutton-Lainson Co.*,
  774 N.W.2d 501 ......................................................................................... 54

*Seijas v. Republic of Argentina*,
  606 F.3d 53 (2d Cir. 2010)......................................................................... 58

*Shariff v. Goord*,
  235 F.R.D. 563 (W.D.N.Y. 2006).............................................................. 14

*Sharpe v. A&W Concentrate Co.*,
  No. 19-CV-768 (BMC), 2021 WL 3721392 (E.D.N.Y. July 23, 2021) .................. 18

*Siemer v. Associates First Capital Corp.*, No.,
  CV97-281, 2001 WL 35948712 (D. Ariz. March 30, 2001) ........................... 32, 33

*Simpson Housing Solutions, LLC v. Hernandez*,
  347 S.W.3d 1 (Ark. 2009) .......................................................................... 49

*Small v. Lorillard Tobacco Co.*,
  720 N.E.2d 892 (N.Y. 1999)....................................................................... 44

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ................................................................... 38

*Stern v. DoCircle, Inc.*,
  No. SACV 12-2005 AG JPRX, 2014 WL 486262 (C.D. Cal. Jan. 29, 2014) .......... 69

*Stratton v Am. Med. Sec., Inc.*,
  266 F.R.D. 340 (D. Ariz. 2009) .................................................................. 32

*Suchanek v. Sturm Foods, Inc.*,
  No. 11-cv-565-NJR-RJD, 2018 WL 6617106 (S.D. Ill. July 3, 2018) ............... 22, 24

*Swindell v. Crowson*,
  712 So. 2d 1162 (Fla. Dist. Ct. App. 1998) .............................................. 55

*Sykes v. Mel S. Harris & Assocs. LLC*,
  780 F.3d 70 (2d Cir. 2015)..................................................................... 1, 14

*Tait v. BSH Home Appliances Corp.*,
    289 F.R.D. 466 (C.D. Cal. 2012) ................................................................. 38, 54

*Tershakovec v. Ford Motor Co.*,
    No. 17-21087-CIV, 2021 WL 2700347 (S.D. Fla. July 1, 2021) ....................... 47, 51

*Tomka v. Hoechst Celanese Corp.*,
    528 N.W.2d 103 (Iowa 1995) ............................................................................ 54

*Torres v. Nissan North America Inc.*,
    No. CV 15-03251 RGK (FFMx), 2015 WL 5170539 (C.D. Cal. Sept. 1, 2015) ....................... 56

*Tropical Sails Corp. v. Yext, Inc.*,
    No. 14 CIV. 7582, 2017 WL 1048086 (S.D.N.Y. Mar. 17, 2017) ......................... 56

*Trustmark Ins. Co. v. Bank One, Arizona, NA*,
    48 P.3d 485 (Ariz. Ct. App. 2002) ...................................................................... 55

*Tyson Foods, Inc. v. Bouaphakeo*,
    136 S. Ct. 1036 (2016) ............................................................................... 15, 16

*U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*,
    800 F. Supp. 2d 515 (S.D.N.Y. 2011) ........................................................... 28, 29

*United States v. City of New York*,
    No. 07-cv-2067 (NGG) (RLM), 2011 WL 3174084 (E.D.N.Y. July 8, 2011) ........................ 74

*Valentino v. Carter-Wallace, Inc.*,
    97 F.3d 1227 (9th Cir. 1996) ............................................................................. 74

*Vega v. T-Mobile USA, Inc.*,
    564 F.3d 1256 (11th Cir. 2009) ......................................................................... 56

*Ventures Edge Legal PLLC v. GoDaddy.com LLC*,
    2018 WL 619723 (D. Ariz. Jan. 30, 2018) ............................................................ 32

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
    643 F. Supp. 2d 1256 (W.D. Wash. 2009) ............................................................ 48

*Wal-Mart Stores, Inc. v. Dukes*,
    131 S. Ct. 2541 (2011) ..................................................................................... 74

*Waste Mgmt. Holdings, Inc. v. Mowbray*,
    208 F.3d 288 (1st Cir. 2000) ............................................................................. 29

*Weidenhamer v. Expedia, Inc.*,
    2015 WL 7157282 (W.D. Wash. Nov. 13, 2015) ................................................... 47

*Weiner v. Snapple Beverage,*
  *Co.*, 2010 WL 3119452 (S.D.NY. Aug. 5, 2010) ...................................................... 44

*Williams v. Cty. of Niagara,*
  No. 06-CV-291A, 2008 WL 4501918 (W.D.N.Y. Sept. 29, 2008) .......................... 69

*Wright v. Brooke Group Ltd.,*
  652 N.W.2d 159 (Iowa 2002) ................................................................................ 54

*Wright v. Publishers Clearing House, Inc.,*
  372 F. Supp. 3d 61 (E.D.N.Y. 2019) ............................................................... 44, 47

*Yi Xiang v. Inovalon Holdings, Inc.,*
  327 F.R.D. 510 (S.D.N.Y. 2018) ........................................................................... 17

## **Statutes**

15 U.S.C. § 2068(a)(2)(B) ......................................................................................... 61

California Civil Code §§ 1792 and 1791.1 ................................................................ 52

N.Y. Gen. Bus. Law § 349 ................................................................................... 43, 59

## **Rules**

Fed. R. Civ. P. 23(a) .................................................................................................. 11

Fed. R. Civ. P. 23(a)(4) ............................................................................................. 11

Fed. R Civ. P. 23(b)(2) ..................................................................................... 8, 73, 74

Rule 23(b)(3) ..................................................................................... 15, 16, 70, 75

Rule 23(c)(4) ...................................................................................................... 74, 75

## **Other Authorities**

7AA Wright & Miller, *Federal Practice & Procedure* § 1790 (3d ed. 2005) ............................. 75

## PRELIMINARY STATEMENT

Plaintiffs begin with what is ***not*** at issue on their Motion for Class Certification (ECF 125). In order to avoid merits discovery, Defendants conceded that whether their advertising and marketing of the Rock 'n Play Sleeper ("RNPS"), which they sold to almost five million unsuspecting consumers as a product safe and suitable for their infants to sleep, was materially misleading is a common question. Defendants also conceded that whether the RNPS was defective and dangerous for infant sleep—something that has now been confirmed by the Consumer Protection Safety Commission ("CPSC") and Congress—is a common question. Finally, Defendants conceded their state of mind—their knowledge and intent—is a common question. *Id.* at 20-21. The answers to these overarching questions of liability, which predominate because they turn solely on Defendants' conduct, will drive the resolution of this entire litigation, and constitute sufficient grounds for this Court to grant Plaintiffs' motion for class certification. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015).

Plaintiffs move to certify fourteen classes.[1]  Plaintiffs who purchased RNPS from retailers ("Purchaser Plaintiffs") move to certify eleven Statewide Classes seeking damages for consumers under one or more state laws ("Purchaser Classes"). Plaintiffs who are owners of RNPS, such as those who purchased secondhand or received RNPS as gifts ("Owner Plaintiffs"), along with Purchaser Plaintiffs, seek to certify a Nationwide Class under Rule 23(b)(2) ("Injunctive Relief Class") seeking to improve Defendants' shameful recall, which had such a low participation rate that there are still approximately 4.4 million potentially deadly Rock 'n Play Sleepers in unsuspecting consumers' hands. In the alterative, Plaintiffs seek to certify Nationwide Purchaser Class under Rule 23(c)(4) on liability issues ("Nationwide Issue Class"). As detailed below,

---

[1] The Class definitions are set forth in Plaintiffs' Opening Brief (ECF 125-1 at 19) and a chart of the classes is contained in Appendix A to Plaintiff's Opening Brief.

Plaintiffs have established that each of the Rule 23 requirements are met with respect to each class.

Defendants cannot dispute, try as they might, that they marketed the RNPS to consumers as a safe infant sleeper, not only through their advertising on the product's box, their brand reputation, on retailer websites and social media, but also in the *very name of the product*. They also do not and cannot dispute they never disclosed during the decade that the product was the market that the use of the Sleeper had resulted in scores of infant injuries (plagiocephaly and torticollis) and even deaths. Thus, *every* member of the Purchaser Classes paid for a product that was sold, marketed, and priced as a safe infant sleeper. Yet, *every* single member of the Purchaser Classes *purchased* a product that was not safe, had not been properly researched or tested by Defendants, and that tragically resulted in the deaths of approximately ninety-seven infants.

Having no basis to contest the uniformity and materiality of their misrepresentations, misleading statements, and omissions, Defendants now seek to rely on inconsequential differences some Plaintiffs may have had in their experiences, such as different understandings of infant sleep safety, being told different things about safe infant sleep by their pediatricians, and slightly different uses of the product. However, a wealth of authority holds that these sorts of purported differences are irrelevant to class certification, especially where, as here, the relevant consumer protection statutes apply a presumption of reliance under the circumstances presented here, or do not require reliance at all. Here, Defendants' uniform marketing of the RNPS misled consumers into believing it was something it was not: a safe infant sleeper. Indeed, Plaintiffs' testimony confirms that they believed the RNPS was a safe product, and they would not have purchased or used it had they known it was potentially deadly for their babies.

Defendants also seek to rely on the fact that some Plaintiffs used, and Class members could use, the Rock 'n Play *Sleeper* for purposes other than infant sleep. This argument fails for several

reasons. *First*, Plaintiffs do not claim that Defendants violated consumer protection statutes by advertising the Rock 'n Play Sleeper when it could not actually be used for sleep.  Rather, because RNPS places infants at a 30-degree incline, it is inherently unsafe and cannot be used without exposing infants to danger.  It is common knowledge that infants can fall asleep routinely, and suddenly (as Fisher-Price's own General Manger admitted to Congress), such that the product is dangerous even if a parent places their infant in it briefly while doing something else. Indeed, tragically, one of the Plaintiffs in this case lost her grandchild after she had been placed in the product for just a few minutes. *Second*, the fact that some Class members may have used the RNPS for purposes other than sleep is irrelevant and does not change the fact that *every* Purchaser Plaintiff and Class member purchased a product advertised as a safe infant sleeper, but *none* of them actually received one. This is the crux of every relevant state's consumer fraud statute, and this fact is universal to all Purchaser Plaintiffs and Class members. Defendants cannot slice and dice away these uniform facts in their futile attempt to resist class certification in a case involving one set of uniform misrepresentations, misleading statements and omissions made to one group of consumers for a single product, the Rock 'n Play Sleeper, that is sold at same or similar prices.

As detailed below, Defendants' additional arguments against class certification—including that, in a straightforward case like this, damages cannot be calculated on a class-wide basis—are equally infirm.  Plaintiffs submit their motion for class certification should be granted in all respects.

## STATEMENT OF FACTS

Plaintiffs provided an extensive factual background of this action in their memorandum in support of class certification. *See* ECF 125-1 ("Opening Brief" or "Pl. Br.") at 4-17. Here, Plaintiffs will address some factual developments that occurred after their Opening Brief was filed on February 8, 2021, and address some of the factual issues raised in Defendants' memorandum in

opposition to class certification [ECF 165 ("Defendants' Brief" or "Def. Br.")].

I.  **The U.S House of Representatives Oversight Committee Issues a Scathing Expose into Defendants' Choice to Place Profits over Infant Lives**

On June 7, 2021, the U.S. House of Representatives Committee on Oversight and Reform (the "Oversight Committee") issued a 38-page report entitled "Infant Deaths in Inclined Sleepers: Fisher-Price's Rock 'n Play Reveals Dangerous Flaws in U.S. Product Safety" (the "Report"). *See* Ex. 1 (Report).[2] The Report is the culmination of the Oversight Committee's two-year investigation of Defendants, following "media report that dozens of infants died in inclined sleep products because of inadequate safety research and product designs that conflicted with longstanding guidelines on safe infant sleep." *Id.* at 1. The Oversight Committee obtained "thousands of documents" from several manufacturers, including Defendants, and conducted interviews with five current and former Fisher-Price employees.[3] The Report's conclusion was damning:

> Fisher-Price failed to ensure the Rock 'n Play was safe before bringing it to market, ignored critical warnings from pediatricians, parents, and foreign regulators that the product was dangerous, and continued to market it for overnight sleep despite clear evidence that this put infants at risk of serious harm or death . . . . ***Fisher-Price's poor safety practices and lack of meaningful oversight allowed the Rock 'n Play to stay on the U.S. market for a total of 10 years, during which time more than fifty infants died using the product***—while the company raked in at least $200 million in revenue.
>
> *   *   *
>
> Fisher-Price did not take adequate steps to ensure its product was safe before bringing it to market, ignored warnings and evidence that the product may be unsafe, and ***marketed the Rock 'n Play for overnight sleep despite evidence that sleeping at an incline could put infants at risk of serious harm or death***.

---

[2] Numbered Exhibits ("Ex.") can be found as attachments to the Declaration of Demet Basar ("Basar Reply Dec."), attached hereto as Exhibit A, which also includes descriptions and abbreviations used herein.

[3] Plaintiffs attempted to obtain transcribed copies of these interviews from Defendants, but Defendants and their counsel claim that they were not provided such copies by the Oversight Committee and have no means by which to obtain them. *See* Ex. 2 (Mattel Interrogatory Responses); Ex. 3 (Fisher Price Interrogatory Responses).

Ex. 1 (Report) at i (emphasis added). The Report also found that Fisher-Price's internal Safety Committee warned about the need to research the safety of the RNPS, but "[t]he company never completed any research establishing that it was safe for infants to sleep at an angle before bringing the product to market." *Id.* at ii. The Report highlights that Fisher-Price's testing of the RNPS was limited to 62 infants,[4] and did not involve *any* medical doctors in analyzing the test results. *Id.*

On the same day the Report became public, Fisher-Price General Manager Chuck Scothon and Mattel CEO Ynon Kreiz testified before the Oversight Committee. *See* Ex. 4 (HCOR Tr.). Mr. Scothon testified that "[n]ewborns can sleep as much as 18 hours a day," and "a baby can fall asleep almost anywhere," such that "there are products designed specifically for overnight, unsupervised sleep." *See id.* at 7. Mr. Scothon testified that the "Rock 'N Play was designed, marketed and sold as a product intended for sleep." *Id.*

## II.     The RNPS is Unsafe for Infant Sleep such that it is Worthless

Despite their own General Manager admitting before the Oversight Committee that the RNPS was "designed, marketed and sold as a product intended for sleep," Defendants take an entirely contradictory position in their brief, claiming that the "RNPS is a multi-use product" and was marketed as such. Def. Br. at 7. Defendants claim that consumers, including Plaintiffs, used the RNPS for other purposes, such as "play," as a "parking spot," for soothing, and as a "place for babies with reflux." *Id.* at 9. Defendants also make the disingenuous point that because some Plaintiffs used the RNPS primarily for naps, rather than overnight sleep, they were somehow not harmed. *Id.* at 14. However, as Mr. Scothon's testimony acknowledged, infants fall asleep suddenly and often such that these other purposes are irrelevant because *a product that is dangerous for infant sleep is not safe for infants*. Ex. 4 (HCOR Tr.) at 2. Tragically, infants have

---

[4] The parents of the 62 infants were asked to observe their infants using the product at home and to answer a series of questions. Ex. 1 (Report) at 11.

been injured or died in the RNPS even during naps, or when the infant fell asleep in the RNPS after being awake when placed in the product. *See* Consolidated Class Action Complaint ("CAC"), ECF 19 ¶ 152. In fact, Drover's grandchild died after being placed in a RNPS for 10 minutes while her daughter put her other grandchildren to bed. *See* Ex. 5 (Drover-Mundy Compl.) ¶¶ 2, 62. A product marketed as an infant "Sleeper" that is potentially *deadly and injurious* for babies that fall asleep in it is a worthless product. Indeed, Defendants as well as other manufacturers have recalled other inclined infant products due to the dangers associated with them. Exs. 28-50.

## III.    Experts Confirm Defendants' Marketing was Material to Consumers

In rebuttal to the flawed consumer survey of Defendants' expert Dr. Kivetz (*see* Argument Section II.B.4.), Plaintiffs retained Dr. J. Michael Dennis, who has worked as a survey research expert for more than twenty years. Ex. B (Report of J. Michael Dennis, Ph.D. "Dennis Report") ¶ 14. Dr. Dennis designed and conducted a consumer survey consisting of over 500 participants who were selected to participate in the survey using similar procedures to those used by Dr. Kvietz. *Id.* at ¶¶ 83-85, 116. Survey participants were exposed to the original product packaging of an RNPS that was sold in the marketplace. *Id.* at ¶ 93. Dr. Dennis's consumer survey found that 89.7% and 91.9% of participants perceived the RNPS packaging as communicating that the product is "safe for babies to use" and "intended to be able to sleep and nap in it," respectively. *Id.* at ¶ 99. Importantly, 85.2% indicated that their understanding of the RNPS packaging to communicate that "it is intended for babies to be able to sleep and nap in it" made them likely to purchase the product. *Id.* at ¶ 102. Likewise, 82.5% indicated that their understanding of the packaging to communicate that the RNPS is "Safe for babies to use" made them likely to purchase it. *Id.*

Additionally, once participants indicated their purchase intentions based on exposure to the RNPS packaging, they were shown a disclaimer stating the product "carries the risk of infant

fatalities or other serious health problems." *Id.* at ¶¶ 103-05. The wording of the disclaimer is conservative (*i.e.*, favorable to Defendants), given that it does not actually advise participants that infant fatalities have occurred in the product, that scores of infants developed plagiocephaly and torticollis from being in the product, or that the product was not adequately tested prior to production. *Id.* Once respondents viewed a simple disclaimer of a "risk," their intention to purchase the RNPS decreased by a staggering 28.2 percentage points. *Id.* at ¶ 106. Notably, the number of participants who indicated their purchase intention as "Extremely Unlikely" before viewing the disclaimer (24 participants or 4.1% of the sample) increased substantially when viewing the disclaimer (118 participants or 20.4% of the sample). *Id.* As a result of his survey, Dr. Dennis concluded that Defendants' misrepresentations and omissions were material to consumers' purchasing decisions. *Id.* at ¶¶ 127-28.

Likewise, Plaintiffs' other rebuttal expert, Bruce G. Silverman, who has over 50 years of professional experience in the marketing industry, concludes that Defendants' misleading claims were material to consumers. Ex. C (Report of Bruce G. Silverman "Silverman Report") at ¶¶ 8, 11. First, the use of "sleeper" in the name of the RNPS communicates the primary use of the product, which would be material to consumers. *Id.* at ¶¶ 41-67. Any other uses or attributes of the RNPS would be secondary. *Id.* at ¶ 143. Second, the images and other claims on the RNPS packaging were material to consumers because, as Mr. Silverman explains, "product labels are the last means of communication with consumers before" a purchase decision is made. *Id.* at ¶¶ 39, 68-88. Indeed, claims and graphics on packaging "help close the sale by providing the rationales consumers need to make an informed purchase decision." *Id.* at ¶ 66. Third, Mr. Silverman explains that, based on his experience, "safety is always an issue" for consumers of infant products. *Id.* at ¶ 73. Fourth, Fisher-Price's brand is associated with trust and safety that was conveyed

through Defendants' marketing such that it was material to consumers. *Id.* at ¶¶ 89-110. In addition to its marketing at the point of sale, Defendants employed other marketing methods that similarly conveyed the misleading claim that the RNPS was safe, including print and on-line ads, videos for on-line and social media use, paid influencers and bloggers (*i.e.* word of mouth). *Id.* at ¶¶ 111-25. Lastly, Mr. Silverman explains that Defendants' marketing materials (including the packaging) would not have alerted consumers of the dangers of the RNPS and, had consumers known of the true dangers, they would not have purchased RNPS. *Id.* at ¶¶ 126-136.

## IV.   Plaintiffs and Class Members All Purchased or Used RNPS Because They Thought it Was Safe for Infant Sleep

Defendants devote several pages of their brief to discussing differences between some versions of the RNPS (some vibrated, others did not, etc., *see* Def. Br. at 5), the advertising that Plaintiffs did or did not see (*id.* at 14), the way RNPS were displayed at various retail stores. (*id.* at 10-11) and the way Plaintiffs "acquired the RNPS" (*id.* at 12-16). These purported differences are irrelevant for class certification. What is relevant is that as a result of Defendants' Marketing Statements,[5] Safety Message, and trust in the Fisher-Price brand, all Plaintiffs believed they were purchasing or using a safe infant Sleeper, yet none of them received one.[6]

### A.   Purchaser Plaintiffs Purchased the RNPS Believing it was Safe for Infant Sleep

Despite Defendants' disingenuous arguments to the contrary (Def. Br. at 11), all Purchaser

---

[5] Unless defined herein, capitalized terms used herein have the same meanings and definitions as set forth in Plaintiffs' Opening Brief.

[6] With respect to the Injunctive Relief Class Plaintiffs (*i.e.* all purchasers and owners of the RNPS), they all testified that they owned the RNPS and believed the Recall to be insufficient, and thus have met the standard for certification pursuant to Fed. R Civ. P. 23(b)(2). *See* Ex. 6 (Purchaser Tr. Table) at Column G; Ex. 7 (Owner Tr. Table) at Column G.  The Injunctive Relief Class are all eligible to participate in the Recall and seek injunctive relief to improve it.

Plaintiffs[7] purchased at least one *new* RNPS from either an online or a brick-and-mortar retailer. Ex. 6 (Purchaser Tr. Table) at Column A. While Hanson and Kaden both purchased RNPSs secondhand, Defendants neglect that both *also* testified they purchased a *new* RNPS, just as other Purchaser Plaintiffs. Ex. 17 (Kaden Tr.) at 94:25-95:4; Ex. 14 (Hanson Tr.) at 106:24-107:7.[8]

Despite minor differences in the style, color, extraneous features, and price of their RNPS, all of the Purchaser Plaintiffs testified that they purchased the RNPS because they believed the product was safe, including for sleep. *See* Ex. 6 (Purchaser Tr. Table) at Column D. All of the Purchaser Plaintiffs testified that their beliefs were based on the name of the product (the Rock 'n Play *Sleeper*), text on the RNPS's box or the retailer websites, and/or imagery depicting sleeping babies (and sleeping parents) on the box. *Id.* at Columns B-C. That some Plaintiffs may have heard about the RNPS from an Instagram influencer, and some may have heard about it from family and friends (*see* Def. Br. at 13-14) is of no moment. Ex. C (Silverman Report) at ¶ 125. Nor is it relevant that some Plaintiffs may have been told different information about safe sleep practices by their pediatricians (*see* Def. Br. at 15-16; *but see* Section II.B.2, *infra*). The only relevant point is that *all* Purchaser Plaintiffs and Class members purchased a device called a Sleeper believing that it was safe for infant sleep.

Further, all but one of the Purchaser Plaintiffs who were asked testified that they associated the Fisher-Price brand with safety and trust. Ex. 6 (Purchaser Tr. Table) at Column E. This is

---

[7] The Purchaser Plaintiffs who purchased a RNPS are Alfaro (NY), Barton (AZ), Drover (PA), Flores (CA), Hanson (IA), Nowlin (AR), Kaden (CA), Pasternacki (CO), Huey (FL), Nadel (NY), Willis (TN), and Shaffer (WA). The Injunctive Relief Plaintiffs include the Purchasers Plaintiffs, as well as Owner Plaintiffs Cuddy, Fieker, Mandley, Mulvey, Poppe, Simmonds, Jacoby, and Wray.

[8] Defendants also note that Simmonds purchased her RNPS used, but Simmonds is not a member of the Purchaser Classes and only seeks injunctive relief on behalf of the Injunctive Relief Class. *See* Pl. Br. Appx. A.

unsurprising, given that Fisher-Price vigorously worked to ensure that its brand is synonymous with high-quality, safe products for children and infants. CAC ¶¶ 196-204; Pl. Br. at 9; Ex. 4 (HCOR Tr.) at 10. Indeed, a consumer survey conducted by Mintel (which defense expert Dr. Kivetz considers reputable) found that consumers associate the Fisher-Price brand with safety, which was the primary concern of consumers buying baby products. Ex. 54 (Mintel Study) at 40, 45; Ex. 51 (Kivetz Tr.); 288:1-292:4; 313:8-321:2. This trust, combined with the use of the word "Sleeper" in the RNPS's name and the packaging describing and depicting sleeping infants, led Purchaser Plaintiffs and Class members to believe that the RNPS would be safe.

As set forth in the CAC, none of the Purchaser Plaintiffs nor the Class members would have purchased the RNPS had they known that the RNPS was unsafe for infant sleep or lead to infant deaths. CAC ¶¶ 24-46. Plaintiffs who were asked testified similarly. *See* Ex. 6 (Purchaser Tr. Table) at Column G. Indeed, Purchaser Plaintiffs who were still using the RNPS when they learned of its danger immediately stopped using the RNPS.[9]

### B. Owner Plaintiffs Would Not Have Used the RNPS had the Dangers Been Disclosed

The Owner Plaintiffs[10] who received RNPS as gifts or purchased them secondhand, testified similarly to Purchaser Plaintiffs. Owner Plaintiffs who received the RNPS as gifts after placing it on their baby registries testified that they selected the RNPS as a gift because they believed that it would be safe for infant sleep after seeing advertising and/or noting that Defendants named the product a "Sleeper." S*ee* Ex. 7 (Owner Tr. Table) at Columns B-D. All of the Owner Plaintiffs who were asked testified that they would never have used the RNPS had the dangers been disclosed. *Id.* at Column G. Moreover, the Owner Plaintiffs testified that Defendants' Recall

---

[9] *See, e.g.*, Ex.8 (Alfaro Tr.) at 143:13-18; Ex. 24 (Shaffer Tr.) at 91:13-15; 101:1-7; 134:11-22**.**
[10] The Owner Plaintiffs are Cuddy, Fieker, Mandley, Mulvey, Poppe, Simmonds, Jacoby, and Wray.

was insufficient and ineffective. *Id.* at Column H.

## ARGUMENT

I.    **The Rule 23(a) Requirements Are Satisfied**

In their Opening Brief, Plaintiffs demonstrated the four prerequisites established in Rule

23(a) were satisfied, namely (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy.

*See* FED. R. CIV. P. 23(a). Defendants do not dispute numerosity or commonality as these

requirements are plainly met. Nor do Defendants credibly challenge Plaintiffs' typicality and

adequacy. As demonstrated below and in the Opening Brief, the typicality and adequacy

requirements of Rule 23(a) are clearly met here.

### A.   The Typicality and Adequacy of Most Plaintiffs are Unchallenged

Class representatives are required to "fairly and adequately" represent a class. FED. R. CIV.

P. 23(a)(4). Adequacy is determined based on two factors: (1) whether the plaintiff's interests are

antagonistic to those of the other class members and (2) whether the plaintiff's attorneys are

qualified, experienced, and able to conduct the litigation. *In re Flag Telecom Holdings, Ltd. Sec.

Litig.*, 574 F.3d 29, 35 (2d Cir. 2009). Defendants do not dispute that Plaintiffs' counsel is

qualified.[11] As described below, Plaintiffs also meet the adequacy requirement.

Despite vague assertions that Huey and Nadel are inadequate representatives (Def. Br. 20,

44),[12] Defendants have not argued that these Plaintiffs' interests are antagonistic to the other class

---

[11] In addition to Dee Miles and Demet Basar, Plaintiffs now move to appoint James E. Eubank as one of Plaintiffs' proposed co-class counsel in place of Lydia Reynolds (ECF 202), who has withdrawn as Plaintiffs' counsel upon changing employment. ECF 185. Plaintiffs are contemporaneously filing an amended notice of motion.

[12] As Defendants identify (Def. Br. at 20), Mulvey testified that she received her RNPS as a gift and did not purchase a RNPS. As such, Plaintiffs move for her to represent the Injunctive Relief Class and no longer move for her to represent the New York Purchaser Class. Defendants also claim Texas Plaintiff Black is an inadequate representative because she allegedly purchased an inclined sleeper from a different manufacturer rather than a RNPS. If it is conclusively established

members. Defendants' only substantive challenge to the adequacy of *any* of the twenty-one Plaintiffs is Alfaro, Def. Br. at 19, but that challenge is readily defeated. *See* Section I.D., *infra*. By failing to challenge the adequacy of the other Plaintiffs, Defendants concede their adequacy to serve as Class representatives.[13] *See, e.g.*, *Herrera-Amador v. New York City Police Dept.*, 2021 WL 3012583, at *18 (E.D.N.Y. July 16, 2021) (finding that party "concedes through silence" arguments by its opponent that it fails to address); *Cole v. Blackwell Fuller Music Publ'g, LLC*, 2018 WL 4680989, at *7 (S.D.N.Y. Sept. 28, 2012) (same).

Additionally, Defendants' arguments concerning some Plaintiffs' typicality are based exclusively on attacking the merits of Plaintiffs' claims, which also falls flat. *See* Sections I.B-D. & II.D-G., *infra*. Typicality merely requires that "each class member's claim arises from the same course of events, and each class member makes similar legal arguments." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 182 (W.D.N.Y. 2005). "[T]he typicality requirement is not highly demanding" because "the claims only need to share the same essential characteristics, and need not be identical" *In re Kind LLC "Healthy & All Nat." Litig.*, 337 F.R.D. 581 (S.D.N.Y. 2021) (citing *Robidoux v. Celani*, 987 F.2d 931, 936-37 (2d Cir. 1993)). "When it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, the typicality requirement is usually met irrespective of minor variations in the fact patterns underlying the individual claims." *Id.* Here, Defendants' misleading claims equally affected Purchaser Plaintiffs and the Class members who purchased RNPS.

---

this is the case, Plaintiffs will promptly move to withdraw her as a proposed Purchaser Plaintiff and substitute a Texas purchaser as a class representative in her stead.

[13] Plaintiffs whose adequacy is conceded: Purchaser Plaintiffs Alfaro, Barton, Drover, Flores, Hanson, Nowlin, Kaden, Pasternacki, Willis, and Shaffer as well as Owner Plaintiffs Cuddy, Fieker, Mandley, Poppe, Simmonds, Jacoby, and Wray.

**B. Huey is Typical of the Florida Class**

Defendants' claim that Huey did not use her own money to purchase a RNPS (Def. Br. at 21) is belied by her deposition testimony that she used her father's card to purchase a RNPS because she did not have a card to use at the time, but she reimbursed her father in cash, which Defendants gloss over in a footnote. [14, 15] Ex. 15 (Huey Tr.) at 142:25-143:21. As such, Huey spent her own money on her RNPS. Defendants fail to cite any authority to support its argument that Huey is atypical because of this reimbursement. [16] Further, Huey's claims arise from Defendants' uniform marketing of the RNPS, just as other Florida Class Members; thus, typicality is satisfied.

**C. Hanson is Typical of the Iowa Class**

Defendants claims that Hanson's claims are time-barred and subject to a unique defense such that her claims are not typical of the Iowa class (Def. Br. at 21), and that individualized issues predominate. Def. Br. at 31. In so arguing, Defendants essentially ask this Court to rule on the tolling issue before certification of the class, which would be premature as "the merits of [Plaintiffs'] equitable tolling [is] not dispositive for the issue of class certification." *Minter v. Wells Fargo Bank, N.A.*, 279 F.R.D. 320, 328 (D. Md. 2012). The appropriate inquiry regarding typicality is whether prospective class members "rely on the same legal theory" and "the same course of conduct perpetrated by Defendant when arguing the elements of equitable tolling." *Id.* at 325–26. Here, Plaintiffs have made uniform allegations regarding tolling as to the Defendants'

---

[14] Despite Defendants' criticism for not having produced evidence, (Def. Br. at 21 n.20), Huey and her father did not print a receipt for the reimbursement, not unlike most families.

[15] Also, Huey testified that *she* purchased another RNPS as a gift for her cousin and did remember whether she reimbursed her grandmother. Ex. 15 (Huey Tr.) at 147:3-11, 234:15-18. Regardless, Huey is typical of the Florida Class based on her first RNPS purchase alone.

[16] *Sanders v. Apple Inc.*, 672 F. Supp. 2d 978, 991 (N.D. Cal. 2009) is wholly inapposite as it held individuals who did not purchase the products lacked standing and does not stand for the proposition that reimbursement does not constitute a purchase. See *In re Flonase Antitrust Litig.*, 692 F. Supp. 2d 524, 533 (E.D. Pa. 2010) (reimbursement was sufficient for standing).

course of conduct and the legal theories on which they rely. CAC ¶¶ 228–43. Whether the statute of limitations can be tolled is a class-wide issue, such that Hanson is typical of other class members rather than subject to unique defense. *See, e.g.*, *In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 406 (S.D.N.Y. 2015) (defenses are not atypical where they could be raised as to other class members). For the reasons set forth above and in Sections II.C.2. and II.D.5., *infra*, Hanson is an appropriate Iowa class representative.

### D.   Alfaro is an Adequate Representative Whose Claims are Typical of New York Class

Defendants' contention that Alfaro is not a typical or adequate representative because she participated in the Recall is a red herring. Def. Br. at 21-22.[17] Indeed, typicality is met where the class representative and "many class members received a partial or full refund . . . ." *E.g.*, *In re Scotts EZ Seed*, 304 F.R.D. at 406. Also, "[d]ifferences in the damages sustained by individual class members does not preclude a showing of typicality, nor defeat class certification." *Shariff v. Goord*, 235 F.R.D. 563 (W.D.N.Y. 2006) (citations omitted).

It is undisputed that some Class members, like Alfaro, participated in the Recall. Indeed, the CAC seeks, among other things, modification of the terms of the Recall so that all participants are treated equally regardless of when they purchased a RNPS. *See* CAC ¶ 266(j). Defendants contend that Alfaro "received an item of value" from Fisher-Price as part of the Recall. That item was a Barney the Dinosaur toy, which she testified was the only option provided to her. Ex. 8

---

[17] Although Defendants refer to both typicality and adequacy with respect to Alfaro, their argument is really directed to typicality, not adequacy. They claim Ms. Alfaro is subject to unique defenses, not that her interests are "antagonistic to the interest of other members of the class." *Sykes v. Mel S. Harris & Assocs., LLC*, 780 F.3d 70, 90 (2d Cir. 2015) (discussing adequacy). *Greeley v. KLM Royal Dutch Airlines*, 85 F.R.D. 697 (S.D.N.Y. 1980), cited by Defendants, is inapposite in this regard. In *Greeley,* a proposed class action on behalf of passengers challenging lost baggage settlement tactics used by an airline, the plaintiff had *refused* the settlement and thus had no personal interest in pressing the litigation.  Here, by contrast, Alfaro, like other class members, was induced to purchase a RNPS by Defendants' misrepresentations, and was injured despite her participation in the recall.

(Alfaro Tr.) at 204:23-205:6. But her children neither liked it nor used it. *Id*. at 209:7-22. What Alfaro undeniably did not receive, which Defendants do not and cannot contest, was a refund of the purchase price of her RNPS or something of equivalent value of her choice. Def. Br. at 21 n.23 (acknowledging Alfaro received a toy purportedly worth $29.99 despite having paid approximately $50 for her RNPS). Defendants' deceptive marketing of the RNPS caused Alfaro to suffer economic harm that has not been remedied: she is not seeking a "double recovery." Plainly, she is asserting that the "same unlawful conduct"—selling her a sleeper product that can kill children who sleep in it—that affected other class members affected her. She is typical of the New York Class.

Defendants also contend that Alfaro is "at odds with the class" because she testified that it was relatively easy to participate in the Recall. Def. Br. at 22. Not so. First, Defendants omit that Alfaro also testified the Recall process was burdensome: she testified that it took a few tries and some time to get the product disassembled and get it shipped out. Ex. 8 (Alfaro Tr.) at 195:22-196:1. Second, Alfaro's "easy" remark, at most, goes to merits. Defendants are free to deploy it to try to illustrate that the Recall was not improperly burdensome at trial. But it creates no issue with Alfaro's typicality or adequacy, as Defendants do not and could not argue that any unique facts pertain to her participation in the Recall and not to that of other Class members. The terms of the Recall are the same for everyone.

## II.   The Purchaser Classes Meet the Rule 23(b)(3) Requirements

Defendants' opposition demonstrates a fundamental misunderstanding of Rule 23(b)(3): the predominance inquiry ask only "whether the common, aggregation-enabling, issues in the case are ***more prevalent or important*** than the non-common, aggregation-defeating, individual issues." *Tyson Foods, Inc. v. Bouaphakeo*, 136 S. Ct. 1036, 1045 (2016) (quotations omitted, emphasis

added). A class may be certified under Rule 23(b)(3) "even though other important matters will have to be tried separately, such as damages or some affirmative defenses peculiar to some individual class members." *Id.* Indeed, the predominance requirement is satisfied "if the plaintiffs can show that ***some*** of the … questions can be answered with respect to the members of the class as a whole through generalized proof and that those common issues are more substantial than individual ones." *Kurtz v. Kimberly-Clark Corp.*, 414 F. Supp. 3d 317, 333 (E.D.N.Y. 2019) (citation omitted; emphasis in original).[18] As set forth below, none of the purported individual issues cited by Defendants overcome the predominant common issues concerning Defendants' misleading marketing of the RNPS and other misconduct.

## A. All Purchaser Plaintiffs and Class Members Suffered Injury

Defendants' claim that the Purchaser Classes are overbroad and include uninjured consumers is unfounded. Def. Br. at 24. First, Defendants' argument that Purchaser Class Members were not exposed to its marketing is nothing more than an attempt to bootstrap their reliance arguments, which fail. *See* Section II.B., *infra*. Second, their argument that some Plaintiffs testified they did not see advertising is based on citations to Owner Plaintiffs who do not represent the Purchaser classes (Def. Br. at 24, 14 (citing ECF 166-4 ¶ 109)) and on mischaracterizations of Purchaser Plaintiff's testimony (*see* Section II.D., *infra*). Third, contrary to Defendants' argument that the Purchaser Classes include "consumers who purchased the RNPS on the secondary market" (Def. Br. 24), the claims for damages are brought by Purchaser Plaintiffs on behalf of class members who purchased their RNPS new from a retailer. *See* Pl. Br. at 19. Individuals who purchased their RNPS used or secondhand, along with gift recipients of the RNPS, are included

---

[18] *Kurtz* was later reversed in part, but only with respect to Rule 23(b)(2) findings. *See Kurtz v. Costco Wholesale Corp.*, 818 F. App'x 57, 63 (2d Cir. 2020).

only in the Injunctive Relief Class seeking class treatment under 23(b)(2). [19] *Id.*

     Defendants cite to *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, which was an antitrust class action alleging retailers paid inflated prices for tuna products as a result of a price-fixing conspiracy. 993 F.3d 774, 781 (9th Cir.), *reh'g en banc granted,* 5 F.4th 950 (9th Cir. Aug. 3, 2021).  The *Olean* court held injury could not be proved or disproved through common evidence because the retailers' damages model showed 28% of class members did not pay an inflated price.  *Id.* at 791.  Here, the "injury is the purchase price" of the RNPS, *see Kurtz*, 321 F.R.D. at 531 (citations omitted), which all Purchaser Class members paid to Defendants' retailers, such that, unlike *Olean*, individual trials are not necessary to determine whether Purchaser Class members suffered injury.  Defendants also cite to *Denney v. Deutsche Bank AG*, which supports a finding of injury as the Second Circuit held that standing was satisfied where the complaint alleged the plaintiffs paid excessive fees for negligent or fraudulent tax advice. 443 F.3d 253, 265 (2d Cir. 2006).  Thus, Purchaser Plaintiffs and Class members suffered injury and the Purchaser Classes are not overbroad. [20]

---

[19] Should the Court decide Plaintiffs' Purchaser Classes are overbroad as written, "the Court has authority sua sponte to modify [the] proposed class definition[s]" to ensure only purchasers of new RNPS from retailers are included in the classes rather than deny certification. *E.g.*, *Yi Xiang v. Inovalon Holdings, Inc.*, 327 F.R.D. 510, 521 (S.D.N.Y. 2018). For example, the Purchaser Class definitions could be modified to exclude purchasers on the secondary market.

[20] *See Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012) ("To the extent that class members were relieved of their money by Honda's deceptive conduct—as Plaintiffs allege— they have suffered an 'injury in fact.'").  Defendants cite *Mazza* and other California cases for the proposition that a presumption of reliance is not applicable (Def. Br. 24 n.28). Unlike *Mazza* where consumers alleged false claims in a variety of brochures and TV advertising, Defendants' Defendants' uniform Marketing Statements conveying the Safety Message, including the name of the RNPS sleeper at a minimum, and omissions of the known dangers was widespread and the RNPS packaging did not disclose its dangers such that it is reasonable to presume exposure.  *See* Sections II.B.1. & II.D.3., *infra*; *see also Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1099 (N.D. Cal. 2018) ("Exposure to statements displayed on the outside of a product's packaging is clearly more likely, and therefore much easier to infer . . . ."); *In re NJOY, Inc. Consumer Class*

**B. Materiality Can Be Determined Using Class-wide Proof**

Individual issues concerning materiality, reliance, or causation do not predominate regarding Purchaser Classes' consumer protection claims despite Defendants' contentions that class members may not have been exposed to Defendants' advertising, may have purchased for reasons other than sleep, and may have received information regarding infant sleep from pediatricians or other sources. *See* Def. Br. 24-30.  Materiality "'does not require an investigation into 'individual interaction[s] with the product,' and it presents a common question as long as the products 'bore the same allegedly misleading claim.'" *E.g.*, *Sharpe v. A&W Concentrate Co.*, No. 19-CV-768 (BMC), 2021 WL 3721392, at *4 (E.D.N.Y. July 23, 2021) (citations omitted). Defendants' marketing and packaging of the RNPS bore the same misleading claim: that the product was safe and suitable for infant sleep.

### 1. Defendants Uniformly Marketed the RNPS as Safe for Infant Sleep

While Defendants attempt to read individualized reliance requirements into states' consumer protection statutes (Def. Br. 24-30), the statutes at issue here either do not require reliance, employ a presumption of reliance, or otherwise provide that reliance is subject to class-wide rather than individualized proof (Section II.D., *infra*) such that Defendants' conduct (*i.e.*, its marketing and packaging) is the relevant inquiry. *See, e.g.*, *Belfiore v. Procter & Gamble Co.*, 311 F.R.D. 29, 70 (E.D.N.Y. 2015) (the question of whether a claim on a "label was material to consumer's decision to purchase 'is an objective inquiry that focuses on that packaging.'"

---

*Action Litig.*, 120 F. Supp. 3d 1050, 1105 (C.D. Cal. 2015) ("As respects the omissions claims based on product packaging, there is no question that Mazza is not controlling and is distinguishable."). While the Court in *NJOY* denied class certification because "there is no evidence of the materiality of this omission" on the record, *id.* at 1117, there is ample evidence here of the materiality of Defendants' omission concerning the safety of the RNPS. *See* Section II B., *infra*. Lastly, *In re Clorox Consumer Litig.*, is inapposite as it involved four TV commercials that only ran for 16 months such that exposure could not be presumed.  301 F.R.D. 436, 444 (N.D. Cal. 2014)

(quotation omitted)). Courts nationwide have repeatedly held that a representation or omission on a product's packaging, or in a product's very name, is sufficient to establish that consumer protection claims are subject to common proof. *See, e.g.*, *Ebin v. Kangadis Foods Inc.*, 297 F.R.D. 561, 565-66 (S.D.N.Y. 2014) (certifying New York and New Jersey consumer protection claims of purchasers of oil that was allegedly misrepresented as "100% Pure Olive Oil" on the packaging).[21] Indeed, "packaging claims do not require proof as to individual understandings and can be judged based on an objective standard." *In re Kind*, 337 F.R.D. at 600 (certifying Florida, New York, and Florida consumer protection claims (citations omitted)).

Contrary to Defendants' assertion that "Plaintiffs testified they never saw any advertising claims for the RNPS" (Def. Br. at 24), Purchaser Plaintiffs who purchased the RNPS in a store or online testified that they (a) saw the name of the product, *i.e.*, "Sleeper" and/or (b) saw sleep-related statements and/or images of a sleeping baby on the product's box or on the website where they purchased the RNPS (*e.g.*, Amazon, Buy Buy Baby, etc.). *See* Ex. 6 (Purchaser Tr. Table) at Columns B-C. Defendants' unsupported claim that "Plaintiffs have not established what specific advertising claims are at issue" (Def. Br. at 26) is belied by the CAC and Opening Brief, which clearly define Safety Message (Pl. Br. at 2), and Marketing Statements (Pl. Br. at 7), to which all

---

[21] *See also In re Scotts EZ Seed*, 304 F.R.D. at 409 (certifying class of purchasers of seeds falsely advertised on packaging as being "50% thicker" under New York and California law); *de Lacour v. Colgate-Palmolive Co.*, No. 16-CV-8364 (KMW), 2021 WL 1590208, at *5 (S.D.N.Y. Apr. 23, 2021) (certifying class alleging that toothpaste described as "natural" on packaging was not made with natural ingredients under New York, California, and Florida law); *Dzielak v. Whirlpool Corp.*, 2017 WL 6513347 (D.N.J. Dec. 20, 2017) (certifying a claim under Texas law based on allegations that an appliance was improperly labeled with an energy efficiency logo); *Collins v. Quincy Bioscience, LLC*, No. 19-CV-22864, 2020 WL 3268340, at *24 (S.D. Fla. Mar. 19, 2020) (certifying a claim under Florida law because "whether Quincy's packaging and advertising of Prevagen is likely to deceive the public are common questions that can be analyzed and resolved on a classwide basis"); *Elias v. Ungar's Food Products, Inc.*, 252 F.R.D. 233, 239 (D.N.J. 2008) (presumption of causation under New Jersey law applied and predominance was met where food packaging contained misrepresentations).

consumers were exposed. Determining the truth or falsity of the Safety Message and Marketing Statements uniformly made to Class members will generate common answers, which predominate over any individual issues. *E.g.*, *Allen v. Similasan Corp.*, 306 F.R.D. 635, 648 (S.D. Cal. 2015) (predominance met given the uniformity of representations despite small differences).

Further, Defendants' internal documents overwhelmingly show Defendants' representations and omissions were material to consumers purchasing a product called a "Sleeper." *See In re ConAgra Foods, Inc.*, 90 F. Supp. 3d 919, 1018 (C.D. Cal. 2015) (companies' marketing research studies and internal strategy documents supported finding that materiality could be demonstrated with common proof); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 613 (N.D. Cal. 2018) ("internal documents show that Dr. Pepper thought the 'Made From Real Ginger' claim *was* material."). Plaintiffs respectfully refer the Court to their Opening Brief (Pl. Br. at 9-13), which sets for the common evidence of materiality of the marketing message that the RNPS was a safe infant sleep product, as well as Plaintiffs' Responses to Defendants' Evidentiary Objections (ECF 201), which establishes the relevancy of Defendants' internal documents. Notably, Defendants' own 2011 research study found that "Prenatal moms previously unfamiliar with the Rock n' Play who saw the product positioned as a Sleeper (original) expressed significantly higher rates of purchase interest than moms who saw" the product described as a "soother." *See* Pl. Br. Ex. 8, FSHR0004127.[22] Also, Fisher-Price marketed the RNPS "with [their]

---

[22] Although Defendants dispute the findings of *their own* 2011 research study (Def. Br. at 27 n.33), their arguments go to the merits of Plaintiffs' claims as the study tends to show sleep was material to purchasing decisions, which is sufficient at this stage. *See In re ConAgra*, 90 F. Supp. 3d at 1018 (companies' marketing research studies and internal strategy documents tend to show claims on packaging were material). Indeed, what is important about the 2011 study is what Defendants learned from it: that consumers preferred the name Rock 'n Play Sleeper, not Rock 'n Play Soother, such that Defendants thought including "Sleeper" in the name was material. Ex. C (Silverman Report) at ¶¶ 146-47.

other bassinets" and touted it to consumers as "the only infant seat that meets industry safety standards for bassinets." *See* Ex. 55 (Pilarz Letter) at FSHR0003976-77. Fisher-Price wanted its brand to be synonymous with safe sleep solutions by pushing its "rigor in quality and safety" messaging to consumer. *See*, *e.g.*, Ex. 56 (Story Development Grid) at FSHR006186.  Defendants knew "[g]etting a good night's sleep, and doing so safely, is ***one of the most important considerations*** for expecting parents." *Id.* at FSHR0061685 (emphasis added).

### 2.   *Defendants' "Multi-Use" Argument is Irrelevant to Materiality*

Despite uniformly and consistently marketing the RNPS as a safe sleep product, Defendants argue the RNPS was a "multi-use product" with various features and that Plaintiffs and class members may have purchased or used the product for reasons other than sleep. Def. Br. 28-29. Beyond being wholly divorced from their internal documents demonstrating how they actually marketed the RNPS, Defendants' "multi-use" argument ignores that "where reliance is not at issue, *the individual reason for purchasing a product becomes irrelevant* and subsumed under the reasonable consumer standard, *i.e.*, whether the deception could likely have misled someone, and not, whether it in fact did." *Hasemann v. Gerber Prod. Co.*, 331 F.R.D. 239, 266 (E.D.N.Y. 2019) (emphasis added). To be material, the challenged statement "need not be the sole or even the predominant or decisive factor influencing the class members' decisions to buy the challenged products." *Krommenhock v. Post Foods, LLC*, 334 F.R.D. 552, 566 (N.D. Cal. 2020) (internal quotations omitted). Indeed, "[i]t strains credulity to suggest that a 'significant portion of the general consuming public or of targeted consumers' do not rely—at least *in part*—on representations about the products' uses and effectiveness on product packaging when buying the products." *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 667 (C.D. Cal. 2014) (predominance was met despite argument that "consumers buy the products for 'many reasons'").

Here, the consumer protection statutes do not require individualized proof of reliance such

that the mere fact RNPSs may be purchased or used for reasons other than the sleep and has various features is irrelevant. *See, e.g.*, *Kurtz*, 414 F. Supp. 3d at 333 ("motivations for purchase do not affect the price paid at the cash register" (citation omitted)).[23] Defendants' Safety Message and Marketing Statements, including the misleading *name of the product*, communicated the safety and suitability of the RNPS for infant sleep to Plaintiffs and Class members regardless of other attributes or uses. *See* Section II.B.1., *supra*; *see also* Ex. C (Silverman Report) at ¶¶ 63, 67, 103-10, 143. As such, determining whether Defendants' Safety Message and Marketing Statements were material "doesn't turn on the experiences of individual users." *Nilon v. Nat.-Immunogenics Corp.*, No. 312CV00930LABBGS, 2014 WL 12570897, at *8 (S.D. Cal. Apr. 15, 2014) (predominance was met where consumers were allegedly misled to purchase a product that was unsafe to ingest).

Defendants attempt to distinguish *Kurtz* by claiming that the flushable wipes at issue in *Kurtz* were "not a multi-use product." However, the defendants in *Kurtz* argued that certification was improper because, *inter alia*, some consumers may have used the wipes "for something other than toileting purposes or use the wipes for toileting purposes but do not flush them." 414 F. Supp. 3d at 334. The court rejected this argument, finding that common issues nonetheless predominated,

---

[23] *See also de Lacour*, 338 F.R.D. at 341 (rejecting argument that class members may have purchased products "for reasons different from one another, and that are unrelated to the 'natural' claim" on the packaging); *Chavez v. Blue Sky Nat. Beverage Co.*, 268 F.R.D. 365, 378 (N.D. Cal. 2010) (rejecting argument "that not all potential class members relied on the Santa Fe representations and may have had other reasons to buy Blue Sky beverages"); *Ries v. Arizona Beverages USA LLC*, 287 F.R.D. 523, 530 (N.D. Cal. 2012) ("[I]t is likewise of marginal significance [to materiality] that both plaintiffs have admitted multiple reasons for their purchase of AriZona products."). The case cited by Defendants is not to the contrary. *See Suchanek v. Sturm Foods, Inc.,* No. 11-cv-565-NJR-RJD, 2018 WL 6617106, *12-13 (S.D. Ill. July 3, 2018). In *Suchanek*, the plaintiff could prove materiality on a class-wide basis because the defendants deceptively disguising instant coffee as ground coffee was crucial to purchasing decisions and there was no evidence plaintiffs would have purchased the coffee had they known the truth. The same is true here with respect to Defendants' failure to disclose the dangers of the RNPS.

insofar as "Plaintiffs have submitted proof that every consumer paid a percentage amount more for wipes labeled flushable, regardless of what price was actually paid or the subsequent use of the wipes." *Id.* at 333. Similarly, Plaintiffs allege that they would not have purchased the product at all had they known that it was not safe for infant sleep as advertised (CAC ¶¶ 24-46),[24] just as the consumers in *Kurtz* would not have paid as much as they did for the flushable wipes had they known that the wipes were likely to damage their plumbing and sewer systems.

Further, despite Defendants' claim that some Plaintiffs may have purchased or used the RNPS for uses other than sleep, every Purchaser Plaintiff purchased the RNPS believing it was safe,[25] and used the RNPS as a place for their babies to sleep.[26] Regardless of any other descriptors or features, the RNPS was always marketed in the U.S. as a "Sleeper," even when that same marketing was banned in other countries over safety concerns. Ex. 57 (Ford Tr.) at 82:9-22. Further, some features, such as SmartConnect (added so that parents could control settings "all without disturbing baby!") and Auto-Rock (with two speeds: "Naptime (30 minutes) or Nighttime (6 hours)") were specifically designed and marketed to sell the RNPS as a safe infant sleeper. *See* ECF 166-117 (Examples of RNPS Packaging).

Moreover, that some Plaintiffs were told varying advice by pediatricians or others about their babies sleeping at an incline (Def. Br. at 30), is equally irrelevant. *See, e.g.*, *Forcellati v. Hyland's, Inc.*, No. CV 12-1983-GHK MRWX, 2014 WL 1410264, at *11 (C.D. Cal. Apr. 9, 2014)

---

[24] Defendants criticize Plaintiffs' Affidavits (ECF 125-21) as "self-serving" (Def. Br. 61 n.110) but Plaintiffs who were asked testified they would not have purchased the RNPS had they known it was unsafe. S*ee* Ex. 6 (Purchaser Tr. Table) at Column G.  Defendants' citations to *Hanwha Corp. v. Cedar Petrochemicals, Inc.,* 760 F. Supp. 2d 426 (S.D.N.Y. 2011) and *McMahon v. Novello,* 192 F. Supp. 2d 54 (S.D.N.Y. 2001) are misplaced as neither involve consumer class actions.

[25] Statement of Fact Section IV.A., *supra*; *see also* Ex. 6 (Purchaser Tr. Table) at Column D.

[26] *See Id.* at Column F. The lone exception is Flores, who does not know how her daughter-in-law used the RNPS that Flores purchased from her registry.

("the particular circumstances under which each individual purchase was made cannot 'transform the common question' of whether the alleged misrepresentations were objectively material 'into a multitude of individual ones'").[27] What each class member knew, or did not know, about infant sleep before purchasing this product is as irrelevant to materiality as what each *Kurtz* class member did, or did not know, about the effect of "flushable" sanitary wipes on plumbing systems. Also, Plaintiffs certainly were not "aware of the allegedly omitted information" (Def. Br. at 30), as Defendants failed to disclose any of the known dangers as well as the infant deaths and injuries occurred in the RNPS. *Suchanek*, 2018 WL 6617106, at *13 (reliance could be established on a class-wide basis where there was "no evidence that Plaintiffs would have purchased GSC even if they 'knew the truth' about the product" (citation omitted)). Here, every Purchaser Plaintiff who was asked testified that he or she would not have purchased the RNPS had he or she known it was or could be dangerous for their infant.[28]

### 3. Plaintiffs' Experts Confirm Materiality is Susceptible to Class-wide Proof

Defendants' criticism that "Plaintiffs did not submit any survey of their own showing the materiality of any of Defendants' advertising" is unfounded. Def. Br. at 27. Indeed, "materiality need not be proven by extrinsic evidence such as consumer surveys . . . materiality may be proven by showing that the misrepresentation related to an inherent characteristic of the product." *Rexall*

---

[27] *See also In re Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) ("an allegation of reliance is not defeated merely because there was alternative information available to the consumer-plaintiff, even regarding an issue as prominent as whether cigarette smoking causes cancer."); *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *9 (S.D.N.Y. Mar. 19, 2019) ("[M]ateriality . . . is an objective question that does not depend on the mindset of each individual purchaser."); *In re Dollar Gen. Corp. Motor Oil Mktg. & Sales Pracs. Litig.*, No. 16-02709-MD-W-GAF, 2019 WL 1418292, at *26 (W.D. Mo. Mar. 21, 2019) (certifying California, Florida, New Jersey, and New York claims because "the evidence Defendants have presented regarding varying pre-purchase knowledge of certain named Plaintiffs . . . does not negate the evidence of the similarity of the alleged misrepresentations").

[28] *See* Ex. 6 (Purchaser Tr. Table) at Columns B-D.

24

*Sundown, Inc. v. Perrigo Co.*, 651 F. Supp. 2d 9, 39–40 (E.D.N.Y. 2009) (citations omitted).[29] As such, Defendants' conduct of their Marketing Statements conveying the Safety Message of the RNPS and their omissions of the known dangers as well as their internal documents are sufficient to demonstrate common proof of materiality exists. *See* Section II.B.1., *supra*; *see also* Pl. Br. at 9-13. In any event, a consumer survey conducted by Plaintiffs' expert, Dr. Dennis, confirms the materiality of Defendants' misrepresentations and omissions can proven on a class-wide basis. *See* Statement of Facts Section III, *supra*.

Indeed, **85.2%** of Dr. Dennis's consumer survey respondents indicated that their understanding of the packaging to communicate that "it is intended for babies to be able to sleep and nap in it" made them likely to purchase the product. Ex. B (Dennis Report) ¶ 102. Likewise, **82.5%** indicated their understanding of the packaging to communicate that the RNPS is "safe for babies to use" made them likely to purchase it. *Id.* Dr. Dennis' survey findings are sufficient to establish the materiality of Defendants' Marketing Statements. *See In re ConAgra*, 90 F. Supp. 3d at 1018–20 (materiality was satisfied where a "majority" of survey respondents found that "100% Natural" claim on label meant no GMOs). Additionally, once respondents viewed a conservative disclaimer of some risk, their purchased intention decreased by nearly 30%, which is substantial. Ex. B (Dennis Report) ¶¶ 103-06. Dr. Dennis's survey is thus class-wide proof demonstrating the materiality of Defendants' misrepresentation and omissions.

---

[29] *See also Krommenhock*, 334 F.R.D. at 565–66 ("California courts have explicitly 'reject[ed] [the] view that a plaintiff must produce' extrinsic evidence 'such as expert testimony or consumer surveys' in order 'to prevail on a claim that the public is likely to be misled by a representation'" (citation omitted, alterations in original)); *In re McCormick & Co., Inc., Pepper Prod. Mktg. & Sales Pracs. Litig.*, 422 F. Supp. 3d 194, 252 (D.D.C. 2019) (rejecting argument that "plaintiffs *must* proffer extrinsic evidence of materiality/causation/injury across-the-board in order to prove predominance" in certifying Florida and California classes).

Also, "expert reports regarding consumer perception need not be based on scientific surveys, but that experts may testify based on their own experience." *E.g.*, *Price v. L'Oreal USA, Inc.*, No. 17 CIV. 614 (LGS), 2020 WL 4937464, at *5 (S.D.N.Y. Aug. 24, 2020) (collecting cases). Plaintiffs' marketing expert, Mr. Silverman, who has over 50 years of professional experience, including as the creative director of Ogilvy-Mather, once a top global advertising firm, concludes that Defendants' misrepresentations and omissions were material to consumers. *See* Statement of Facts Section III, *supra*; *see also* Ex. C (Silverman Report) at ¶¶ 8, 11-12, 34. Mr. Silverman explains the use of "sleeper" in the name of the RNPS communicates the primary use of the product to consumers such that any other uses or attributes of the RNPS would be secondary in purchase decision. *Id.* at ¶¶ 40, 44, 143. Also, Defendants' misrepresentations and omissions concerning safety were material because "safety is always an issue" for consumers of infant products. *Id.* at ¶¶ 34, 73. Fisher-Price's brand is associated with trust and safety that was conveyed through Defendants' marketing. *Id.* at ¶¶ 89-110. In addition to its marketing at the point of sale, packaging, and website, Defendants employed other marketing methods that similarly conveyed its misleading claims that the RNPS was safe, including through word of mouth. *Id.* at ¶¶ 111-25. Thus, Plaintiffs' experts confirm the materiality of Defendants' misrepresentation and omissions.

### 4. Dr. Kivetz's Flawed Survey Actually Supports a Finding of Predominance

Defendants erroneously claim that an experimental survey conducted by Dr. Kivetz disproves materiality and establishes materiality is not susceptible to class-wide proof. Def. Br. at 1, 16-17, 26-27. To the contrary, Dr. Kivetz's survey purporting to determine materiality demonstrates common proof can be used to prove or disprove materiality. *See Price v. L'Oreal USA, Inc.*, No. 17 CIV. 614 (LGS), 2018 WL 3869896, at *9 (S.D.N.Y. Aug. 15, 2018). Indeed, the manufacturer in *Price* proffered its expert's experimental study, which purportedly showed representations on a product label were immaterial to consumers' purchase intentions. *Id.* The

26

*Price* court rejected the manufacturer's argument that the survey established materiality could not be proven through common evidence, because the manufacturer's own expert's "study purports to show the opposite—that common evidence such as an experimental study can shed light on the question of materiality." *Id.*

Analogous to *Price*, Dr. Kivetz's experimental survey purports to disprove materiality by using common proof to determine that sleep representations did not affect consumers' purchase decisions,[30] which, in any event, solely relates to the merits of Plaintiffs' claims. *See id.*; *see also In re Kind*, 337 F.R.D. at 600 ("The operative issue on class certification is whether the question of materiality predominates, not whether Plaintiffs' answer is correct."); *Ackerman v. Coca-Cola Co.*, No. 09 CV 395 DLI RML, 2013 WL 7044866, at *23 (E.D.N.Y. July 18, 2013) (declining to consider a survey demonstrating consumers had multiple reasons for purchasing a product because whether a reasonable consumer would find "labeling or marketing misleading or deceptive . . . is a merits-based inquiry"). While Plaintiffs disagree with Dr. Kivetz's survey methodology and results, his survey nonetheless reveals materiality can be determined on a class-wide basis. Also, Dr. Kivetz's survey findings notably undercut Defendants' argument that consumers had multiple reasons for purchasing the RNP—such as play, entertainment, and soothing—because it was advertised as a "multi-use product." *See* Dr. Br. 28. Indeed, less than 3% of survey participants who saw the RNPS packaging mentioned "Soothing" or "Play/Entertainment/Fun" in explaining their purchase decisions such that these "other uses" were uncommon purchase reasons. Dkt. 166-1 (Kivetz Rep.) at 200, 204; Ex. 51 (Kivetz Tr.) at 296:22-297:6; 311:18-312:20.

---

[30] *See* ECF 166-1 (Kivetz Report) at 47 ("the findings [of the survey] indicate that the alleged misrepresentations and omission did *not* have any influence (*i.e.*, did *not* have a material or causal effect) on consumers' decisions to purchase the disputed Fisher-Price products"); *see also* Ex. 51 (Kivetz Tr.) at 308:20-23 ("The alleged misrepresentations about sleep or alleged deception about sleep, it is definitely not a material factor in purchase decisions.").

Should the Court consider Dr. Kivetz's survey for any other purpose than finding the question of materiality predominates, his survey should be given little (if any) weight. *See, e.g.*, *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 228 (2d Cir. 1999) (errors in survey methodology go "to the weight of the evidence"). First, while he admits understanding allegations are important in survey design,[31] Dr. Kivetz misunderstands Plaintiffs' claims concerning safety,[32] and he self-admittedly does not understand Plaintiffs' omission claims.[33]  As such, Dr. Kivetz's survey does not test the challenged misrepresentations and omissions.

Second, Dr. Kivetz's misunderstanding Plaintiffs' claims, among other reasons, resulted in an improper control stimulus.[34] Ex. B (Dennis Report) ¶¶ 67-69. For the control stimulus, Dr. Kivetz added a "disclaimer" that the "product is not intended for sleeping" to purportedly address Plaintiffs' omission claim. *See* ECF 166-1 (Kivetz Report) at 28-43; Ex. 51 (Kivetz Tr.) at 231:20-236:6. Beyond being factually incorrect because the RNPS was designed and marketed as a product intended for sleep (*see* Section II.B.1 & Statement of Facts Section I), Dr. Kivetz's disclaimer fails to test Plaintiffs' omission claim. Ex. B (Dennis Report) ¶ 67. Also, by re-naming the product a "Soother," the control stimulus Dr. Kivetz used shares the same misleading elements as the original RNPS packaging because, like "Sleeper," it misleads consumers as to the products' safety for sleep. *Id.* ¶¶ 68-69; *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 534 (S.D.N.Y. 2011) (declining to give a survey any weight where the control "included the

---

[31] Ex. 51 (Kivetz Tr.) at 90:4-10.

[32] *Compare* Ex. B (Dennis Report) ¶ 23 *and* CAC ¶¶ 75, 183-205 *with* Ex. 51 (Kivetz Tr.) at 293:8-20 (stating his survey "was not about safety per se. It was about sleep-related issues").

[33] *Compare* CAC ¶¶ 22, 190 *and* Ex. B (Dennis Report) ¶ 67 *with* Ex. 51 (Kivetz Tr.) at 86:18-90:3 (stating Plaintiffs' omission claims "wasn't clear to me").

[34] In general, a control stimulus in a survey "is a non-infringing product which is similar to the products at issue." *Nabisco v. Warner-Lambert Co.*, 32 F. Supp. 2d 690, 700 (S.D.N.Y. 1999) (citation omitted).

very elements being assessed").[35]  Indeed, Defendants have recalled inclined baby products with "Soothe" and "Soother" in the name due to infant deaths when sleeping in the products despite not being marketed as sleepers.[36] In all, Dr. Kivetz's survey has a flawed foundation, which produced unreliable results. Ex. B (Dennis Report) ¶¶ 39-70.

## C.  Defendants' Statute of Limitations Defenses Also Support a Find of Predominance

The Second Circuit has rejected the argument Defendants advance here in holding: "common issues of law or fact do not predominate" because different states "employ various legal standards for tolling statutes of limitations." *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 127 (2d Cir. 2013). Fraudulent concealment, for example, can be "demonstrated via class-wide, generalized evidence" even where the "jurisdictions whose law may apply to plaintiffs' contract claims require that a 'plaintiff asserting fraudulent concealment prove it exercised some degree of diligence' to discover the claims." *Id.* at 128. In other words, "common evidence of this concealment will predominate in resolving whether the relevant statutes of limitations were tolled." *Id.*  Moreover, it is settled that the presence of individual defenses does not preclude class certification. *Pefanis v. Westway Diner, Inc.*, No. 08 CIV 002 DLC, 2010 WL 3564426, at *5 (S.D.N.Y. Sept. 7, 2010) ("the presence of individual defenses does not by its terms preclude class certification").[37] As a result, any variations in applicability of the discovery rule, continuing act

---

[35] "Without a proper control, there is no benchmark for determining whether [the result] is significant or merely reflects flaws in the survey methodology . . . . [The] stimulus for the control group that shares as many characteristics with the control group as possible, with the key exception of the characteristic whose influence is being assessed" *U.S. Polo Ass'n, Inc. v. PRL USA Holdings, Inc.*, 800 F. Supp. 2d 515, 534 (citations omitted)).

[36] Ex. 53 (Soother Recall Notice); Ex. 4 (HCOR Tr.) at 19 ("the company marketed the Glide Soother, and Rock 'n Glide Soother, an inclined product, that was just recalled because of four infant deaths expressly for sleep").

[37] *See also Keegan v. Am. Honda Motor Co.,* 284 F.R.D. 504, 545 (C.D. Cal. 2012) ("variations in the sources and application of statutes of limitations will not automatically foreclose class certification under Rule 23(b)(3)"); *Waste Mgmt. Holdings, Inc. v. Mowbray*, 208 F.3d 288, 296

tolling, and estoppel are insufficient to defeat class certification.

Defendants' general discussion of the tolling of various claims in various states (Def. Br. 31-34) obfuscates the fact that Defendants argue that only four counts are actually time-barred for lack of tolling: Barton's Arizona Consumer Fraud Act claim, and Hanson's Iowa Consumer Frauds Act, Breach of Implied Warranty, and Unjust Enrichment claims. *See* 165-2; Dkt. 165-2 at 3, 15-17. However, the Second Circuit has explicitly rejected Defendants' argument that varying state law regarding fraudulent concealment raises sufficient individualized questions to defeat class certification. Common issues of law or fact predominate in this regard.

### 1. Barton's Claims May Be Tolled Pursuant to the Discovery Rule, Fraudulent Concealment, and/or Estoppel

Defendants argue that Arizona has explicitly rejected continuing act tolling but admit that it does recognize the discovery rule where plaintiffs have exercised reasonable diligence. Def. Br. at 33. As is the case with the fraudulent concealment analysis, even where a plaintiff must "prove it exercised some degree of diligence[,]" class certification is still appropriate. *In re U.S. Foodservice*, 729 F.3d at 128.

### 2. Hanson's Claims May Be Tolled Pursuant to Continuing Act Tolling, Fraudulent Concealment, and/or Estoppel

Defendants baldly assert that Hanson's claims are not tolled but do not argue that continuing act tolling is inapplicable in Iowa. Def. Br. at 21. To the contrary, Defendants cite *Hegg v. Hawkeye Tri-Cty. REC*, for the proposition that "where the wrongful act is continuous or repeated, so that separate and successive actions for damages arise, the statute of limitations runs

---

(1st Cir. 2000) ("the mere fact that such concerns may arise and may affect different class members differently does not compel a finding that individual issues predominate"). This is true even in the case of a meritorious statute of limitations defense. *In re WorldCom, Inc. Sec. Litig.,* 219 F.R.D. 267, 303 (S.D.N.Y. 2003) ("the existence of even a meritorious statute of limitations defense does not necessarily defeat certification").

as to these latter actions at the date of their accrual, not from the date of the first wrong in the series." 512 N.W.2d 558, 559 (Iowa 1994); Def. Br. at 15-16. That concession alone weighs in favor of certification. Further, Defendants only assert that the discovery rule in Iowa is inapplicable to Hanson's breach of implied warranty claim, (Def. Br. at 33). leaving two uncontested claims. For the reasons stated above, fraudulent concealment may apply to toll the statute of limitations and does not raise individualized issues sufficient to defeat class certification. Finally, Defendants do not specifically argue that estoppel is inapplicable in Iowa.

**D. Purchaser Classes Asserting Consumer Protection Claims Should be Certified**

Defendants argue the Purchaser Classes should not be certified with respect to nine states' consumer protection claims because class representatives lack typicality. In doing so, Defendants wrongfully attack the merits of Plaintiffs' claims and ignore typicality is "determined with reference to the company's actions, not with respect to particularized defenses it might have against certain class members." *Guippone v. BH S&B Holdings LLC*, No. 09 CIV. 1029 CM, 2011 WL 1345041, at *6 (S.D.N.Y. Mar. 30, 2011) (citations omitted). Typicality is met where "Plaintiff's claims here arise out of the allegedly false statement, worded in several variations, made on every . . . container." *Chavez*, 268 F.R.D. at 378; *Kurtz*, 321 F.R.D. at 535 ("Named plaintiff's claims need not be identical to each class member's claims to be typical; the fact that all the representations on Kimberly–Clark's products are substantially similar is sufficient"). Here, Plaintiffs claims are typical of the Class members because all of their claims arise out of Defendants' misleading Marketing Statements conveying its Safety Message and omissions of the known dangers of the RNPS. *See* Ex. 6 (Purchaser Tr. Table) at Columns B-D, & G. Further, Defendants largely reiterate that individual issues predominate because of materiality, reliance, or causation, which fail for the reasons set forth below and in Section II.B., *supra*.

### 1. *The Arizona Class*

Defendants' contention that individual issues predominate with respect to Plaintiffs' Arizona Consumer Fraud Act ("ACFA") claim because Plaintiffs supposedly cannot establish class-wide reliance (Def. Br. at 34) should be rejected. While some Arizona courts hold a plaintiff must establish class-wide reliance, reliance is presumed by the act of purchasing the product. *See Siemer v. Associates First Capital Corp.*, No. CV97-281, 2001 WL 35948712, at *14-16 (D. Ariz. March 30, 2001) (the act of purchasing the product at issue is sufficient to establish reliance upon the alleged misrepresentations). Further, "the Court need not evaluate the reasonableness of the Plaintiffs' reliance because under the [ACFA], reliance does not have to be reasonable." *Id.* Defendants cite to *Naiman v. Alle Processing Corp.*, CV20 0963 PHX DGC, 2020 WL 6869412 (D. Ariz. Nov. 23, 2020), but that case is distinguishable insofar as it involved a claim that the defendant frozen meal manufacturer had violated the ACFA by misrepresenting the number of servings contained in each package, and the court determined that class certification would require individualized inquiries as to how many ounces/servings each class member thought they were purchasing. In stark contrast, Plaintiffs allege (and testified accordingly) that *every single class member* who purchased the product believed it was safe for infant sleep.[38],[39] Indeed, Arizona Plaintiff Barton testified that she believed the RNPS would be a safe sleep device for her infant

---

[38] *See* CAC ¶¶ 22, 75, 190; *see also* Ex. 6 (Purchaser Tr. Table) at Column G.

[39] The other Arizona authority cited by Defendants is equally distinguishable. *See Stratton v Am. Med. Sec., Inc.*, 266 F.R.D. 340 (D. Ariz. 2009) (noting that the insurance product at issue was not "inherently flawed" unlike the RNPS and the plaintiffs did not allege omission claims); *Ventures Edge Legal PLLC v. GoDaddy.com LLC*, 2018 WL 619723, at *3 (D. Ariz. Jan. 30, 2018) (declining to presume reliance because, unlike the instant action, *Ventures Edge* "does not involve a single product with set functionalities in which GoDaddy has marketed the product absent some of those functionalities" and while some class members may have thought they were purchasing a prior version of the software at issue, others may not have); *Grimmelmann v. Putle Home Corp.*, 201 WL 2744943 (D. Ariz. July 9, 2010) (declining to certify class when different class members received different information about the utility rates at issue from the defendants).

based on Defendants' advertising, and she never would have purchased the RNPS had she known that it could be deadly. *See* Ex. 9 (Barton Tr.) at 292:3-19, 293:13-16, 314:4-12. This action is far more analogous to *Siemer*, where the court held that the act of purchasing the allegedly fraudulently marketed insurance product demonstrated adequate reliance, 2001 WL 35948712, at *14-16, and *In re Arizona Theranos, Inc., Litigation*, No. 2:16-cv-2138, 2020 WL 5435299, at *7-8 (D. Ariz. March 6, 2020) (reversed in part on other grounds), in which the court certified a class of purchasers alleging they were misled as to the reliability of over-the-counter blood tests. Thus, Plaintiffs have established predominance with respect to their ACFA claim.

### 2. *The Arkansas Class*

Defendants ask the Court to enforce Section 4-88-113(f)(1) of the Arkansas Deceptive Trade Practices Act ("ADTPA) prohibiting private class actions simply because two courts interpreting the laws of Ohio and Tennessee have found Rule 23 does not preempt similar restrictions in those states. Def. Br. at 36-37, n. 44. Defendants fail to cite a single case (and Plaintiffs are aware of none) wherein a *federal* court applied the *ADTPA's* class action prohibition. Indeed, Arkansas federal courts have found that the ADTPA's class action prohibition *is*, in fact, preempted by Rule 23. In *Mounce v. CHSPSC, LLC*, 5:15-CV-05197, 2017 WL 4392048 (W.D. Ark. Sept. 29, 2017), the court held that it "cannot imagine what 'mischief [the legislature] sought to be abolished' by foreclosing a group of individuals from efficiently banding together to litigate their low-dollar, yet factually similar, claims against a company that violates the ADTPA." *Id.* at *7. The *Mounce* court then found that because "the class-action amendment to the ADTPA is procedural, rather than substantive, both Justice Scalia's and Justice Stevens's tests [in *Shady*

*Grove*] are satisfied." *Id.* at *7 n.4;[40] *accord Whitley v. Baptist Health*, 4:16-CV-624-DPM, 2020 WL 4575991, at *1 (E.D. Ark. Aug. 7, 2020); *Murphy v. Gospel for Asia, Inc.*, 327 F.R.D. 227, 244 (W.D. Ark. 2018). The *Murphy* court also held the 2017 amendment is inapplicable where "the actionable conduct [in] this case began well before this amendment was implemented." 327 F.R.D. at 244. It is undisputed Defendants' deceptive conduct and Nowlin's purchase of her RNPS occurred before the August 2017 effective date of the amendment to the ADTPA.[41]

Defendants next argue that Nowlin and the Arkansas Class cannot satisfy predominance because each owner of the RNPS must "individually" prove reliance under the August 2017 amendments to the ADTPA. Def. Br. 37-38. However, individual proof of reliance can be shown on a class-wide basis through reasonable inferences drawn from circumstantial evidence under Arkansas law, which the 2017 amendment did not alter.[42] *Murphy*, 327 F.R.D. at 239–40 (reliance can be proven "upon the implicit and explicit representations made by GFA on a class-wide basis"). Arkansas federal courts follow their state courts to hold that individual reliance can be proven by common proof where the defendant "made substantially uniform representations throughout the class period" to raise a class-wide inference of reliance. *Murphy*, 327 F.R.D. at 240; *accord Philip Morris Companies, Inc. v. Miner*, 462 S.W.3d 313, 319 (Ark. 2015). This is especially true where "the alleged misrepresentations appear on the packaging." *In re Dial*

---

[40] "Justice Scalia's plurality opinion held that Rule 23 always preempts the conflicting state law, regardless of whether the state law is procedural or substantive in nature; but Justice Stevens's concurring opinion held that Rule 23 only preempts a conflicting state law that is procedural in nature. As this Court finds that the class-action amendment to the ADTPA is procedural, rather than substantive, both Justice Scalia's and Justice Stevens's tests are satisfied." *Id.*

[41] Ex. 21 (Nowlin Tr.) at 122:23-25, 141:11-14.

[42] *Motal v. Allstate Prop. & Cas. Ins. Co.*, No. 4:20-CV-01011 KGB, 2021 WL 724564, at *4 (E.D. Ark. Feb. 24, 2021) (reliance is required "under the 2011 or 2017 version of the ADTPA"). As such, Defendants' attempts to distinguish *Murphy* as citing pre-amendment cases fall flat. *See* Def. Br. 37 n.47.

*Complete Mktg. & Sales Pracs. Litig.*, 312 F.R.D. 36, 58 (D.N.H. 2015) (certifying ADTPA class). Here, reliance can be proven on a class-wide basis based on an inference of reliance and on Defendants' uniform marketing pushing a single misleading message: the RNPS is safe for infant sleep.[43] *See Miner*, 462 S.W.3d at 317–18 ("[T]he key inquiry under the ADTPA focuses on the defendant's actions.").

Lastly, Defendants try to defeat Nowlin's claim by asserting that Nowlin had previously been recommended incline sleep by her doctor and that Nowlin did not testify to seeing the packaging at the store, just the product itself. Def Br. at 37. However, Nowlin testified she believed Defendants' marketing the RNPS "as a safe sleeper" misled her (Ex. 21 (Nowlin Tr.) at 241:4-9). Also, the fact that some Plaintiffs and Class members may have received various information from their pediatricians about infant sleep has no bearing on their claims here. *See* Section II.B.2. Defendants fail to cite a single case holding that a court must examine each class member's unique knowledge about the safety or functionality of a product under the ADPTA.

### 3. The California Class

#### a. Flores and Kaden Have Standing Because They Relied on Defendants' Misleading Misrepresentations

Defendants argue that Plaintiffs Flores and Kaden lack standing to seek class-wide relief under California's UCL and CLRA. Def. Br. at 38. To make this argument, Defendants misstate what qualifies as a reliance under California law. Defendants argue that Flores "decided to purchase the RNPS from the registry because it was 'Fisher-Price, right price, [and] good for kids,' not because of Defendants' advertising." *Id*. (citing ECF 166-18). Defendants assert that Kaden "collect[ed] information from a lot of different sources when deciding to purchase the RNPS." *Id*. at 39 (citing ECF 166-22). Defendants' framing of this issue is contrary to California law.

---

[43] https://www.youtube.com/watch?v=chmZCMOZlA8&ab_channel=buybuyBABY

*First*, neither the UCL nor the CLRA require a plaintiff to rely on a defendant's advertising. To the contrary, a plaintiff can assert reliance solely on misrepresentations in the name or packaging of the product. For example, in *Pettit v. Proctor & Gamble*, the plaintiff brought UCL and CLRA claims based on defendant's "flushable wipes", which were in fact not flushable. *Pettit v. Procter & Gamble Co.*, No. 15-CV-02150-RS, 2017 WL 3310692 (N.D. Cal. Aug. 3, 2017). The purchaser did not rely on any marketing or advertising, but on the product's packaging:

> Pettit purchased Freshmates in 2014, apparently under the impression that "flushable" meant "[t]hat it goes down the toilet... [t]hat it was safe for the sewer system"… Later… she learned wipes like Freshmates have "damaged home plumbing systems and wastewater treatment facilities in municipalities all over the country."
>
> According to Pettit, she and the putative class members were wrongly charged a premium for "flushable" wipes that are not actually suitable for flushing.

*Id.* at 1. The Northern District of California granted class certification on the purchaser's UCL and CLRA claims, and in the process, rejected the defendant's arguments that the plaintiff lacked standing. *Id.* at 5. Likewise, in *Ries*, the plaintiffs purchased "Arizona All Natural Green Tea", which was not all natural, but contained chemically-derived sweeteners. 287 287 F.R.D. at 527. The court held that consumers' reliance on "All Natural" in the name of the product was sufficient to establish standing. *Id.* at 531.

The Court should do the same here because Flores and Kaden are in an analogous position to the *Pettit* and *Ries* plaintiffs: they were wrongly charged a premium for a "sleeper" that was not actually suitable for sleeping. Flores plainly testified that she relied on the name of the RNPS in making her purchase decision. *See* Ex. 13 (Flores Tr.) at 45:24-46:4 ("It's called a sleeper" made her think the RNPS was safe). Kaden similarly testified that she was influenced to purchase the product because "the product was called a sleeper," had a "picture of a sleeping baby," and a "statement that it was safe for all night or overnight sleep."  *Id.* at 113:17-22. Also, Flores saw

statements regarding sleep on the website, and Kaden saw pictures of babies sleeping in the RNPS or box when purchasing the product. *See* Ex. 6 (Purchaser Tr. Table) at Column C. Thus, Defendants misstates the law and ignores testimony when claiming that Flores and Kaden cannot establish reliance on any false or misleading claims in Defendants' advertising. Def. Br. at 39

*Second*, Defendants misunderstand California law in arguing that Flores and Kaden cannot establish reliance on misleading claims because they admitted to weighing other factors in their purchase decisions, such as price, blogs, and brand reputation. In discussing standing under the UCL, the California Supreme Court has held:

> It is not necessary that the plaintiff's reliance upon the truth of the fraudulent misrepresentation be the sole or even the predominant or decisive factor influencing his conduct. It is enough that the representation has played a substantial part, and so had been a substantial factor, in influencing his decision.

*In re Tobacco II Cases*, 20 P.3d at 39 (internal citations omitted). Thus, Flores and Kaden do not need to have relied *solely* on Defendants' misrepresentations. It is sufficient that Defendants' misrepresentations and omissions were a substantial factor, which Plaintiffs' testimony clearly establishes.

### b. Because Defendants' Misleading Misrepresentations and Omissions were Material, Individual Issues Do Not Predominate

Defendants' arguments about the predominance of individual issues in the proposed California Class are premised on the same glaring flaw as their standing argument: "Plaintiffs cannot establish that all members of the putative California Class were exposed to the allegedly offending advertising." (Def. Br. at 39-40). Again, Defendants try to frame the issue in term of exposure to advertising alone, which is not the law.

Materiality under the UCL and CLRA is an objective standard: "A misrepresentation is judged to be 'material' if a reasonable man would attach importance to its existence or

nonexistence in determining his choice of action in the transaction in question." *In re Tobacco II*, 207 P.3d at 39. Further, "a presumption, or at least an inference, of reliance arises wherever there is a showing that a misrepresentation was material." *Id.*; *see also Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011). As such, the issue is not whether individual class members were exposed to a misrepresentation, but whether the misrepresentation was communicated to the entire class. *E.g.*, *Nilon*, 2014 WL 12570897, at *7 (reliance and exposure can be presumed under UCL and CLRA where "a plaintiff singles out a product's labeling or a common advertising campaign"); *Krommenhock*, 334 F.R.D. at 581 n.24 ("Whether 'all or most consumers' were actually exposed to and relied on Challenged Statements are not relevant questions under the California consumer protection statutes at issue"). For example, in *Ries*, the product's name contained: "[t]he representation that a beverage is 'All Natural' or '100% Natural' is likely to be material." 287 F.R.D. at 531. The *Ries* court certified a class under the UCL and CLRA, holding:

> In such cases an inference of reliance for each class member arises as to the entire class where, as here, material misrepresentations have been made to the entire class. Plaintiffs meet the *Dukes* standard because the entire proposed class has suffered the same injuries flowing from the alleged misrepresentations . . . .

*Id.* at 538 (internal citations omitted). Also, the *In re Tobacco II* court held that where consumers allege "exposure to a long-term advertising campaign" concealing health risks, they are not required to prove with "an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statement." 207 P.3d at 40. Moreover, exposure to misrepresentations "has no relevance to the present case, where Plaintiffs' theory is that Defendant's *omissions* violated the UCL, FAL, and CLRA and that partial representations *on the product itself* are misleading." *Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 482 (C.D. Cal. 2012).

Here, the very name of Defendants' product—Rock 'N Play **Sleeper**—is a *material* misrepresentation and omission about its safety and suitability, which was made to the entire class.

38

Any reasonable person would attach importance to the term "Sleeper" in determining whether to purchase a product for infant sleep, just as Flores and Kaden. Further, just as in *In re Tobacco II*, consumers have been exposed to Defendants' long-term Safety Message about the RNPS concealing safety risks as well as Defendants' brand name. *See* Ex. C (Silverman Report) at ¶¶ 34. Thus, the entire California class has suffered the same injuries (*i.e.*, purchasing RNPS) flowing from Defendants' alleged misrepresentations and omissions.

### 4. *The Florida Class*

Defendants assert that a class cannot be certified under the Florida Deceptive and Unfair Trade Practices Act ("FDUTPA") because, they say, there was no "uniform exposure" to their misrepresentations such that individual causation issues predominate. Def. Br. at 40-41. Essentially, Defendants seek "to re-read a reliance and *seeing* requirement into the statute that does not exist." *Hasemann*, 331 F.R.D. at 264 (emphasis in original). But "[t]here are no individualized issues of reliance or causation under FDUTPA" because proof of reliance is unnecessary. *Collins*, 2020 WL 3268340, at *29 (collecting cases). Indeed, the FDUTPA "employs a similar framework as New York and California" such that consumers need only "show that a reasonable consumer would have been deceived." *E.g.*, *In re Kind*, 337 F.R.D. at 599 (citation omitted); *see also Bowe v. Pub. Storage*, 318 F.R.D. 160, 182 (S.D. Fla. 2015) (the "correct inquiry . . . is whether Public Storage's misrepresentations were "likely to deceive a consumer acting reasonably in the same circumstances" (citations omitted)). Under the FDUTPA, the important inquiry is "not of detailed scrutiny into the issue of exposure, but instead into the issue of deception . . . ." *Hasemann*, 331 F.R.D. at 264 (predominance was met under FDUTPA). Here, Huey and every Florida Class member were exposed to and deceived by the uniform misrepresentation that the Rock 'n Play *Sleeper* was safe for sleep at least by its name, as well as its omissions. *See* Section II.B., *supra*; Ex. 15 (Huey Tr.) at 165:17-166:2 ("It's not a Rock 'n Play. It's not a Rock 'n Play and Entertain.

It's a Rock 'n Play Sleeper, meaning it's okay for sleep.").

The cases cited by Defendants are not to the contrary. In *Perisic v. Ashley Furniture Indus.*, 2018 U.S. Dist. LEXIS 118337 (M.D. Fla. June 27, 2018), plaintiffs attacked as the uniform misrepresentation Ashley Furniture's use of the words "leather" and "durable" to sell an imitation-leather product called DuraBlend. The court rejected certification because class members had seen various representations about durability and "the use of that term begs the question: Durable as compared to what?" There is no comparable ambiguity here, where the RNPS name connotes a product safe for use with infant sleep and Defendants' omitted the dangers of the product. Defendants' citation to *Fitzpatrick v. Gen. Mills, Inc.*, 263 F.R.D. 687, 693 (S.D. Fla. 2010), is puzzling, because it is an excellent case in Plaintiffs' favor, certifying a class based on uniform misrepresentations about the digestive benefits of a yogurt product over defense arguments that there was no uniform representation among advertising statements because the health claim was common to all advertising for the product. *Id.* at 700. Finally, *PB Prop. Mgmt. v. Goodman Mfg. Co., L.P.*, 2016 U.S. Dist. LEXIS 97520 (M.D. Fla. May 11, 2016), concerned air conditioning and heating systems with defective coils that were sold through contractors and other middle-men who made varying claims about the products, with nothing like the uniform "Sleeper" name or the consistent health messaging in *Fitzpatrick.*

### 5. *The Iowa Class*

Defendants' claim that a class cannot be certified under the Iowa Private Right Act ("IRPA") because Hanson cannot demonstrate Defendants' advertising claims were the but for cause of her harm fails. Def. Br. at 42. Defendants ignore that Hanson purchased the RNPS because the word "Sleeper" was part of the product's name and because of Fisher Price's reputation for safety. Ex. 14 (Hanson Tr.) 133:3-17, 133:22-134:1. She trusted what Defendants told her and the other Class Members—that the RNPS was a safe product. *Id*. at 133:3-17. Hanson, her daughter,

and daughter-in-law all believed the RNPS was "a safe place for the babies to sleep." *Id*. at 166:14-19. Based on those beliefs in Fisher Price's reputation for safety as well as the product's safety, Hanson purchased the RNPS for her grandchildren. Had she known of the danger associated with the RNPS, she would not have purchased it or let her grandchildren use it. *Id.* at 159:25-160:11; *see also* ECF 125-21 (Hanson Aff.) ¶ 6. As such, Hanson clearly satisfies the "but-for" test in *Brown v. Louisiana-Pacific Corporation*: but for Defendants' misleading claims and omissions regarding the safety of the RNPS for infant sleep, Defendants' reputation for safe products, and the word "Sleeper" in the product name, Hanson would not have purchased the products. 820 F.3d 339, 348-349 (8th Cir. 2016). As such, Hanson's claims are typical.

Contrary to Defendants' claim that Plaintiffs must show that all Iowa Class Members were exposed to their misrepresentations, a presumption of causation is proper here on a class-wide basis. *See Brown*, 820 F.3d at 347 n.3 ("[A]n inference of reliance is logical in an omission of material facts situation because of the difficulty in proving what the party would have done if it had had the relevant information." (quotation omitted)). Defendants made uniform misleading representations and omissions regarding the safety and suitability of the RNPS for infant sleep, such that causation can be established using class-wide proof.

### 6. The New Jersey Class

Admitting that "reliance is not required" and that a presumption of causation can be applied under the New Jersey Consumer Fraud Act ("NJCFA"),[44] Defendants nonetheless argue Nadel cannot establish causation, making him atypical of the class and inadequate as a representative. Def. Br. at 43-44. Defendants mischaracterize Nadel's purchase of the RNPS as being based on

---

[44] *See e.g.*, *Elias*, 252 F.R.D. at 249 ("Where the representations are in written and uniform materials presented to each prospective plaintiff, there is a presumption of causation in [the] NJCFA").

his experience with a RNPS he was previously gifted and as not recalling the packaging or other advertising. *See* Def. Br. at 44. Contrary to Defendants' inaccurate version of Nadel's testimony, he testified that he registered for his first RNPS after seeing it online and walking through a store. In addition, he recalled seeing statements and imagery, including pictures of a sleeping baby and a mother, on the packaging. Ex. 20 (Nadel Tr.) at 74:2-12, 76:1-4, 154:6-25. Prior to his purchase, Nadel saw Defendants' marketing material touting the product, including a picture of a child in the RNPS, on both an information blurb and on a webpage (*id*. at 82:16-20, 83:5-9) as well as on the RNPS box. *Id.* at 113:19-114:4. Nadel further testified that "I was happy with the first one and then ***continued to see advertising*** -- you know, see things online and that probably definitely caused me to get the second one myself." *Id.* at 151:16-21 (emphasis added). Nadel purchased the RNPS based on his view that it would be a "good place" (*i.e.*, safe place) for his second daughter to sleep. *Id.* at 160:2-3. As such, Defendants' claims that Nadel is an atypical and inadequate class representative because he "doesn't recall" packaging or advertising is flatly contradicted by his testimony.

The heart of Defendants' erroneous argument is that predominance is lacking because every class member cannot prove that they relied upon the same representation. First, "the true burden [under the NJCFA] for the plaintiffs is to make a showing that the statements found on the packaging were misrepresentations, not to prove causation as to each individual class member." *Elias*, 252 F.R.D. at 238; *Ebin*, 297 F.R.D. at 568 (certifying NJCFA class where the "same generalized evidence will be used" to determine whether packaging was likely to mislead a reasonable consumer). Second, a NJCFA claim need not be based on an affirmative misstatement of fact as claims may be based on knowing omissions of material fact relating to a product being sold. *See Dugan v. TGI Fridays, Inc.*, 171 A.3d 620, 636 (N.J. 2017) (holding an "'unlawful

practice' contravening the CFA may arise from . . . *a knowing omission*") (emphasis added); *Cameron v. S. Jersey Pubs, Inc.*, 213 A.3d 967, 984 (N.J. Super. Ct. App. Div. 2019) (same). Importantly, concealment of safety risks demonstrates satisfaction the NJCFA elements. *See Berry v. Mega Brands Inc.*, 2009 WL 233508, at *4 (D.N.J. Jan. 30, 2009) ("Plaintiffs' Complaint alleges that Defendants concealed a known safety risk from customers" as the recall notice stated that toys contained magnets which could be swallowed by a child) (citing *Perth Amboy Iron Works, Inc., v. American Home Assurance Co.*, 226 N.J. Super. 200, 208-13 (N.J. App. Div. 1988) (holding that an engine manufacturer could be held liable under the NJCFA for concealing known safety or operational problems)). The CAC very clearly alleges that the NJCFA claim is based, *inter alia*, on Defendants' conduct in failing to reveal to potential purchasers that they knew the product was defective because it was unsafe and unsuitable for infant sleep. *See* CAC ¶ 791. Had Nadel known the truth about the RNPS—that they were not safe—he would not have purchased it. ECF 125-21 (Nadel Aff.) at 24. But of course, like the other Plaintiffs and Class members, Nadel did not know the RNPS were dangerous until well after his purchase. Ex. 20 (Nadel Tr.) at 68:6-24. As such, the omitted information about the dangers of the RNPS was material.[45] Lastly, Defendants' arguments that a presumption of causation is inappropriate fail for the reasons set forth in Section II.B, *supra*.

### 7. *The New York Class*

Defendants concede that there is no reliance requirement under N.Y. Gen. Bus. Law § 349,

---

[45] Defendants principally rely on *Marcus v. BMW of North America, LLC*, 687 F.3d 583, 610 (3d Cir. 2012 to rebut causation, but that case is inapposite. In *Marcus*, the Court found defendants submitted "significant" evidence that plaintiff consumers were actually aware of the defects in the tires at issue in the litigation and purchased the tires anyway (*id.* at 611), which is not the case here. In addition, while Defendants cite *In re Tropicana Orange Juice Mktg. & Sales Pracs. Litig.*, No. CV 2:11-07382, 2018 WL 497071, at *8 (D.N.J. Jan. 22, 2018), in claiming claim the putative class members did not act in a sufficiently similar manner with respect to the alleged omission or misrepresentation; here, unlike that case, there is no evidence consumers would have purchased the products had they known they were dangerous and potentially cause death.

and instead argue that Plaintiffs cannot demonstrate causation because they cannot establish uniform exposure to the Marketing Statements and the Safety Message (Def. Br. at 45). However, GBL 349 does not require "one hundred percent certainty that each and every customer has been exposed to the representations." *Hasemann*, 331 F.R.D. at 267 (certifying GBL 349 claim, reasoning class certification "rarely hinge[s] on this issue" of uniformity of exposure). Indeed, New York courts regularly certify classes asserting GBL 349 claims based on misrepresentations and omissions made on a product's packaging or in its name. *See, e.g.*, *id.*; *Kurtz*, 414 F. Supp. 3d at 333-34 (certifying class of purchasers of product described on package as "flushable" wipes when such wipes allegedly caused extensive damage to plumbing systems when flushed); *Guido v. L'Oreal, USA, Inc.*, 284 F.R.D. 468, 483 (C.D. Cal. 2012) (common issues predominate with respect to GBL 349 claim arising from an omission of a flammability warning); *Ebin*, 297 F.R.D. at 565-66 (certifying class of purchasers of olive oil that allegedly misrepresented that it was "100% Pure Olive Oil" on the package); *In re Scotts EZ Seed*, 304 F.R.D. at 409 (certifying class of purchasers of seeds falsely advertised on packaging as being "50% thicker"); *Belfiore*, 311 F.R.D. at 70 (whether a label was material to consumer's decision to purchase "is an objective inquiry that focuses on that packaging."); *In re Kind*, 337 F.R.D. at 602 (same).[46] Here, Plaintiff

---

[46] The cases cited by Defendants (Def. Br. at 45, n.72) are readily distinguishable. *See Weiner v. Snapple Beverage Co.*, 2010 WL 3119452 (S.D.NY. Aug. 5, 2010) (declining to certify class when, unlike here, plaintiffs failed to establish price premium for allegedly deceptive "all natural" advertising claim on Snapple beverages); *In re Avon Anti-Aging Skincare Creams and Prods. Mkting. & Sales Pracs. Litig.*, 2015 WL 5730022 (S.D.N.Y. Sept. 30, 2015) (denying certification and *explicitly distinguishing* the marketing claims at issue from "a case in which the misrepresentation at issue was made to all consumers – for example, through a uniform product label"); *Wright v. Publishers Clearing House, Inc.*, 372 F. Supp. 3d 61, 67 (E.D.N.Y. 2019) (granting motion to dismiss where, unlike here, the plaintiffs did not allege which advertisements they saw); *Small v. Lorillard Tobacco Co.*, 720 N.E.2d 892, 896 (N.Y. 1999) (affirming decertification of class tobacco users "where he dangers of smoking had been well documented and were generally known to the public" unlike here where the dangers of inclined sleepers are

has established that she, and all members of the New York Class, were exposed to Defendants' misleading misrepresentations and omissions because (a) the Fisher-Price brand is associated with safety; (b) the word "Sleeper" is *part of the name of the product;* and (c) no reasonable consumer would have purchased RNPSs had they know the truth about the product.[47]

Also, Defendants' argument that Class members' purchasing decisions are individualized (Def. Br. at 45) fails as set forth in Section II.B., *supra*. In focusing on individual purchase decisions, Defendants conflate "reliance" with "causation," which New York courts have "cautioned against." *Kurtz*, 321 F.R.D. at 549. Under GBL 349, "the individual reason for purchasing a product [is] irrelevant" because reliance is not required. *Hasemann*, 331 F.R.D. at 266. Additionally, Defendants' conclusory statement that injury cannot be established class-wide ignores that, in a case such as this, the "injury is the purchase price[,]" which does not depend on individualized experiences with the RNPS. *Kurtz*, 321 F.R.D. at 531 (citations omitted). Thus, Plaintiffs have established that common issues predominate with respect to their GBL 349 claims. Moreover, Alfaro is typical as Defendants do not dispute Alfaro can establish causation or injury.

### 8. The Texas Class

Defendants argue class certification on the Texas Deceptive Trade Practices Consumer Protection Act ("DTPA") claim "must also be denied because individual issues of reliance predominate . . . [and] Plaintiffs cannot establish that all putative class members saw or relied on Defendants' claims or alleged omissions before deciding to purchase their RNPS." Def. Br. at 46-47. But this is wrong. The DTPA does not require reliance to be individually proven for every member of the class. *Alford Chevrolet-Geo v. Jones*, 91 S.W.3d 396, 405-06 (Tex. App. Ct. 2002)

---

not); *Ackerman*, 2013 WL 7044866 (denying class certification when, unlike in the instant action, plaintiffs failed to show how price premiums could be calculated).

[47] Ex. 8 (Alfaro Tr.) at 74:1-15, 152:5-11, 218:5-219:17, 226:11-20.

(holding DTPA did not require that each new car buyer prove individual reliance in each case, and certifying a DTPA class); *In re ConAgra*, 90 F. Supp. 3d at 1017 (certifying a Texas class because "TDTPA claim is susceptible of classwide proof if common evidence exists"). In addition, courts have found the reliance requirement of the DTPA to be materially similar to that of the CLRA. *Brazil v. Dell Inc.*, 585 F. Supp. 2d 1158, 1165 (N.D. Cal. 2008) ("[T]he court does not find that the CLRA and DTPA materially differ with respect to a reliance requirement."). Plaintiffs have established they meet requirements of the CLRA (*see* Section II.D.3., *supra*), and the same result should follow. Plaintiffs allege Defendants made the same misrepresentations in the form of false and misleading marketing to every member of the purchaser class. *See* Pl. Br. at 20-22. Courts have certified classes under the DTPA based on similar misrepresentations, and this Court should as well. *See Dzielak*, 2017 WL 6513347 (certifying a DTPA claim based on allegations that an appliance was improperly labeled with an energy efficiency logo despite not meeting federal efficiency standards); *see also In re ConAgra Foods*, 90 F. Supp. 3d at 1018 (materiality met where consumers exposed to a "100% Natural" or "Natural" claims on ConAgra product labels).[48]

---

[48] Defendants' reliance on *Henry Schein, Inc. v. Stromboe*, 102 S.W.3d 675, 693-94 (Tex. 2003), is misplaced. *Henry Schein* concerned alleged misrepresentations by sellers of dental supplies that included salesman who "steered" plaintiff to a "more expensive product" over the course of phone calls and direct person-to-person contact. *Id.* at 679-80. Thus, there were countless misrepresentations made in different phone calls. By contrast, this case deals with the same alleged misrepresentations directed to all purchasers of Defendants' product. *See* Pl. Br. at 20-22. Similarly, *Martin v. Home Depot U.S.A., Inc.*, 225 F.R.D. 198 (W.D. Tex. 2004), and *Kirkpatrick v. HomeAway.com Inc.*, 2020 WL 7680558 (W.D. Tex. Apr. 21, 2020) dealt with highly individualized questions and defenses that are not applicable here. *See Martin*, 225 F.R.D. at 202 (finding that claims turn on "individual knowledge about the characteristics and alleged defects of treated wood" and the "defense will turn on the individual knowledge available at any given time during the class period, and can vary from year to year, from store to store, from manager to manager, and even from employee to employee"); *see also Kirkpatrick*, 2020 WL 7680558, at *1 (case dealt with a complicated question about whether class members would have used a website if they knew the website would break a promise not to charge "traveler's fees"). Finally, *Gordon v. Sig Sauer, Inc.*, 2019 WL 4572799, at *21 (S.D. Tex. Sept. 20, 2019), was decided at the motion to dismiss stage rather than class certification and is thus inapposite.

### 9. *The Washington Class*

Defendants incorrectly argue that with respect to Plaintiffs' claim under the Washington Unfair Business Practices – Consumer Protection Act ("WACPA") claim that Plaintiffs fail to allege that Defendants' misrepresentations and omissions were a "but for" cause of their injury (Def. Br. at 47). Indeed, Plaintiffs allege that they would not have purchased the RNPS sleeper had they known that it was not actually safe for infant sleep as advertised. While Defendants claim Shaffer's testimony shows she purchased the RNPS based on her coworker's recommendation (Def. Br. at 47), Shaffer testified that she purchased the RNPS because she believed it was safe for overnight sleep due to the advertising she saw on the RNPS box (Ex. 24 (Shaffer Tr.) at 85:3-20, 112:21-113:18) and that she was economically harmed as a result of purchasing the RNPS (*id.* at 125:19-22). As such, Shaffer is typical of other Washington Class members.

Further, Courts have certified classes alleging violations of the WACPA when plaintiffs have made similar claims—*i.e.*, that they purchased a product that was advertised as having a specific attribute (in this case, being a safe infant sleeper), and did not receive such a product. *See, e.g.*, *Kelley v. Microsoft Corp.*, 251 F.R.D. 544, 558-59 (W.D. Wash. 2008) (predominance requirement met when plaintiff-consumers alleged that they paid a premium for a feature they failed to receive); *Tershakovec v. Ford Motor Co.*, No. 17-21087-CIV, 2021 WL 2700347, at *20 (S.D. Fla. July 1, 2021) (certifying MACPA claim where car was advertised as "track-ready"). [49]

---

[49] The cases Defendants cite (Def. Br. at 7 n.78) are inapposite. In *Geier v. M-Qube Inc.*, 314 F.R.D. 692, 701 (W.D. Wash. 2016), the court held questions of causation predominated because the class definition was overbroad as it included people "who viewed non-misleading landing pages, [and] received precisely what they bargained for." *Id.* Also, *Weidenhamer v. Expedia, Inc.*, No. C14-1239RAJ, 2015 WL 7157282, at *12-13 (W.D. Wash. Nov. 13, 2015) denied class certification where airlines' baggage fees were allegedly deceptive because customers had affirmatively elected to view Expedia's baggage fee displays and the displays differed for each airline carrier. *Id.* Further, the plaintiff in *Weidenhamer* did not allege any omissions in its complaint. *Id.*

Also, Washington courts have recognized that where omissions (such as those here) are alleged, "individual issues would not predominate as [plaintiffs can] rely upon a quasi-presumption of reliance." *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1268 (W.D. Wash. 2009) ("Washington courts do not require a plaintiff to allege individual reliance on Defendants' conduct, particularly where the non-disclosure of a material fact is alleged."). As such, "the presumption of reliance based on the identical material omission is sufficient basis of common proof for reliance and causation." *Falco v. Nissan N. Am. Inc.*, No. CV1300686DDPMANX, 2016 WL 1327474, at *11 (C.D. Cal. Apr. 5, 2016) (certifying WACPA claim).

### E. Negligence Classes Should Be Certified

#### 1. Arkansas

Defendants do not challenge they owed a duty to sell products that are safe for their intended and normal use, had a duty to warn consumers of the dangers inherent in the RNPS, nor that Plaintiff and the Class were damaged. Defendants' sole challenge is that Nowlin cannot prove proximate cause, which is based on mischaracterizations of Nowlin's testimony. Def. Br. at 48-49. At no point did Nowlin testify she was "specifically looking for an inclined sleep product." *Id.* In fact, Nowlin testified she was looking for something her baby could sleep in next to her bed, like a bassinet.[50] Nowlin further testified she only purchased the RNPS because she saw it first at Wal-Mart and Target.[51] Contrary to Defendants' assertion that Nowlin never saw the box or advertisements, she testified she simply could not remember, five years later, specifically what the box looked like at Wal-Mart.[52] Defendants come forward with any evidence that Wal-Mart did not provide the boxes nor display the boxes nor the product name of the RNPS.

---

[50] Ex. 21 (Nowlin Tr.) at 146:18-25; 149:7-16.
[51] *Id.* at 61:21-62:5; 143:14-147:23.
[52] *Id.* at 62:17-24.

Also, there is no intervening influence for Ms. Nowlin's purchase decision other than Defendants' actions. Defendants have not shown the existence of any other source of influence for Ms. Nowlin nor to the Class that would influence their purchasing decisions. Defendants' cited case law only support this point. *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604, 626 (8th Cir. 2011), involved faulty plumbing fitting that failed and caused property damage. Certification of the negligence claim was denied because it was not shown whether the failure was caused by a uniform defect or some other environmental factors unique to each class members property. *Id.* Here, the defect of the RNPS is uniform and so fundamental that reasonable parents would not have purchased one for their child had Defendants disclosed the true dangers of the RNPS. *Simpson Housing Solutions, LLC v. Hernandez*, 347 S.W.3d 1, 20 (Ark. 2009), involved personal injuries and deaths from carbon monoxide exposure due to defectively designed HVAC units in an apartment complex. The court found predominance lacking because each class member would need to show "the extent of exposure to carbon monoxide and how that exposure caused damage to the putative-class members." *Id.* at 19. In this case, Nowlin has shown if Defendants had not misrepresented or had provided accurate warnings of the danger of the RNPS, neither she nor the Class would have purchased the RNPS.[53]

### 2. *New Jersey*

Defendants argue that the economic loss doctrine bars the New Jersey Plaintiffs' negligence claim (Def. Br. at 49), but New Jersey courts recognize an exception to this doctrine "when the tort claim is based on conduct that is either independent of a contract or where there is a risk of personal injury." *In re Volkswagen Timing Chain Products Liab. Litig.*, No. 16-2765 (JLL), 2017 WL 1902160, at *21 (D.N.J. May 8, 2017) (upholding a negligent misrepresentation

---

[53] Ex. 21 (Nowlin Tr.) at 146:18-147:5.

claim against assertion of the economic loss doctrine, and collecting cases from of states with this exception). Here, Plaintiffs' negligence claim arises from, among other things, Defendants' omissions and misrepresentations regarding the RNPS. CAC ¶ 817. This claim concerns a separate set of facts from the warranty/contract claim, which concerns Defendants' egregious breach of the implied warranty of merchantability, and is independent of that claim. [54] Furthermore, there is a high risk of personal injury here, given the defective and dangerous nature of the RNPS for infants. Therefore, Plaintiffs' negligence claim falls securely within this exception to the economic loss doctrine. [55]

### F.  Implied Warranty Classes are Certifiable

Plaintiffs seek certification of breach of implied warranty claims for ten classes: Arkansas, California, Colorado, Florida, Iowa, New Jersey, New York, Pennsylvania, Texas, and Washington. Importantly, Defendants' arguments regarding the merits of Plaintiffs' claims are beside the point because the relevant issue under Rule 23 is whether the class claims can be pursued using common proof and/or legal arguments. *See Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013) ("Rule 23 grants courts no license to engage in free-ranging merits

---

[54] By contrast, the case that Defendants involved a negligence claim that duplicated the U.C.C. cause of action, and the duplication is "superfluous and counterproductive." *Alloway v. General Marine Industries, L.P.*, 149 N.J. 620, 641 (N.J. 1997). Here, the negligence claim asserted by the New Jersey plaintiffs against defendants concerns a different set of facts from the contract claim.

[55] If, however, the Court finds that there is too much duplication of the implied warranty claim by the negligence claim, the New Jersey Plaintiffs request, in the alternative, in the event the class is not certified on the implied warranty claim, it instead be certified on the negligence claim in addition to the NJCFA and unjust enrichment claims. "A class action permits 'claimants to band together' and, in doing so, gives them a measure of equality against a corporate adversary, thus providing 'a procedure to remedy a wrong that might otherwise go unredressed.'" *Lee v. Carter-Reed Co., L.L.C. et al.*, 203 N.J. 496, 517-18 (N.J. 2010) (quoting *Matter of Cadillac V8-6-4 Class Action*, 461 A.2d 736 (N.J. 1983)). New Jersey courts, and indeed courts across the country, favor class action suits in lieu of individual lawsuits, for the sake of "'judicial economy,' 'consistent treatment of class members,' and 'protection of defendants from inconsistent [results].'" *Id.* at 518 (quoting *Iliadis v. Wal-Mart Stores, Inc.* 191 N.J. 88, 104 (N.J. 2007)).

inquiries at the certification stage."). Indeed, any merits-based defenses are themselves common as to all class members. For the reasons set forth below, the breach of implied warranty claims, including whether the claim falls within an exception to the privity requirement where required, are based on common set of facts and legal issues such that predominance is met.

### 1. Certification is Proper for the Five States Lacking Privity Requirements

Defendants tacitly admit that Arkansas, Colorado, New Jersey, Pennsylvania, and Texas do not require privity for a claim of breach of implied warranty. Defendants' primary argument as to breach of implied warranty claims in states lacking privity requirements appears to consist of an attempt to "gin up" an individual issue relating to whether some class members in these states may have been "satisfied" with the product before the Recall (Def. Br. 52-53). This argument is nothing more than a red herring as the test for breach of an implied warranty is objective rather than subjective such that courts applying Arkansas, Colorado, New Jersey, Pennsylvania, and Texas law have each certified classes on the claim because the focus of implied warranty claims is the defendant's conduct and the nature of the product itself.[56] Moreover, no class member

---

[56] **Arkansas:** *Gen. Motors Corp. v. Bryant*, 285 S.W.3d 634, 639 (Ark. 2008) (affirming certification of class alleging breach of implied warranty because "[w]hether or not the class vehicles contain a defectively designed parking-brake system and whether or not General Motors concealed that defect are predominating questions"); **Colorado:** *Joseph v. Gen. Motors Corp.*, 109 F.R.D. 635, 637 (D. Colo. 1986) (certifying class of Colorado purchasers of certain model Cadillac who were pursuing, *inter alia*, claims of breach of implied warranty); **New Jersey:** *Cadillac V8-6-4 Class Action*, 461 A.2d at 744 (affirming certification of a class of New Jersey car buyers under New Jersey law, noting that allegation of a specific defect and common complaints "sustain a class action for breach of implied warranty"); *Bunting v. DaimlerChrysler Co., LLC*, No. A-3590-07T3, 2009 WL 649570, at *2 (N.J. Super. Ct. App. Div. Mar. 16, 2009) (holding that a plaintiff's subjective complaints regarding product had no bearing on warranty claim); **Pennsylvania:** *Samuel-Bassett v. Kia Motors Am., Inc.*, 34 A.3d 1, 24 (Pa. 2011) (upholding certification of a Pennsylvania class of car purchasers pursuing implied warranty of merchantability claims, holding: "common questions of law and fact existed, such as whether the 1997-2000 Sephias had the common defect alleged, whether KMA had the ability to repair the defect, whether KMA breached the express and implied warranties"); **Texas:** *Tershakovec*, 2021 WL 2700347, at *21 (certifying Texas implied warranty class because "the big question of whether the product was defective at the time it was sold is a common one").

remained "satisfied" with a product once they learned the true state of affairs: it could kill their child if he or she fell asleep in the RNPS. S*ee* Ex. 6 (Purchaser Tr. Table) at Column G; *see also* Ex. 7 (Owner Tr. Table) at Column G. Despite Defendants' apparent argument that successful concealment of the true nature of the defect from purchasers could somehow defeat a claim for breach of implied warranty, this is a common issue. *E.g.*, *Bryant*, 285 S.W.3d at 639 ("whether or not General Motors concealed that defect [is a] predominating question[]"). Thus, whether the RNPS was defective is the predominating issue over any potential individual issues relating to the implied warranty claims pleaded on behalf of the Arkansas, Colorado, New Jersey, Pennsylvania, and Texas classes.

### 2.   *A California Breach of Warranty Class is Warranted*

First, Defendants' "privity" argument ignores that Plaintiffs pleaded a breach of implied warranty claim on behalf of the California class under the Song-Berly Consumer Warranty Act, California Civil Code §§ 1792 and 1791.1, *et seq* ("SBA"). *See* CAC Count 17. Such a breach of implied warranty claim lacks a privity requirement. *See Ehrlich v. BMW of N. Am., LLC*, 801 F. Supp. 2d 908, 921 (C.D. Cal. 2010) ("the Court agrees with Plaintiff and the weight of authority that the plain language of section 1792 of the Song-Berly Act does not impose a similar vertical privity requirement").[57] As such, an implied warranty claim under the SBA should be certified for the same reasons predominance is met with respect to the other states that lack privity requirements. *See* Section II.F.1., *supra*; *see also Allen*, 306 F.R.D. at 649 (predominance was met,

---

[57] *See also Gonzalez v. Drew Indus.*, 750 F. Supp. 2d 1061, 1072 (C.D. Cal. 2007 ) ("the plain language of the Song-Berly Act . . . has been interpreted by a sister-district court in this district as explicitly imposing an implied warranty on manufacturers as well as retail sellers."); *In re NVIDIA GPU Litig.*, No. C 08-04312 JW, 2009 WL 4020104, at *4 (N.D. Cal. Nov. 19, 2009) ("The plain language of the Song-Berly Act does not require vertical contractual privity between a manufacturer and a consumer.").

because under the SBA, "Plaintiffs need only show that the Products did not conform to the promises or affirmations on the Products' labels in order to successfully prove this claim.").

With regard to Plaintiffs' other warranty claim (CAC Count 16), California recognizes the third-party beneficiary exception to the privity requirement. *E.g.*, *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 984 (N.D. Cal. 2014). Also, California law recognizes an exception to the privity requirement based on statements made on manufacturer's product packaging, as is the case here. *See Gonzalez*, 750 F. Supp. 2d at 1072-73 ("even were the Court to strictly apply the a vertical privity requirement, California law recognizes exceptions to the privity requirement where there has been reliance on the manufacturer's written representations in labels or advertising."); *Burr v. Sherwin Williams Co.*, 42 Cal. 2d 682, 696, 268 P.2d 1041, 1048-49 (1954) (where the California Supreme Court held the requirement of privity did not apply in a warranty claim if the end-use consumer relied on labels created by the manufacturer).

### 3. *The Privity Defense to the Remaining Claims Turns on Common Issues*

New York recognizes a "thing of danger" exception to the privity requirement where a product is "likely to be a source of danger" to people if not properly designed and fashioned. *See Hubbard v. Gen. Motors Corp.*, No. 95 CIV. 4362, 1996 WL 274018, at *5 (S.D.N.Y. May 22, 1996) (citations omitted); *All-Tronics, Inc. v. Ampelectric Co.*, 354 N.Y.S.2d 154 (App. Div. 1974) ("a defect in a potentially hazardous product subjects the distributor-vendor and the manufacturer to liability to a purchaser for breach of implied warranties"). Moreover, New York recognizes an exception to the privity requirement based on a third-party beneficiary theory. *See e.g.*, *Catalano v. BMW of N. Am., LLC*, 167 F. Supp. 3d 540, 554 (S.D.N.Y. 2016); *Praxair, Inc. v. Gen. Insulation Co.*, 611 F. Supp. 2d 318, 330 (W.D.N.Y. 2009). Whether or not the implied warranty claim of the New York class falls within either of these exceptions is itself an issue which is common to the entire New York class. Indeed, determining the application of "things of danger" exception

involves common issues surrounding the defective nature of the RNPS. *See Tait v. BSH Home Appliances Corp.*, 289 F.R.D. 466, 485 (C.D. Cal. 2012) (certifying New York implied warranty claim because "Plaintiffs' theory here is grounded in a defective design common to all").

Similarly, Iowa recognizes a design defect exception to the privity requirement when the breach is based on a defective design. *Wright v. Brooke Group Ltd*., 652 N.W.2d 159, 183 (Iowa 2002) ("If the breach is based on a defective design… recovery is not precluded under the stated facts.").[58] Also, Iowa recognizes the third-party beneficiary exception to privity.[59] Similarly, Washington law recognizes a third-party beneficiary exception, including where a manufacturer knew the purchaser's purpose or requirements for purchasing the manufacturer's product. *Lohr v. Nissan N. Am., Inc*., 2017 WL 1037555, at *7 (W.D. Wash. Mar. 17, 2017). Determining the applicability of these exceptions to privity is a class-wide issue.

Next, "Florida courts have found the privity requirement to be satisfied when a manufacturer . . . has direct contact with . . . a buyer who purchases from a third party." *Ohio State Troopers Ass'n, Inc. v. Point Blank Enterprises, Inc.*, No. 0:17-CV-62051-UU, 2018 WL 3109632, at *6 (S.D. Fla. Apr. 5, 2018). Here, Defendants placed language and images on the RNPS' box and website (including calling it a "Sleeper") and pictures of a sleeping infant on the box, which could amount to direct contact with buyers. Also, although Defendants point to a split of authority

---

[58] *See also Ballard v. Amana Soc'y, Inc.,* 526 N.W.2d 558, 562 (Iowa 1995) ("More recently, this court has held that proof of a 'serious product defect' was sufficient to support submission of strict liability and breach of warranty theories."); *Scott v. Dutton-Lainson Co*., 774 N.W.2d 501, 505 n. 2 (Iowa 2009); *Meredith v. Medtronic, Inc.*, 318CV00127RGEHCA, 2019 WL 6330677, at *3 (S.D. Iowa Oct. 25, 2019).

[59] *Bailey v. Iowa Beef Processors, Inc.,* 213 N.W.2d 642, 645 (Iowa 1973); *see also Midwest Dredging Co. v. McAninch Corp*., 424 N.W.2d 216, 224 (Iowa 1988). While the third-party beneficiary exception does not extend to claims seeking only economic damages, *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103, 108 (Iowa 1995), Plaintiffs seek injunctive and declaratory relief in addition to damages.

regarding whether Florida recognizes a third-party beneficiary exception (Def. Br. 51), determining its application is a common legal issue.

### G. Unjust Enrichment Classes Can be Certified

Although unjust enrichment laws vary slightly from state to state, almost all contain the same elements or slight variations thereof: (1) the defendant was enriched (2) at plaintiff's expense, and (3) under the circumstances, it would be unjust or inequitable for the defendant to retain the benefit.[60] "Class certification of unjust enrichment claims is appropriate where, as here, 'the crux of the plaintiffs' claims is that defendant unjustly retained the benefits of its sale of . . . products to consumers after it failed to disclose material facts about the defective nature of those products.'";

*See, e.g., Famular*, 2019 WL 1254882, at *10 (citing *In re Scotts*, 304 F.R.D. at 412).

Defendants cite distinguishable cases to suggest individual inquiries are necessary to

---

[60] **Arizona:** *Trustmark Ins. Co. v. Bank One, Arizona, NA*, 48 P.3d 485, 491 (Ariz. Ct. App. 2002) (three near-universal elements of unjust enrichment exist, with the additional requirement of the absence of a legal remedy); **Arkansas:** *Hall v. David H. Arrington Oil & Gas, Inc.*, No. 209-CV-0091 BSM, 2010 WL 1253383, at *2 (E.D. Ark. Mar. 25, 2010) (the elements, while rephrased, are the same.); **California:** *Peterson v. Cellco Partnership*, 164 Cal. App. 4th 1583, 1593 (2008) (same elements); **Colorado:** *Lewis v. Lewis*, 189 P.3d 1134, 1140-41 (Colo. 2008) (while not separated into discrete elements, the three elements are the essence of the definition of unjust enrichment – Paul, here I would quote from the case); **Florida:** *Swindell v. Crowson*, 712 So. 2d 1162, 1163 (Fla. Dist. Ct. App. 1998) (same three elements, plus defendant must appreciate the benefit); **Iowa:** *Lakeside Feeders, Inc. v. Producers Livestock Marketing Ass'n*, 666 F.3d 1099, 1112 (8th Cir. 2012) (same elements); **New Jersey:** *Associates Commercial Corp. v. Wallia*, 511 A.2d 709, 716 (N.J. Sup. Ct. App. Div. 1986) (same elements); **New York:** *Clark v. Daby*, 300 A.D.2d 732, 732 (N.Y. App. Div. 2002) (same elements); **Pennsylvania:** *AmeriPro Search, Inc. v. Fleming Steel Co.*, 787 A.2d 988, 991 (Pa. 2001) (same elements, plus the defendant must appreciate the benefit); **Tennessee:** *Freeman Industries, LLC, v. Eastman Chemical Co.*, 172 S.W.3d 512, 525 (Tenn. 2005) (same elements, plus defendant must appreciate the benefit and plaintiff to show exhaustion all remedies under privity of contract unless pursuit of remedies would be futile); **Texas:** *Argyle Independent School Dist. ex rel. Board of Trustees v. Wolf*, 234 S.W.3d 229, 247 (Tex. Ct. App. 2007) (Unjust enrichment "applies the principles of restitution to disputes where there is no actual contract, based on the equitable principle that one who receives benefits that would be unjust for him to retain ought to make restitution.… To recover under an unjust enrichment theory, the benefits to the other party must be actually unjust under the principles of equity."); **Washington:** *Bailie Communications, Ltd. v. Trend Business System, Inc.*, 810 P.2d 12, 17-18 (Wash. Ct. App. 1991) (The elements are the same).

determine each Plaintiff's factual circumstances with respect to the unjust enrichment claim and

Plaintiffs cannot prevail because they received "the benefit of the bargain."[61] Def. Br. at n. 97.

*First*, some of the cases that Defendants cite involved the plaintiffs entering into varying contracts

that merited individual examinations.[62] Here, by contrast, all Purchaser Plaintiffs and Class

members purchased Defendants' defective and dangerous product, so no such individual

examinations are required. *Second*, some of the cases cited by Defendants involved situations

where some of the plaintiffs potentially had prior information regarding the defective products or

policies that gave rise to the unjust enrichment claims.[63] Here, Defendants did not disclose the

defective and dangerous nature of the RNPS until after Plaintiffs and Class members made their

purchases, so there was no potential for prior information regarding the danger. *Third*, some cases

involved specific aspects of a product or products that provided benefits such that, individual

inquiries were required.[64] Here, the RNPS is uniformly dangerous due to its 30-degree incline and

---

[61] Plaintiffs do not seek damages under a benefit of the bargain theory. *See* Pl. Br. at 41.

[62] *CLN Properties, Inc. v. Republic Services, Inc.,* No. CV-09-1428-PHX-DGC, 2010 WL 5146734, at *12-13 (D. Ariz. Dec. 13, 2010) (involving varying contracts with the defendant's subsidiaries); *Friedman v. Dollar Thrifty Automotive Group, Inc.,* 304 F.R.D. 601, 611 (D. Colo. 2015) (involving distinct and varying contracts with oral agreements and add-on products); *Maxwell v. Tyson Foods, Inc.,* No. 1:08cv00017-JAJ-TJS, 2012 WL 12541110, at *12 (S.D. Iowa July 19, 2012) (involving varying contracts).

[63] *Torres v. Nissan North America Inc.*, No. CV 15-03251 RGK (FFMx), 2015 WL 5170539, at *6 (C.D. Cal. Sept. 1, 2015) (Information about the product's defective nature had already been dispersed across the internet when some class members made their purchases); *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1274 (11th Cir. 2009) (There was a prevailing question of how much each employee knew about the company's policies); *Brown v. Kerkhoff*, 279 F.R.D. 479, 492-93 (S.D. Iowa 2012) (determination of unjust enrichment involved the treatment recommended by each patient's chiropractor); *Best Buy Co. v. Barerra*, 248 S.W.3d 160, 163-34 (Tex. 2007) (involving potential class members with differing knowledge about restocking fees).

[64] *In re ConAgra Foods*, 90 F. Supp. 3d at 993-95 (under Florida law) and 1010 (under New York law) (whether ConAgra's retention of the full purchase price of oils was unjust required individual inquiry as to class members' understanding of 100% Natural); *In re Tropicana*, 2018 WL 497071, at *5 (Purchasers may have received benefits of orange juice); *Tropical Sails Corp. v. Yext, Inc.*, No. 14 CIV. 7582, 2017 WL 1048086, at *15 (S.D.N.Y. Mar. 17, 2017) (individual inquiry

had a uniform function as a safe sleeper product for infants, so there is no need for individual examinations into the motivations of different plaintiffs and class members.

The remaining cases that Defendants cite regarding "the benefit of the bargain" pertain to products that were not uniformly defective, so that some class members may in fact have received "the benefit of the bargain."[65] Here, all Plaintiffs and class members purchased the same uniform, defective product that contained the same universal danger to their babies; thus, all plaintiffs suffered the same injury. *See, e.g.*, *Famular*, 2019 WL 1254882, at \*10.   Lastly, Defendants' argument that Willis failed to exhaust her remedies is a common defense potentially applicable Tennesee Class members, such that her claims are typical.  *See* Section I.A., *supra* (citing cases).

## H.  Damages are Capable of Being Calculated on a Class-Wide Basis

### 1.  Plaintiffs Need Only Demonstrate the Damages are Calculable

Defendants attack Plaintiffs' proposed damages analysis from a faulty premise. Second Circuit law is clear that plaintiffs need not provide a full and complete damages model in order to obtain class certification. In *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 407 (2d Cir. 2015), held that *Comcast v. Behrend*, 569 U.S. 27 (2013), "did not hold that proponents of class certification must rely upon a classwide damages model to demonstrate predominance." *Id.*; *see also de Lacour*, 338 F.R.D. at 344 ("A plaintiff's expert is not required to perform their analysis at the class

---

required where subscription service provided three primary benefits); *In re Actiq Sales & Mktg. Practices Litig.*, 307 F.R.D. 150, 169, 171 (E.D. Pa. 2015) (individual inquiry required where off-label prescriptions inherently had different effects on different potential class members); *Bearden v. Honeywell Int'l, Inc.*, No. 3:09-01035, 2010 WL 1223936, at \*10 (M.D. Tenn. Mar. 24, 2010) (class included car owners who were not "bothered by its ozone output").

[65] *Johnson v. Mitsubishi Digital Elecs. Am., Inc.*, 365 Fed. Appx. 830, 832-33 (9th Cir. 2010) (the product in question was not actually defective and could perform all of the functions represented and warranted by the manufacturer.); *Green v. Green Mountain Coffee Roasters, Inc.*, 279 F.R.D. 275, 285 (D.N.J. 2011) (product  neither uniform nor uniformly defective); *In re Canon Cameras*, 237 F.R.D. 357, 359-60 (S.D.N.Y. 2006) (same); *Ajose v. Interline Brands, Inc.*, 187 F. Supp. 3d 899, 914-15 (M.D. Tenn. 2016) (same).

certification stage."); *In re Scotts EZ Seed Litig.*, 304 F.R.D. at 414 ("[N]othing in *Comcast* requires an expert to perform his analyses at the class certification stage"). Indeed, in the Second Circuit, "the fact that damages may have to be ascertained on an individual basis is not sufficient to defeat class certification." *Roach*, 778 F.3d at 405 (citation omitted). Under *Roach*, "a class will be certified if the substantive issues regarding liability predominate over the individualized issues that will affect only damages.'' *In re Namenda Indirect Purchaser Antitrust Litig.*, 2021 WL 509988, at *15 (S.D.N.Y. Feb. 11, 2021) (quoting *Seijas v. Republic of Argentina*, 606 F.3d 53, 58-9 (2d Cir. 2010)). Here, Plaintiffs propose two damage methodologies—(1) a full refund method and (2) a diminution in value method—both of which are capable of calculating damages on a class-wide basis using common evidence. Moreover, each is fully consistent with Plaintiffs' theory of liability as required by *Comcast*.

### 2. *Full Refund Damages are Calculable on a Class-wide Basis*

Defendants incorrectly contend that full refund damages "must be rejected" at this stage of the litigation. Def. Br. at 58-61. Whether Plaintiffs can prove that the RNPS is so dangerous as to be valueless is a merits question. *See Rodriguez v. It's Just Lunch Int'l*, No. 07-CV-9227 (SHS), 2018 WL 3733944, at *4 (S.D.N.Y. Aug. 6, 2018) (contesting the value of the product in question "'goes to the proof of the merits of plaintiffs' claims,' not their amenability to certification" (quotation omitted)). In fact, numerous courts have held a full refund damages methodology satisfies *Comcast* at the class certification stage. *See In re Scotts EZ Seed*, 304 F.R.D. at 408.[66]

Here, Plaintiffs' damages expert, economist Colin B. Weir, has proposed a full refund methodology that is capable of calculating full refund damages on class-wide basis *if* Plaintiffs prove, at the merits stage, that the RNPS are valueless. *See* ECF 125-2 (Weir Dec.) ¶¶15-17. Dr.

---

[66] *In re Morning Song Bird Food Litig.*, 320 F.R.D. 540, 556 (S.D. Cal. 2017); *Allen*, 300 F.R.D. at 671; *Rikos v. Procter & Gamble Co.*, 799 F.3d 497 (6th Cir. 2015).

Rossi, Defendants' own expert, admitted that full refund damages would be appropriate if Plaintiffs prove the product should never have been sold. Ex. 59 (9/27/21 Hearing Tr.);[67] Ex. A (Basar Reply Dec.) at ¶ 62. In the contemporaneously filed Reply Declaration of Colin B. Weir ("Weir Reply Dec." attached hereto as Ex. D), Mr. Weir addresses Defendants' expert's improper liability-centric criticisms of his methodology, none of which concern whether his methodology is *capable* of calculating class-wide damages, which is the relevant inquiry here. *See id.* at ¶¶ 8-20.

Defendants' merits-based arguments are similarly infirm. Defendants rely on *In re Amla Litigation*, 320 F. Supp. 3d 578 (S.D.N.Y. 2018) ("*Amla II*"), noting that a class was decertified because a full damages refund theory was rejected.[68] However, the court initially *certified* classes in *In re Amla Litig.*, 282 F. Supp. 3d 751, 767 (S.D.N.Y. 2017) ("*Amla I*"), holding that "the defense's contention [that product was not completely worthless] is 'properly addressed at trial or in a ruling on a summary-judgment motion.'" *Id.* (quoting *Amgen*, 568 U.S. at 470). *Amla II* was a ruling on *summary judgment* where the court, on the evidence before it, did not allow full refund damages because the plaintiffs alleged a single component of a five-part kit was defective, but failed to prove the whole kit was valueless. 320 F. Supp. 3d at 591. Here, Plaintiffs allege the entire

---

[67] As of the date of this filing, the official transcript of the 9/27/2021 Daubert Hearing has not yet been released. Plaintiffs will supplement Exhibit 59 with excerpts from the official court reporter's transcript that contain Dr. Rossi's testimony, when they become available.

[68] Actually, the *Amla* opinion decertified *in part*. Damages claims under NYGBL § 349, warranty claims, claims for misrepresentations regarding functionality and safety remained certified. Defendants also cite *In re POM Wonderful LLC*, No. ML 10–02199 DDP (RZx), 2014 WL 1225184, at *3 n. 2 (C.D. Cal. Mar. 25, 2014); *Red v. Kraft Foods, Inc.*, No. CV 10–1028–GW(AGRx), 2012 WL 8019257, at *11 (C.D. Cal. Apr. 12, 2012); *Brazil v. Dole Packaged Foods, LLC*, No. 12-cv-01831-LHK, 2014 WL 2466559, *15 (N.D. Cal. May 30, 2014); and *Lanovaz v. Twinings N. Am., Inc.*, No. C-12-02646-RMW, 2014 WL 1652338, *6 (N.D. Cal. April 24, 2014) which involve food products and "are readily distinguishable because food products have some *inherent nutritional value.*" *Allen*, 300 F.R.D. at 671 n.25

design of the RNPS is so dangerous as to render it valueless, and, in fact, the entire category of infant sleepers has largely vanished. *See* Pl. Br. at 3; *see also* Exs. 28-50.

Defendants' comparison of the RNPS to "inherently dangerous" tobacco products is inapposite. A purchaser of cigarettes, whether labeled "Lights" or not, knows that they are dangerous. Baby gear products, especially from Fisher-Price, are supposed to be safe. Further, *In re Tobacco Cases II* held "[a] full refund *may* be available in a UCL case when the plaintiffs prove the product had *no* value to them." 192 Cal. Rptr. 3d 881, 895 (Ct. App. 2015). Here, no Plaintiff would have purchased or used the RNPS knowing the risks of the product.

*In re Vioxx Class Cases*, 103 Cal. Rptr. 3d 83 (Ct. App. 2009), is also readily distinguishable. In *In re Vioxx*, the class plaintiffs alleged they would have bought an alternative product but for the defendants' deceptive marketing overstating the drug's effectiveness and understating its risks. In *Krueger v. Wyeth, Inc.*, another class action concerning prescription drug marketing, plaintiffs were permitted to pursue a full refund damages theory. No. 03-CV-2496-JAH-AJB, 2011 WL 8971449 (S.D. Cal. Mar. 30, 2011). The court distinguished *Vioxx* because the *Krueger* plaintiffs did not claim they would have purchased a competing product, but that they would not have purchased the subject drug *at all* had it been marketed truthfully. *Id*. at *6. Additionally, the court noted that there was no similar alternative drug on the market that plaintiffs could have purchased. *Id.* Here, as noted above, Plaintiffs would not have purchased the RNPS had the danger been disclosed, and there was no safer alternative that Plaintiffs could have purchased because the danger inherent to the incline of the RNPS was also present in all inclined sleep products offered by other manufacturers.

Moreover, in arguing the RNPS still hold value, Defendants return to their failed argument that the RNPS is a multi-use product.  *See* Def. Br. at 61-60; *but see* Section II.B.2., *supra*.

60

However, Defendants ignore, that pursuant to the Recall terms, all consumers have been instructed to stop using the RNPSs entirely, not just for sleep. Additionally, 15 U.S.C. § 2068(a)(2)(B) makes it "unlawful for any person to . . . sell, offer for sale . . . any consumer product" that has been recalled. CPSC Guidance notes that this even includes "individuals holding yard sales and flea markets."[69] The approximately 4.4 million RNPSs still left in consumers' hands after the ineffective Recall cannot legally be used or sold. They are worthless.

### 3.  *Plaintiffs' Proposed Diminution in Value Damages Model Satisfies Comcast*

Mr. Weir's proposed conjoint survey methodology for calculating diminution in value damages is fundamentally sound and can accurately calculate diminished value (if the RNPS has any) on a class-wide basis. These issues are extensively covered in Plaintiffs' Opposition to Defendants' Motion to Exclude the Declaration and Opinions of Mr. Colin B. Weir (ECF 182), which is incorporated herein by reference. *See* Ex. D (Weir Reply Dec.) ¶ 22. Defendants do not and cannot claim the methodology is unreliable as their own damages experts, Drs. Toubia and Rossi, do not claim it is and, in fact, both conduct conjoint analyses themselves. *Id.* at ¶ 23.

Defendants' challenges Mr. Weir's proposed use of conjoint methodology to calculate class-wide damages lack factual support.  First, while Defendants claim Mr. Weir's Declaration (ECF 125-2) is "skeletal," it in fact includes a detailed discussion of how Mr. Weir would conduct his analysis using a combination of a conjoint survey,[70] regression analysis, and a market simulation to calculate the price premium attributable to Defendants' omissions and misleading representations. *See* ECF 182 at 12-17; *see* ECF 125-2 (Weir Dec.) at Ex. 3.  Second, Defendants' contention that Mr. Weir's conjoint methodology is inconsistent with Plaintiffs' theory of liability

---

[69] *See* https://www.cpsc.gov/s3fs-public/ResellersGuide.pdf (last accessed Sept. 17, 2021).

[70] Defendants criticize various aspects of Mr. Weir's *proposed* survey, but criticisms about survey methodology go the weight of the survey at the merit stage. *E.g.*, *Schering Corp.*, 189 F.3d at 228 (errors in survey methodology go "to the weight of the evidence").

such that it fails to satisfy *Comcast* strains credulity.  Defendants claim the attribute of interest in

Mr. Weir's proposed conjoint survey—a "safety warning" that "this inclined infant ***sleeper*** carries

the risk of infant fatality or other serious health problems" (ECF 125-2 (Weir Dec.) at Ex. 3 ¶

29)—is inconsistent with Plaintiffs' theory of liability because the safety warning does not relate

to sleep. Def. Br. at 64.[71]  The safety warning clearly relates to the dangers for infants placed into

a sleeper in which they, as infants often do, will fall asleep. *See* ECF 182 at 21-23. Plaintiffs assert

a single theory of liability: Defendants misled consumers into buying a product that is dangerous

for its intended use, and consumers would not have purchased the RNPS at all, or would have paid

less for it, had the truth been disclosed. Mr. Weir's Declaration includes a fully developed outline

of his proposed conjoint methodology to calculate damages, which satisfies what was requested

by the Court (ECF 30 at 7), Second Circuit precedent, and *Comcast*. ECF 30 at 7.[72]

### a. *Defendants' Supply-Side Factors Argument is Routinely Rejected*

Defendants' contention that Plaintiffs' proffered conjoint survey cannot "calculate a true

market price of the RNPS" based on supply-side considerations is wrong for several reasons.  As

an initial matter, Defendants ignore that Mr. Weir, has an entire section in his report titled "Supply

Side Considerations." *See* ECF 125-2 (Weir Dec.) at Ex. 3 ¶¶ 50-58. Many courts have rejected

the same attacks on conjoint analysis, and nothing here requires a different outcome. *See*

---

[71] Defendants also claim that the conjoint methodology addresses "at most, Plaintiffs' omission theory" because the attribute of interest in the proposed conjoint survey is the safety warning. Def. Br. at 63. The conjoint methodology is also capable of measuring the diminution in value attributable to Defendants' misrepresentations because, as Plaintiffs allege, the representation that the RNPS is a safe and suitable place for infants to sleep is misleading precisely because it conceals the dangers of the product.

[72] Defendants inaccurately claim the Second Circuit reversed class certification in *Kurtz v. Costco Wholesale Corp.*, 768 Fed. App'x. 39, 40-41 (2d Cir. 2019) "due to insufficient detail in Mr. Weir's report" (Def. Br. at 62). The Second Circuit *remanded* the case to make further findings of fact to enable proper review, and later affirmed certification of the damages class, specifically accepting Mr. Weir's methodologies over defendants' arguments. *See Kurtz*, 818 F. App'x at 61-30.

*Krommenhock*, 334 F.R.D. at 576 (rejecting argument that "Weir made no attempt to account for competitors' actions in the market" because "the model utilized prices that 'mirror' those actually observed in the market and based on actual sales data, and also holds quantity constant"); *Hadley*, 324 F. Supp. 3d at 1106 ("Gaskin's proposed conjoint analysis adequately accounts for supply-side factors and does not merely measure demand-side willingness-to-pay"); *accord Kaupelis v. Harbor Freight Tools USA, Inc.*, 2020 WL 5901116, at *6 (C.D. Cal. Sept. 23, 2020);[73] *Fitzhenry-Russell*, 326 F.R.D. at 606 (conjoint survey adequately considered supply-side factors by using historical prices, actual competitor products, and fixed quantity of supply from historical sales.); *In re: Lenovo Adware Litig.*, 2016 WL 6277245, at *21 (N.D. Cal. Oct. 27, 2016) (Gaskin's survey "addressed 'the supply side' of the market'"); *accord In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d 936, 969-71 (N.D. Cal. 2018) ("*MyFord Touch II*").

In *Hadley*, 324 F. Supp. 3d at 1104-06, the court rejected the same "supply side" argument Defendants raise here, and explained that "conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the

---

[73] In holding that the plaintiffs' experts' (Gaskin and Weir) damages model satisfied *Comcast*, Judge Selna in *Kaupelis* also considered and rejected many of the same cases Defendants rely upon here, including *In re General Motors LLC Ignition Switch Litigation*, 407 F. Supp. 3d 212, 216, (S.D.N.Y. 2019), *NJOY*, 120 F. Supp. 3d at 1119 and *Saavedra v. Eli Lilly and Co.*, 2014 WL 7338930 (C.D. Cal. Dec. 18, 2014). Notably, in all of those cases, the plaintiffs' experts <u>admitted</u> that the surveys only measured demand. *See In re General Motors*, 407 F. Supp. 3d at 235 ("as Boedeker himself acknowledges, his model measures only the effect that a disclosed defect would have on willingness to pay."); *NJOY*, 120 F. Supp. 3d at 1119 ("Harris does not dispute that both his conjoint and direct method analyses provide only a model for testing what a consumer is willing to pay, without considering other factors in a functioning marketplace."); *Saavedra*, 2014 WL 7339030, at *6 ("Plaintiffs have done worse than not even advancing a reliable method of calculating classwide damages—they have advanced 'no damages model at all.'").

statistical calculations reflect the actual quantities of products sold during the class period." *Id.* at 1105; *see also Hilsley v. Ocean Spray Cranberries, Inc.*, 2018 WL 6300479, at *15 (S.D. Cal. Nov. 29, 2018) ("[C]ourts have found that the supply side of the conjoint analysis damages model is satisfied if the prices in the surveys reflect the actual market prices during the class period and the quantities used reflect the actual quantities of products sold."). That is precisely what Mr. Weir proposes here. *See* ECF 125-2 (Weir Dec.) at Ex. 3 ¶ 50 ("the historic number of units sold is a fact"); *id.* ¶ 53 ("I will conduct research of the actual retail sales and market data and include[] these real world price points in the survey. These real-word transactions occurred at prices that *already* reflect the supply side factors then extant in the marketplace. I will also consider the variability in pricing both at the wholesale and retail levels to determine that pricing was responsive to changing market factors." (emphasis in original)). Against this backdrop, Defendants' argument misses the mark. *See* Ex. D (Weir Reply Dec.) ¶¶ 26-111.

Dr. Rossi's notion that the but-for world must account for the *possibility* that Defendants *might* have altered anything beyond the alleged harm is contrary to the Reference Manual on Scientific Evidence and requires rampant speculation. More importantly, it results in an apples-to-oranges comparison. *See id.* at ¶¶ 32-38, 55-74. As Dr. Rossi was forced to admit on the stand at the *Daubert* hearing on September 27, 2021, a reduction in supply increases the market value of the product. Ex. 59 (9/27/21 Hearing Tr.); Ex. A (Basar Reply Dec.) at ¶ 62.[74] Reducing supply in the but-for world will yield a market equilibrium price that is only applicable if some lesser number of products exists, which cannot be extrapolated back into the real world where more of the products actually exist. The market value of the 4.7 million RNPS that consumers purchased in

---

[74] As of the date of this filing, the official transcript of the 9/27/2021 Daubert Hearing has not yet been released. Plaintiffs will supplement Exhibit 59 with excerpts from the official court reporter's transcript that contain Dr. Rossi's testimony, when they become available.

the real world can only be calculated by a method that determines the value of 4.7 million RNPS

units in the but-for world. *See* Ex. D (Weir Reply Dec.) ¶¶ 32, 45-50, 55-61. Further, his contention

that the equilibrium price of some lesser number units can be applied to all purchasers in the real

world is logically unsound based on Dr. Rossi's own understanding of economics. As previously

noted (Section II.H.2., *supra*), even Dr. Rossi agreed that purchasers who would never have bought

the RNPS in the but-for world would be entitled to a full refund. Applying his reduced-supply

market equilibrium price to *all* real-world units not only results in an overstatement of market

value, but also means that class members who would never have purchased the RNPS would not

receive a full refund. *See* Ex. D (Weir Reply Dec.) ¶¶ 57-61.

Finally, Defendants' argument concerning the "presence of competitor products" has been

squarely rejected within this Circuit. Indeed, as the Southern District of New York observed:

> [The choice-based conjoint] method is designed to determine not
> only the price premium, but also the "willingness-to-pay" – which
> accounts for the possibility that prices across competitor products
> could change if products with the Challenged Claims were not
> offered on the market, or "that Class Members may have paid less
> for the Challenged Products but-for the Challenged Claims (the
> "price premium") but may also have chosen not to purchase the
> Challenged Products at all without the Challenged Claims." This
> approach satisfies the requirement of *Comcast* – that Plaintiffs
> match their damages model to their liability theory.

*Price*, 2018 WL 3869896, at *10. Accordingly, Defendants' argument that Mr. Weir damages

proposal "does not satisfy the requirements of *Comcast*," (Def. Br. at 64), is wholly without merit.

### b. Defendants' "Overcompensation" Argument Does Not Foreclose Class Certification

Defendants argue that Plaintiffs' damages models "fail to account for factors such as the

secondary market[.]" Def. Br. at 65. That argument has been rejected by various other courts, and

the Court should do so here as well.  Indeed, in *In re Polyurethane Foam Antitrust Litig.*, 2014

WL 6461355 (N.D. Ohio Nov. 17, 2014), the defendant complained that classwide damages could

not be calculated because certain class members "will receive damages that overcompensates that class member relative to the harm it suffered." *Id.* at *46. However, the Court correctly held that "questions of allocation will likely require individualized analysis, that is typical of aggregate litigation, and does not cause individual issues to predominate over common questions in this case." *Id.* For this reason, many courts have rejected this "overcompensation" argument and certified classes on behalf of indirect purchasers. *See Rougier v. Applied Optoelectronics, Inc.*, 2019 WL 6111303, at *15 (S.D. Tex. Nov. 13, 2019) (holding that "Plaintiffs' proposed damages model comports with the requirements of Rule 23(b)(3) as set forth in *Comcast*" despite defendant's argument that "Plaintiffs' proposed damage model fails to track the Class theory of liability and overcompensates Class Members"); *Baker v. Equity Residential Mgmt., L.L.C.*, 390 F. Supp. 3d 246, 265 (D. Mass. 2019) (rejecting argument that plaintiffs' proposed damages model "raises a *Comcast* problem because it overcompensates tenants"). [75]

## I.   The Class Action is a Superior Means of Resolving This Litigation

### *1.   Defendants' Manageability Arguments are Irrelevant and Exaggerated*

Defendants argue that the proposed class action "presents serious manageability problems." (Def. Br. at 65-67.) However, the issue is not simply whether class litigation presents management challenges. Instead, Rule 23(b)(3) prescribes a *comparison*: whether class litigation is "superior to" individual litigation. *See Guzman v. VLM, Inc.*, No. 07-CV-1126 JG RER, 2008 WL 597186, at 4 (E.D.N.Y. Mar. 2, 2008) ("Rule 23(b)(3) allows a class action to be maintained as long as the plaintiff establishes . . . the superiority of a class action **compared to** other methods."

---

[75] *See also*, *e.g.*, *In re TFT-LCD (Flat Panel) Antitrust Litig.*, 267 F.R.D. 583, 608 (N.D. Cal. 2010), *amended in part*, 2011 WL 3268649 (N.D. Cal. July 28, 2011); *In re Static Random Access memory (SRAM) Antitrust Litig.*, 264 F.R.D. 603 (N.D. Cal. 2009); *In re Nexium (Esomeprazole) Antitrust Litig.*, 297 F.R.D. 168, 176 (D. Mass. 2013), *aff'd sub nom. In re Nexium Antitrust Litig.*, 777 F.3d 9 (1st Cir. 2015); *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 701 (S.D. Fla. 2004).

(citations omitted, emphasis added)); *see also Hardgers-Powell v. Angels in Your Home LLC*, 330 F.R.D. 89, 106 (W.D.N.Y. 2019) ("A class action is also the superior method because of the small damages suffered ***in relation to*** the expense of individual litigation."). Defendants do not even attempt such a comparison; there is no mention of how it would be *more* manageable or cost-effective to have millions of virtually identical lawsuits adjudicated separately. On balance, the claims against Defendants are far more manageable as a class action because of the predominance of factual and legal issues common to every proposed class member.

In addition, the points raised by Defendants do not present substantial manageability problems. Identifying class members should not be difficult. Defendants contend that, out of 21 Plaintiffs, Black did not purchase a RNPS (but purchased an inclined product from another manufacturer) and that Huey did not pay for the RNPS she ordered (which is inaccurate). *See* Section II.D.2., *supra*. Defendants also inaccurately claim that Kaden could not remember when she purchased the RNPS (Def. Br. at p. 66 n.119), but she testified that she purchased an RNPS in January 2019, which she remembers because it was shortly after her daughter was born. Ex. 17 (Kaden Tr.) 130:24-131:4. Rather than demonstrating a problem, this shows that self-identification of class members is highly accurate because more than 90 percent of the Plaintiffs have no issues.

Defendants also claim that among the many wrongful death actions against them, four of the wrongful death plaintiffs had purchased other brands of inclined sleepers. While this is irrelevant because those plaintiffs are not part of this action, the Court can easily manage such issues by requiring proof of purchase or other acceptable documentation at the appropriate time. Also, courts in the Second Circuit have held that challenges in identifying class members (such as where retention of proof of purchase is unlikely) should not prevent class certification. *Ebin*, 297 F.R.D. at 567; *see also In re Scotts EZ Seed*, 304 F.R.D. at 407 ("declining to certify classes when

consumers are likely to lack proof of purchase would render class actions against producers almost impossible to bring.").

Defendants argue that distributing damages will not be manageable because Plaintiffs have not yet proposed how to account for customers who sold their RNPS, bought their RNSP on the secondary market, or participated in the Recall. As an initial matter, as set forth above, purchasers in the secondary market are not part of the Purchaser Classes. In any event, the Second Circuit Court of Appeals has squarely rejected Defendants' position:

> Defendants also argue that the calculation of individualized damages makes this case unmanageable as a class action. We disagree … failure to certify an action under Rule 23(b)(3) on the sole ground that it would be unmanageable is disfavored and should be the exception rather than the rule.

*In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001) (abrogated on other grounds by *In re Initial Pub. Offerings Sec. Litig.*, 471 F.3d 24 (2d Cir. 2006)). While every class action presents issues on how to best apportion damages among class members, such issues do not render a class action unmanageable. If they did, there would be no class actions.

Lastly, Defendants' argument that adequate notice cannot be provided to class members, fails for two reasons. *First*, Defendants' failure to effectively inform the public about the Recall is but one of its many fatal defects, as briefed in Sec. II.H.3., *infra*. *Second*, Defendants claim that "notice of this action is likely to only reach the same people who already received notice of the Recall." Def. Br. at 67. Defendants cite no evidence or authority for this speculative proposition. and ignore that, as is the case with all class actions, claims administrators can be retained to design and implement a robust notice program. In all, "any difficulties in managing this class action are vastly outweighed by the benefits." *In re Kind*, 337 F.R.D. at 608–09.

### 2. *Defendants' "Attorney-Driven" Arguments are Irrelevant*

Defendants' speculative claim that prior relationships with some counsel means that some

class representatives "were unlikely to have sued" and "have little interest in prosecuting any action" is insufficient to defeat superiority. Def. Br. at 68. Indeed, the fact "it is unlikely that many members of the class would have the resources or desire to pursue their claims individually in separate actions" supports a finding a superiority. *See Williams v. Cty. of Niagara*, No. 06-CV-291A, 2008 WL 4501918, at *5 (W.D.N.Y. Sept. 29, 2008). Notably, Defendants do not argue any "relationships" with counsel render Plaintiffs' interests antagonistic the remainder of the class nor do Defendants put forth any evidence of impropriety in counsel's communications with Plaintiffs. *See Fournigault v. Indep. One Mortg. Corp.*, 234 F.R.D. 641, 647 (N.D. Ill. 2006) ("I do not see any evidence of impropriety in the attorney's communications. Therefore, I see no reason to deny class certification . . . ."); *Stern v. DoCircle, Inc.*, No. SACV 12-2005 AG JPRX, 2014 WL 486262, at *7 (C.D. Cal. Jan. 29, 2014) ("[T]he Court does not believe that, without more, some preexisting relationship between a named plaintiff and counsel makes the plaintiff an inadequate class representative.").[76] It is also untrue that all Plaintiffs "enjoyed using the RNPS, which performed as promised*." Def. Br. at 68.* For example, Flores has invested a significant amount of time in this action because granddaughter was injured by her RNPS. Ex. 13 (Flores Tr.) at 19:2-7. Also, Kaden endured *three* separate days of deposition, not because she was conscripted by an attorney, but because she is a mother of two who learned that: "a product I had used for my kids and trusted was not safe." Ex. 17 (Kaden Tr.) at 223:1-2. In sum, Defendants' fails to show how a prior relationship with class counsel somehow negates class superiority.

---

[76] The cite cases involving Fair and Accurate Transactions Act violations, where there was "enormous contrast between the huge liability suffered by Defendant and the lack of harm suffered by Plaintiff." *Evans v. U-Haul Co. of Cal.,* No. CV 07-2097-JFW (JCx), 2007 WL 7648595, *7 (C.D. Cal. Aug. 14, 2007); *Foley v. Buckley's Great Steaks, Inc.,* No. 14-cv-063-LM, 2015 WL 1578881, *9-10 (D.N.H. April 9, 2015). Unlike those cases, Plaintiffs and class members harm is not merely statutory violations as they have suffered economic harm.

### 3. *Defendants' Inadequate Recall is Inferior to a Class Action*

Defendants argue its Recall "is superior to adjudication by class action" (Def. Br. at 68-69), but ignore the relevant inquiry is whether "a class action is superior to ***other available methods for fairly and efficiently adjudicating*** the controversy." FED. R. CIV. P. 23(b)(3) (emphasis added). A "recall campaign is not a form of 'adjudication'" under Rule 23(b)(3) such that Defendants' Recall is irrelevant to a superiority analysis. *In re Aqua Dots Prod. Liab. Litig.*, 654 F.3d 748, 752 (7th Cir. 2011); *In re Scotts EZ Seed*, 304 F.R.D. at 415 ("the Court is not convinced non-adjudicative forms of redress may even be considered"); *In re Hannaford Bros. Co. Customer Data Sec. Breach Litig.*, 293 F.R.D. 21, 35 (D. Me. 2013) (a refund "program is not relevant to my superiority determination"); *Allen*, 300 F.R.D. at 672.

Even if the Recall were a proper alternative to consider, Defendants' assertion that the Recall was "Fair and Easy" is unsupported by the facts. *Compare* Def. Br. at 11-2, 68-69 *with* Pl. Br. at 14-17. The Recall and its approval by the CPSC has been widely criticized. *See* Pl. Br. at 15. Indeed, the Oversight Committee's Report noted that a year after the Recall, a survey found that 1 in 10 daycares was still using the RNPS. *See* Ex. 1 (Report) at 30.

Perhaps most troubling is Defendants' consistent denial that there was any product danger, even though they recalled the RNPS. Defendants Recall did not indicate the dangers of the RNPS (including the incline) and misleadingly focused on restraints. ECF 125-10 (Recall Notice). This is evidenced by responses provided to Dr. Kivetz survey when asked if they were aware of issues with baby products like the RNPS. For example, one respondent replied: "The Graco Rock and play's were recalled due to parents stupidity. If they had been supervising theire [sic] babies or had them strapped in right, their babies would still be alive. Complete user error." ECF 166-1 (Kivetz Report) at 445. Another respondent replied with a near verbatim response that infants died "while unrestrained or under other circumstances." *Id.* at 463. A parent who saw only the Recall warning

language could easily be misled into believing that using the restraints was sufficient to prevent injury or death, and thus put their child's life at risk.

Additionally, Sarah Ford's description of the Recall is inaccurate. Purchasers who bought the RNPS more than six months before the Recall were *not* given a new Fisher-Price product, but instead a voucher that could be used for a Fisher-Price product. ECF 166-5 (Ford Decl.) ¶ 36. Additionally, the voucher provided was only good towards certain products chosen by Fisher-Price, not anything the participant wanted. Ford claims that notice was sent to over 900,000 consumers (*id.* at ¶ 37), but the Monthly Progress Reports ("MPRs") filed with the CPSC indicate notice was provided to 570,706 consumers. *See* Ex. 58 (MPRs).

Ms. Ford's assertion that "some retailers also accepted returns of the RNPS without a receipt, such as Target" is misleading. ECF 166-5 (Ford Decl.) ¶ 38. While the MPRs indicate Target accepted consumer returns in-store, there is no evidence that any other store did. The MPRs confirm that Target reported accepting 55,417 returns as of December 31, 2020, amounting to 22.6% of the total recall participation. If Defendants had wanted to employ an effective recall with more participation, they could have worked with *all* retailers to accept returns such as in *In re Aqua Dots Prod. Liab. Litig.*, where consumers sued a manufacturer, distributor, and three retailers over a dangerous toy that was recalled. 270 F.R.D. 377, 385 (N.D. Ill. 2010) (denying class certification); *but see In re Aqua Dots*, 654 F.3d at 752 (Seventh Circuit rejecting district court's superiority analysis because a recall is not an adjudication). The *Aqua Dots* recall gave a full refund to participants, regardless of date of purchase, and consumers were permitted to either return them in store or to the distributor, and there was "no evidence that [the distributor] has ever denied a cash refund to a consumer who asked for one." 270 F.R.D. at 380. These measures resulted in the return of roughly 600,000 toys by consumers out of 1.3 million sold in the U.S.—a 46%

participation rate. *Id*. Here, Defendants' failure to adequately publicize the Recall, burdensome return procedures, and inadequate relief resulted in 245,216 returns of the approximately 4.7 million RNPS sold in the U.S.—an approximate 5.3% participation rate. *See* Ex. 58 (MPRs); *see also Kaupelis*, 2020 WL 5901116, at *10 (rejecting argument that a class action would not provide greater recovery than a recall because "evidence suggests there is still a large number of consumers who still have not received a remedy through the recall").

### 4. *The Personal Injury Lawsuits Have No Bearing*

Defendants conclude their superiority analysis by arguing that the existence of individual injury actions proves that class litigation is not superior to individual litigation. To the contrary, the existence of individual personal injury actions highlights the need for class litigation on economic damages because wide-scale, uniform economic injuries like those caused by Defendants are the very reason class actions exist. *See Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("the policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights").

Defendants also argue that "Plaintiffs already have a remedy through the CPSC-approved Recall Remedy" (Def. Br. at 69), but Defendants' onerous and self-serving recall campaign is not a valid remedy and is irrelevant to superiority, as discussed above. Defendants' reliance on *Patton v. Topps Meat* is misguided for two reasons. First, as Defendants acknowledge, the plaintiffs in *Patton* sought certification of an *injury class* such that the existence of individual injury actions was relevant to the superiority analysis. *Patton v. Topps Meat Co., LLC*, No. 07-CV-00654 S M, 2010 WL 9432381, at *8 (W.D.N.Y. May 27, 2010). Here, because Plaintiffs do not seek an injury class, the existence of individual injury actions is beside the point. Second, the recall program in *Patton* was a *full refund* for *all purchasers* (*id*. at 10)—a far cry from Defendants' recall.

### III.     The Injunctive Relief Class Should Be Certified under Rule 23(b)(2)

Plaintiffs seek certify the Injunctive Relief Class under Rule 23(b)(2) to redress deficiencies in Defendants' Recall. Pl. Br. at 45-48. Defendants do not dispute they "ha[ve] acted or refused to act on grounds that apply generally to the class[,]" FED. R. CIV. P. 23(b)(2). Instead, they argue that Plaintiffs lack standing and their damages are not incidental to injunctive relief. Def. Br. at 70-71.

First, Defendant's argument that Plaintiffs lack standing to seek injunctive relief because they will not purchase RNPS in the future should be rejected because "were the Court to accept the suggestion that plaintiffs' mere recognition of the alleged deception operates to defeat standing for an injunction, then injunctive relief would never be available in false advertising cases, a wholly unrealistic result." *Ries*, 287 F.R.D. at 533 (citation omitted); *see also Kurtz*, 321 F.R.D. at 543.    Unlike the cases Defendants cite holding consumers seeking injunctions to correct the misleading claims or to prevent future sales of the lacked standing because they would not purchase the products in the future, Plaintiffs seek to improve an existing Recall, which is wholly deficient.    *See* Section II.I.3., *supra*. None of the cases Defendants cite involve recalls of potentially deadly products such as the RNPS.

The Second Circuit's decision in *Berni v. Barilla S.p.A.*, 964 F.3d 141 (2d Cir. 2020) illustrates the point.  There, consumers lacked standing for injunctive relief in the form of a "fill-line" and disclaimers as to the amount of pasta in pasta boxes for future sales. *Id.* at 149. The Second Circuit reasoned that not all class members would benefit from the injunctive relief because the fill-line or disclaimer language would not "materially improve their position as knowledgeable consumers." *Id.* at 148.  Here, improving the Recall would improve the knowledge of consumers as to the dangers of the RNPS and benefit all Injunctive Relief Class Members.  Due

to Defendants' inadequate notice of the Recall (*see* Section II.I.3., *supra*), consumers are still at risk of using the product.  An injunction requiring Defendants to improve their Recall to appraise consumers of the dangers of the RNPS provides relief to each Injunctive Relief Class member.

Second, damages are incidental to the injunctive relief Plaintiffs seek with respect to the Injunctive Relief Class. Monetary relief is considered incidental when it "flow[s] directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief" and does not "entail complex individualized determinations." *Ackerman*, 2013 WL 7044866, at *16 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 131 S. Ct. 2541, 2560 (2011)). Here, through their inadequate Recall, Defendants have acted on ground applicable to the Injunctive Relief Class. *See id.* (certifying a (b)(2) class where package was misleading despite plaintiffs seeking monetary and injunctive relief). Thus, certification of a Rule 23(b)(2) class is warranted.

## IV.   Alternatively, the Nationwide Issue Class Should be Certified Under Rule 23(c)(4)

Plaintiffs identified the two discrete issues under which they seek Rule 23(c)(4) certification. Pl. Br. at 62. The Second Circuit has "consistently endorsed a broad reading of Rule 23(c)(4)." *United States v. City of New York*, No. 07-cv-2067 (NGG) (RLM), 2011 WL 3174084, *11 (E.D.N.Y. July 8, 2011).[77] As the Second Circuit has stated, "the plain language and structure of Rule 23 support the Ninth Circuit's view [that '[e]ven if the common questions do not predominate over the individual questions so that class certification of the entire action is warranted, Rule 23 authorizes the district court in appropriate cases to isolate the common issues under Rule 23(c)(4)(A) and proceed with class treatment of these particular issues.']." *In re Nassau County Strip Search Cases*, 461 F.3d 219, 226 (2d Cir. 2006) (quoting *Valentino v. Carter-*

---

[77] *See also Gulino v. Bd. of Educ. Of City School Dist. of City of New York*, 907 F. Supp. 2d 492 (S.D.N.Y. 2012) (district courts in the Second Circuit are directed "to take full advantage of this provision [(c)(4)] to certify separate issues." (quoting *Robinson v. Metro-North Commuter R.R.*, 267 F.3d 147, 167 (2d Cir. 2001))

*Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir. 1996)).

Contrary to Defendants' claim that issue certification is appropriate only if Rule 23(b)(3) requirements are satisfied, the Second Circuit has stated exactly the opposite: "courts may employ Rule 23(c)(4)[] to certify a class on a particular issue even if the action as a whole does not satisfy Rule 23(b)(3)'s predominance requirement." *In re Nassau*, 461 F.3d at 225; *see also* 7AA Wright & Miller, *Federal Practice & Procedure* § 1790 (3d ed. 2005). Certifying issues classes here would promote judicial efficiency by easing the burden individual plaintiffs would face in bringing individual actions for damages. As discussed in Section II, *supra*, the individual issues mentioned by Defendants fail to pose obstacles to issues certification. *See Robinson*, 267 F.3d at 167 ("District courts should take full advantage of this provision to certify separate issues in order to reduce the range of disputed issues in complex litigation and achieve judicial efficiencies" (internal quotation marks and alterations omitted)); *id*. ("[a] class action should not be found unmanageable without [first] exploring the procedural devices available for bringing it inline." (citation omitted)).

## CONCLUSION

For the foregoing reasons and the reasons set forth in Plaintiffs' Opening Brief, Plaintiffs respectfully request that this Court issue an order certifying the Purchaser, Injunctive Relief, and Nationwide Issue Classes, appointing the Plaintiffs as Class Representatives, and appointing Wilson Daniel "Dee" Miles, III, Demet Basar, and James B. Eubank of Beasley Allen as Co-Class Counsel.

Respectfully submitted this 13th day of October, 2021,

/s/ *Demet Basar*

**BEASLEY, ALLEN, CROW, METHVIN, PORTIS & MILES, P.C.**
Demet Basar
W. Daniel "Dee" Miles, III
James B. Eubank
Paul W. Evans
218 Commerce Street
Montgomery, Alabama 36104
Tel: (334) 269-2343
Fax: (334) 954-7555
Demet.Basar@BeasleyAllen.com
Dee.Miles@BeasleyAllen.com
James.Eubank@BeasleyAllen.com
Paul.Evans@BeasleyAllen.com

*Plaintiffs' Lead Counsel*

**CONNORS LLP**
Terrence ("Terry") Connors
Andrew M. Debbins
1000 Liberty Building
Buffalo, NY 14202
Tel: (716) 852-5533
tmc@connorsllp.com
amd@connorsllp.com

*Plaintiffs' Liaison Counsel*

**BURSOR & FISHER, P.A.**
Lawrence ("Tim") Fisher
Alec Leslie
1990 North California Blvd., Suite 940
Walnut Creek, CA 94596
(925) 300-4455
ltfisher@bursor.com
aleslie@bursor.com

**DeNITTIS OSEFCHEN PRINCE, P.C.**
Stephen P. DeNittis
Five Greentree Centre, Suite 410
525 Route 73 North
Marlton, NJ 08053
Tel.: (856) 797-9951
sdenittis@denittislaw.com

**SMOLEN & ROYTMAN**
Daniel Smolen
701 S. Cincinnati Avenue
Tulsa, OK 74119
(918) 585-2667
danielsmolen@ssrok.com

**LAW OFFICES OF JONATHAN A. SORKOWITZ**
Jonathan A. Sorkowitz
7 Skyline Dr Ste 350
Hawthorne, NY 10532
jsorkowitz@sorkowitzlaw.com

*Plaintiffs' Executive Committee*

**LOCKRIDGE GRINDAL NAUEN P.L.L.P.**
Robert Shelquist
100 South Washington Ave., Suite 2200
Minneapolis, MN 55401
(612) 339-6900
rkshelquist@locklaw.com

**FORCHELLI DEEGAN TERRANA LLP**
Elbert F. Nasis
333 Earle Ovington Blvd., Suite 1010
Uniondale, New York 11553
Tel.: (516) 248-1700
enasis@forchellilaw.com

**CARUSO LAW FIRM, P.C.**
Mark A. Smith
Dennis Caruso
The Colonial Building
1325 East 15th Street, Suite 201
Tulsa, OK 74120
(918) 583-5900
msmith@carusolawfirm.com
dcaruso@carusolawfirm.com

**KANTROWITZ, GOLDHAMER & GRAIFMAN, P.C.**
Gary S. Graifman
Melissa Emert
747 Chestnut Ridge Road
Chestnut Ridge, New York 10977
(845) 356-2570
ggraifman@kgglaw.com
memert@kgglaw.com

**STULL, STULL & BRODY**
Howard Longman
6 East 45th Street-5th floor
New York, NY 10017
(212) 687-7230
hlongman@ssbny.com

**REICH RADCLIFFE & HOOVER LLP**
Mark G. Reich
Adam T. Hoover
4675 MacArthur Court, Suite 550
Newport Beach, CA 92660
(949) 975-0512
mgr@reichradcliffe.com
adhoover@reichradcliffe.com

**SHINDLER ANDERSON GOPLERUD & WEESE PC**
J. Barton Goplerud*
Brian O. Marty*
5015 Grand Ridge Dr
West Des Moines, IA 50265
(515) 223-4567
goplerud@sagwlaw.com
marty@sagwlaw.com

**CUNEO GILBERT & LADUCA, LLP**
Daniel M. Cohen
David Stanley
4725 Wisconsin Ave, NW
Washington, DC 20016
Tel.: (202) 789-3960
danielc@cuneolaw.com
davids@cuneolaw.com

**BRANSTETTER, STRANCH & JENNINGS, PLLC**
J. Gerard Stranch, IV*
Benjamin A. Gastel*
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
(615) 254-8801
gerards@bsjfirm.com
beng@bsjfirm.com

**CORY WATSON P.C.**
F. Jerome Tapley*
Douglas A. Dellaccio, Jr.*
Hirlye R. "Ryan" Lutz, III*
Adam W. Pittman*
Lauren S. Miller*
2131 Magnolia Ave. S.
Birmingham, AL 35205
(205) 328-2200
apittman@corywatson.com
ddellaccio@corywatson.com
rlutz@corywatson.com
Lmiller@corywatson.com
Jtapley@corywatson.com

**PITTMAN, DUTTON & HELLUMS, P.C.**
Chris T. Hellums*
Jonathan S. Mann*
2001 Park Place North, Suite 1100
Birmingham, AL 35203
(205) 322-8880
chrish@pittmandutton.com
jonm@pittmandutton.com

**WOLF HALDENSTEIN ADLER
FREEMAN & HERZ LLP**
Kate McGuire
Carl Malmstrom
270 Madison Ave.
New York, New York 10016
(212) 545-4600
mcguire@whafh.com
malmstrom@whafh.com

*Plaintiffs' Counsel*