```
 1              UNITED STATES DISTRICT COURT

 2              WESTERN DISTRICT OF NEW YORK

 3

 4    _____

 5    IN RE: ROCK 'N PLAY SLEEPER      )CASE NO.:

 6    MARKETING, SALES PRACTICES, AND  )1:19-md-2903

 7    PRODUCTS LIABILITY LITIGATION    )

 8    _____)

 9

10                    CONFIDENTIAL

11

12

13

14

15          DEPOSITION OF BRUCE SILVERMAN

16                    VOLUME I

17        REMOTELY IN LOS ANGELES, CALIFORNIA

18             THURSDAY, OCTOBER 28, 2021

19

20

21

22    REPORTED BY:

23    NATALIE PARVIZI-AZAD, CSR, RPR, RSR

24    CSR NO. 14125

25    JOB NO. 4846762
```

Page 1

1              UNITED STATES DISTRICT COURT

2              WESTERN DISTRICT OF NEW YORK

3

4     _____

5     IN RE: ROCK 'N PLAY SLEEPER      )CASE NO.:

6     MARKETING, SALES PRACTICES, AND  )1:19-md-2903

7     PRODUCTS LIABILITY LITIGATION    )

8     _____)

9

10

11

12

13

14       DEPOSITION OF BRUCE SILVERMAN, VOLUME I

15       TAKEN ON BEHALF OF THE DEFENDANTS

16       REMOTELY VIA ZOOM VIDEO CONFERENCING, IN

17       LOS ANGELES, CALIFORNIA, BEGINNING AT

18       9:03 A.M. AND ENDING AT 7:22 P.M., ON

19       THURSDAY, OCTOBER 28, 2021, BEFORE

20       NATALIE PARVIZI-AZAD, CERTIFIED SHORTHAND

21       REPORTER NUMBER 14125.

22

23

24

25

                                        Page 2

CONFIDENTIAL

```
 1                    A P P E A R A N C E S

 2

 3    FOR THE PLAINTIFFS:

 4         BEASLEY, ALLEN LAW FIRM

 5         BY:  JAMES EUBANK, ESQ.

 6         BY:  PAUL EVANS, ESQ.

 7         BY:  DEMET BASAR, ESQ.

 8         218 COMMERCE STREET

 9         MONTGOMERY, ALABAMA  36104

           (800) 898-2034

10         JAMES.EUBANK@BEASLEYALLEN.COM

11         PAUL.EVANS@BEASLEYALLEN.COM

12         DEMET.BASAR@BEASLEYALLEN.COM

13

14    FOR THE DEFENDANTS:

15         GOODWIN PROCTER, LLP

16         BY:  MATTHEW P. KANNY, ESQ.

17         520 BROADWAY

18         SUITE 500

19         SANTA MONICA, CALIFORNIA  90401

           (424) 252-6400

20         MKANNY@GOODWINLAW.COM

21

22    ALSO PRESENT:

23         ROB FENTON, VIDEOGRAPHER

24

25
```

Page 3

```
 1                    I N D E X

 2

 3    WITNESS                                PAGE

 4    BRUCE SILVERMAN

 5         EXAMINATION BY MR. KANNY          7

 6         EXAMINATION BY MR. EUBANK         316

 7         EXAMINATION BY MR. EUBANK         318

 8         EXAMINATION BY MR. KANNY          345

 9         EXAMINATION BY MR. EUBANK         361

10         EXAMINATION BY MR. KANNY          363

11

12              E X H I B I T S

13    EXHIBIT NO.    DESCRIPTION             PAGE

14    EXHIBIT 1      NOTICE OF DEPOSITION    15

15    EXHIBIT 2      EXPERT REPORT           24

16    EXHIBIT 3      FORBES ARTICLE DATED    111
                     MAY 29, 2010

17    EXHIBIT 4      INVOICE TO-DATE         183

18    EXHIBIT 5      CONSOLIDATED AMENDED    206

19                   COMPLAINT

20    EXHIBIT 6      MATTEL PRODUCT DELUXE COPY  274
                     INFORMATION SHEETS

21    EXHIBIT 7      MATTEL PRODUCT DELUXE COPY  274

22                   INFORMATION SHEETS

23    EXHIBIT 8      LOS ANGELES BUSINESS    320

24                   JOURNAL ARTICLE

25
```

CONFIDENTIAL

```
 1          REMOTELY IN LOS ANGELES, CALIFORNIA

 2          THURSDAY, OCTOBER 28, 2021, 9:03 A.M.

 3

 4          THE VIDEOGRAPHER:  Good morning.  We

 5   are on the record.  The time is 9:03 a.m.          09:03:01

 6   Pacific Time.  Today is October 28th, 2021.

 7   Please note that the microphones are sensitive

 8   and may pick up whispering, private

 9   conversations, and cellular interference.

10   Please turn off all cellphones or place them       09:03:17

11   away from the microphones as they can interfere

12   with the deposition audio.  Audio and video

13   recording will continue to take place unless

14   all parties agree to go off the record.

15          My name is Rob Fenton.  I'm the notary      09:03:30

16   video technician with Veritext Legal Solutions

17   located in Los Angeles, California.  The court

18   reporter is Natalie Parvizi-Azad from Veritext

19   Legal Solutions.

20          We are recording these proceedings          09:03:42

21   over videoconference technology due to

22   COVID-19.  This is media unit one for the video

23   deposition of Bruce Silverman in the action

24   titled in re:  Fisher-Price Rock 'n Play

25   Sleeper Marketing Sales Practices and Products     09:04:02
```

Page 5

CONFIDENTIAL

```
 1    Liability Litigation.  This deposition is being
 2    taken on behalf of the defendants.  And the NDL
 3    number is 1:19-MD-2903.
 4          I'm not related to any party in this
 5    action, nor am I financially interested in the      09:04:21
 6    outcome.  Counsel and everyone present in the
 7    room and everyone attending remotely will now
 8    state their appearances and affiliations for
 9    the record.
10          If there are any objections to             09:04:31
11    proceeding, please state them at the time of
12    your appearance, beginning with the noticing
13    attorney.
14          MR. KANNY:  Good morning, everyone.
15    This is Matt Kanny with Goodwin Procter on        09:04:39
16    behalf of the defendants.  I will be taking the
17    deposition today.
18          MR. EUBANK:  My name is James Eubank,
19    at Beasley Allen, appearing on behalf of the
20    plaintiffs.  And I will be defending the          09:04:55
21    deposition today.
22          MS. BASAR:  My name is Demet Basar
23    from Beasley Allen, appearing on behalf of the
24    plaintiffs.
25          MR. EVANS:  My name is Paul Evans with      09:05:05
```

Page 6

```
 1    Beasley Allen, appearing on behalf of

 2    plaintiffs.

 3             THE VIDEOGRAPHER:  Thank you.  Could

 4    the court reporter please administer the oath.

 5             THE CERTIFIED STENOGRAPHER:  Please

 6    raise your right hand to be sworn.

 7

 8                  BRUCE SILVERMAN,

 9     having declared under penalty of perjury to

10     tell the truth, was examined and testified as

11                     follows:

12

13                   EXAMINATION

14    BY MR. KANNY:

15       Q.  Good -- good morning.                09:05:35

16       A.  Good morning.

17       Q.  Could you please state and spell your

18    full name for the record?

19       A.  Yes.  It's Bruce G. Silverman.  That's

20    B-R-U-C-E, initial G, S-I-L-V-E-R-M-A-N.        09:05:43

21       Q.  And Mr. Silverman, what is your date

22    of birth?

23       A.  It's February 16th, 1945.

24       Q.  And where do you currently reside?

25       A.  I reside at 3168 Dona, D-O-N-A, Mema,   09:06:03
```

Page  7

```
 1   president at the time?

 2        A.  Yes.  I was the vice president -- I

 3   was made a senior vice president I think --

 4   gosh.  I -- I think it was when I first got to

 5   Los Angeles.                                10:47:35

 6        Q.  And you ultimately left in 1980

 7   Ogilvy; correct?

 8        A.  I left at the very end of 1980,

 9   literally on the last day of the year.

10        Q.  Why did you leave?                 10:47:50

11        A.  I was recruited away by another agency

12   called Bozell & Jacobs.

13        Q.  In all of your time at -- well, let

14   me -- you list on your client list for Ogilvy,

15   Mattel?                                     10:48:20

16        A.  That's correct.  That was at the Los

17   Angeles office.

18        Q.  So your work for Mattel would have

19   been from 1977 to 1980?

20        A.  Yeah.  Very late '77 through 1980.  10:48:36

21        Q.  What did -- what did -- what did you

22   personally do for Mattel?

23        A.  Well, first of all, as executive

24   creative director, I -- I was responsible for

25   all of the creative work that the agency      10:48:59
```

Page 73

```
 1    produced including all of the work that we did

 2    for Mattel.  Mattel was our largest account at

 3    Ogilvy LA.  It happened to be one of the

 4    largest accounts, at that time, that was

 5    handled by Ogilvy & Mather on a global basis as      10:49:14

 6    well as in the US.  We were at the time

 7    Mattel's only agency.  So we were responsible

 8    for all the girls' toys, things like Barbie and

 9    baby dolls; all the boys' toys, things like Hot

10    Wheels, all the -- everything in between.  So I      10:49:31

11    was responsible for the quality of the work.

12            I was responsible -- and I also -- I

13    created a lot of work.  I created a -- a

14    campaign Barbie called "here comes Barbie fun."

15    It used the song from a movie called -- here         10:49:53

16    comes -- I'm trying to remember the name of the

17    movie.  We -- we bought the rights to the music

18    and created a theme song.  "Here comes Barbie

19    fun."  And that was literally a full campaign

20    for Barbie.  It was sort of a new idea that all      10:50:11

21    of the Barbie commercials and -- would relate

22    to each other, the various Barbie products.  I

23    did some commercials personally that I really

24    got my hands -- got down on the ground and

25    did -- created some commercials for Hot Wheels.      10:50:26
```

Page 74

1    I created commercials for a product called

2    Slime.  It was a gooey product that came in its

3    own garbage can.  Kind of fun.

4            I did -- I was very involved in the

5    launch of the series of products by a division     10:50:43

6    of Mattel called Mattel Electronics that made

7    handheld electronic games, and then later

8    introduced a product that I actually came up

9    with the name for called Intellivision, which

10   was a very, very early kind of game computer.      10:51:01

11       Q.  Did Mattel, to your knowledge, own or

12   was affiliated with Fisher-Price at the time?

13       A.  No.  They acquired -- I don't quite

14   remember when they acquired Fisher-Price, but

15   it was well after I worked on the Mattel          10:51:31

16   account.  In fact, Mattel had their own -- what

17   they called their preschool product line.

18       Q.  Did Ogilvy ever work for Fisher-Price?

19       A.  Not my knowledge.  They didn't work

20   for Fisher-Price during the years I worked        10:51:49

21   there.

22       Q.  Do you know what baby durables are?

23       A.  Baby durables?

24       Q.  Yes.

25       A.  I'm not familiar with that.              10:52:00

Page 75

```
 1          A.  I don't believe so at -- I -- I don't
 2     think so.  You know, it's a while ago.  I've
 3     have -- there were a lot of clients.  In
 4     paragraphs -- in paragraphs 13, 4, 15, you
 5     know, I listed a few of the clients that --        10:58:13
 6     some of the better-known clients.  But those
 7     agencies had much longer client lists than
 8     those that are listed in those paragraphs.  But
 9     I do reference --
10          Q.  (Indiscernible).                           10:58:24
11          A.  -- I reference clients at the end
12     of -- end of Exhibit B.
13          Q.  And -- and just so I'm clear, you
14     don't recall, as you sit here today, ever
15     working while you were at Bozell or BBDO West     10:58:40
16     for any client that manufactured or sold baby
17     durable products, as we defined it earlier?
18          A.  I don't think so.
19          Q.  And if you look at page 63 through 75
20     of your CV which lists your clients, there is     10:59:06
21     no client listed here on this list that is a
22     manufacturer or seller of baby gear durable
23     products; correct?
24          A.  Factory To You stores, which was a --
25     it's a retail chain that Asher/Gould            10:59:41
```

Page 80

```
 1    represented, they may have sold some -- they
 2    may have sold what you're calling durables --
 3    baby durables.  Big Lots may have sold baby
 4    durables.  I'm just looking just to see if
 5    there is anything else, but I don't -- I            11:00:05
 6    don't -- I don't have a category.  Certainly, I
 7    don't list a category of -- of baby durables.
 8         Q.  And for those two retailers that you
 9    described, do you recall ever working with them
10    in connection with any advertising campaign or     11:00:38
11    any marketing campaign in connection with baby
12    durables?
13         A.  I don't recall.  Baby durable products
14    may have been included in some of the
15    advertising we did.  The nature of those           11:00:50
16    clients was that you would frequently, you
17    know, show lots of stuff that was sold at the
18    store.  So I really don't remember the specific
19    products all that much that were sold there.
20         Q.  But you don't recall --                   11:01:02
21         A.  I can tell you -- I mean, I know they
22    sold all kinds of things.  It just -- you know,
23    I know they sold T-shirts and socks and all
24    kinds of things like that.
25         Q.  Right.  But you don't, as you sit here     11:01:18
```

Page 81

1              MR. EUBANK:  Well, then I would object

2     to form as vague and ambiguous as he just said

3     he thinks he does, which is not an affirmative

4     or a negative, so it's vague.

5     BY MR. KANNY:                                    11:30:29

6         Q.  All right.  So what we talked about

7     earlier today, Mr. Silverman, just to make the

8     record clear.  Baby durables -- or I think you

9     mentioned baby gear as defined by some internal

10    documents that you saw from Fisher-Price and       11:30:40

11    Mattel -- products made for baby care and

12    specifically includes things like bassinets,

13    bouncers, swings, rockers, sleepers, and

14    gliders, but do not include items that are --

15    baby items that are disposable like diapers,       11:30:56

16    formula, and -- like diapers and formula and

17    clothes, I think I also said earlier.

18              So with that clarification, it's true,

19    isn't it, that from the beginning of your

20    career through today, you've never worked for     11:31:11

21    any company that manufacturers or sells baby

22    durable products?

23              MR. EUBANK:  And I want to --

24    objection.  Asked and answered.

25              THE WITNESS:  I can't -- could you       11:31:23

                                                    Page 102

CONFIDENTIAL

1    restate the question so I know how to answer

2    yes or no?

3           MR. KANNY:  Sure.  Why don't we have

4    the court reporter read it back since I'm

5    getting a little tired here.                    11:31:36

6           (Record read.)

7           THE WITNESS:  I -- actually, I worked

8    on the Sears account.  And they -- back then,

9    way back then, they probably sold that stuff.

10   But I -- I don't remember ever being involved    11:32:27

11   in doing advertising specifically for those

12   products.  So other than that, I think the

13   answer would be -- to your question -- would be

14   yes.

15          MR. KANNY:  Let's go to -- you guys       11:32:43

16   want to take a five-minute break?

17          THE WITNESS: I would welcome that.

18          MR. EUBANK:  Sure.

19          MR. KANNY:  Okay.  Let's take a

20   five-minute break then.  Thank you.             11:32:53

21          THE VIDEOGRAPHER:  We are going off

22   the record at 11:33 a.m.

23          (Recess.)

24          THE VIDEOGRAPHER:  We are back on the

25   record at 11:42 a.m.                            11:41:31

                                          Page 103

1    mostly moms in the focus groups.  We did some

2    groups with dads, but it was mostly moms.  And

3    the moms would talk about the experiences they

4    were having, including the difficulties they

5    were having.                                    12:18:42

6        Q.  Were any particular products

7    referenced in any of those focus groups?

8        A.  Well, I mean, they -- you know, moms

9    would talk about bassinets, they'd talk about

10   cribs, playpens, all those kind of things.       12:19:06

11   They certainly weren't by brand.  We didn't

12   talk about specific products.  But consumers

13   talked about -- you know, in a focus group, the

14   name tries to define what it is.  They tried to

15   focus on a particular subject, but the           12:19:19

16   subjects -- sometimes the discussion group

17   gets -- discussion takes interesting turns that

18   the group wants to talk about.  And good focus

19   group moderators will try to steer the

20   conversation back to what we specifically want   12:19:42

21   to learn.  "We" meaning the advertising people.

22   But they also know that it's important to let

23   the group go, otherwise the group becomes

24   unresponsive.  That's just -- that's just the

25   art ever of moderating focus groups.             12:19:54

Page 129

```
 1        Q.  So just to get a clear answer, none of

 2     the focus groups' purpose was product specific?

 3            MR. EUBANK:  Objection.  Asked and

 4     answered.

 5            THE WITNESS:  The purpose of the focus    12:25:25

 6     groups was not to find ways to help sell

 7     products.  That wasn't what the campaign was

 8     about.

 9     BY MR. KANNY:

10        Q.  And, peripherally, there may have been    12:25:34

11     some discussions of baby products in those, but

12     that wasn't the purpose of any of those focus

13     groups?

14            MR. EUBANK:  Objection.  Asked and

15     answered three or four times now.              12:25:45

16            THE WITNESS:  It's -- the purpose of

17     the focus groups was for -- to understand the

18     needs and wants of consumers that fell into the

19     target audience for the "Baby-Cal" campaign.

20     When you're interesting in finding out needs    12:26:04

21     and wants, you're going to the -- the

22     conversations -- what you learn is going to

23     include a lot of things that include the

24     products that consumers buy, both what you

25     would call "durables" as well as expendables.   12:26:18
```

Page 134

```
 1    BY MR. KANNY:
 2        Q.  Right.  But the purpose of it wasn't
 3    to find out the needs and wants of particular
 4    products, was it?
 5        A.  It was not to find the needs and wants    12:26:30
 6    for particular products, no.
 7        Q.  And this was about ten years before
 8    the Rock 'n Play sleeper was ever sold?
 9        A.  That sounds right.
10        Q.  If you go to paragraph 21 of your        12:26:57
11    report -- I'm sorry -- paragraph 40, which is
12    on page 13.
13        A.  I'm sorry, 40?
14        Q.  Yes.
15        A.  Okay.                                     12:27:23
16        Q.  It says:
17            "I was involved in dozens of packaging
18            projects during my long agency career for
19            many different kinds of products, including
20            beverages, condiments, automotive products  12:27:30
21            such as motor oil and, relevant to this
22            matter, products primarily purchased by
23            parents for use by children."
24            What packaging projects were you
25    involved with over your agency career --         12:27:47
```

Page 135

CONFIDENTIAL

1    career, that dealt primarily with products

2    purchased by parents for use by children?

3        A.  Let's see.  Breakfast cereals, you

4    know, the -- kids' cereals such as Cocoa

5    Pebbles and Fruity Pebbles made by Post;          12:28:09

6    various candy bars like Hershey's and Reese's

7    Peanut Butter Cups, and some other Hershey

8    products; puppies, I actually did advertising

9    for a chain of pet food -- pet shops that was

10   owned by Mars, Incorporated.  And one of the     12:28:38

11   things we found was that parents love to buy

12   puppies if -- when -- because they had

13   children.  Toys, because I worked on Mattel.

14   And, from time to time, we would be --

15   have discussions with Mattel about ideas for     12:28:53

16   packaging for some of their new toys.

17   Particularly, in the toy business -- at least

18   when I worked on it -- there were staples like

19   Barbie and Hot Wheels.  But there were also new

20   toys introduced every year that, basically,      12:29:09

21   might have lasted one season, sometimes two.

22   And so, a lot of packaging there.  And -- and

23   some others.  Soft drinks, other food products,

24   toaster pastries specifically designed for

25   kids.  One was a product Nabisco made called      12:29:39

Page 136

```
 1    it's Krazy Glazy, with a K.  It's "crazy" with
 2    a K. And there was another one called Sooper
 3    Cookies, S-O-O-P-E-R, K-O-O-K-I-E.  And they
 4    were toaster pastries for kids.
 5           So it was an awful lot -- also          12:29:58
 6    clothing products, things like that.  So, you
 7    know, an awful lot of -- you -- well, you don't
 8    do much packaging for clothing.  I take that
 9    one back.  But you certainly do for packaged
10    good products and things like that.            12:30:16
11        Q.  So except for the toys for Mattel back
12    in '77 through '80 when Mattel didn't own
13    Fisher-Price, all of your packaging projects
14    that you just mentioned all relate to food and
15    soda and other consumables; correct?           12:30:31
16        A.  Gosh.  Let me think about that for a
17    moment.  One of the things that we created --
18    well, it -- it was for fast food.  You know,
19    we -- they still do it.  They have promotion
20    items at fast food places.  One of my clients   12:31:05
21    was Hardee's.  And the campaign was very, very
22    kid oriented.  You know, the advertising was
23    directed to both -- we had commercials very
24    specifically directed to kids and commercials
25    directed to adults where we were promising kind  12:31:28
```

Page 137

```
 1          A.  Well, I'm not sure that -- you know,

 2     I -- I do trademark work, so I -- the word

 3     "confusion," at least in what I do in trademark

 4     work has to do with source and issues with

 5     that.  But I think consumers would not          13:39:58

 6     necessarily know that this product is a product

 7     that they know and feel good about.

 8          Q.  Have you ever worked on any

 9     advertising campaigns for companies that sold

10     any type of baby products?                      13:40:12

11          A.  Yes.

12          Q.  What -- what companies?

13          A.  Mead Johnson nutritional is the

14     manufacturer -- was and still is the

15     manufacturer of Enfamil.  It's the leading baby 13:40:27

16     formula product in the world, actually.  But

17     when I was working on it, in the early 1970's,

18     it was probably US only.  And when I worked on

19     Mattel account, they had a preschool division.

20     I honestly don't remember the products.  It's,  13:40:49

21     you know, a long time ago.  And it wasn't the

22     most part of Mattel's business.  But we

23     certainly did sell products that were at least

24     preschool products.  I'm not sure how young

25     they went.                                      13:41:03
```

Page 152

CONFIDENTIAL

```
 1        Q.  Were they products for infants, if you
 2    recall?
 3        A.  As I just said, I don't recall.
 4        Q.  And Mattel, at that time, was
 5    primarily making only toys; is that right?      13:41:14
 6        A.  Back in those days, Mattel made toys
 7    and they made games and they also sometimes
 8    licensed the names of their products for other
 9    purposes.  And they had a line of preschool
10    products which, you know, my -- as best as I     13:41:37
11    can remember -- and I honestly don't remember
12    really well -- they were toys for preschool
13    children.  I just don't remember to what -- how
14    young they went as far as their products go.
15        Q.  If you look at -- and other than the      13:41:58
16    Enfamil and the Mattel preschool, any other
17    advertising campaigns you worked on that
18    involved products for babies or infants?
19        A.  Yeah.  Kimberly-Clark was in the
20    diapers business and I did some advertising for  13:42:25
21    diapers.
22        Q.  Other than Enfamil with the Mattel
23    preschool and diapers, any other products --
24    any other campaigns you worked on that involved
25    product for babies?                              13:42:40
```

Veritext Legal Solutions
866 299-5127

```
 1          A.   I don't recall others.
 2          Q.   And I'm just going to clarify my own
 3     question that it's the preschool -- I don't
 4     think you understood what age those products
 5     were or what whether those products were for        13:42:55
 6     infants or for younger kids; right?
 7          A.   I didn't say I didn't understand.  I
 8     said I can't remember whether they went --
 9     whether their product line included products
10     for infants or toddlers.                            13:43:09
11          Q.   Sure.  If you look at paragraph 50,
12     it's where you reference the Enfamil baby
13     formula account.
14          A.   Yes.
15          Q.   And I just want to go to the              13:43:22
16     paragraph 27 now.  At the bottom of that, you
17     refer to products ranging from financial
18     services to baby formula.  Is the baby formula
19     referenced there the Enfamil?
20          A.   Yes.                                      13:43:38
21          Q.   And paragraph 40, the products
22     primarily -- so at the last two lines, it says,
23     "products primarily purchased by parents for
24     use by children."  We already covered that
25     earlier today; right?                               13:43:58
```

Page 154

1        A.   I think we did, yes.

2        Q.   Okay.  And if you now go to

3   paragraph 50, we talked about this a little bit

4   earlier today.  But you said that you did focus

5   groups for Geisinger health system pediatric        13:44:16

6   practices?

7        A.   Yes.  We did it for pediatric

8   practices and other specialty practices and

9   that Geisinger --

10       Q.   So when did you those?                      13:44:29

11       A.   2000 it might have been as early as

12   2016.  Definitely 2017, '18 and '19.

13       Q.   And what were the purpose of those

14   focus groups?

15       A.   The development of advertising.  It        13:44:53

16   says it right in that paragraph.

17       Q.   For what types of advertisements?

18       A.   Advertising the -- the -- what do you

19   mean by "what types of advertising"?

20       Q.   What was the -- well, let me ask a          13:45:06

21   separate question.  Strike that question.

22            Did the focus groups help inform the

23   type of advertising you were composing for

24   Geisinger health system?

25       A.   What the focus groups taught us was,        13:45:20

```
 1    one, what -- what consumers were looking for.
 2    And it was, again, it was mostly moms -- over
 3    there in central Pennsylvania -- what they were
 4    looking for from -- from a pediatrician.  You
 5    know, our focus groups consisted of young          13:45:49
 6    mothers.  And, actually, not just young.  You
 7    know, mothers of -- everything from infants up
 8    to teenagers.  But what they were looking
 9    for -- from -- for -- from pediatricians or
10    from a pediatrician's practice.                    13:46:06
11          That -- Geisinger, at that time,
12    operated somewhere between 150 and 200 medical
13    offices.  They called them clinics.  And they
14    had specialty practices, in addition to, you
15    know, just primary care practices.  So they had    13:46:24
16    specialists, including, you know,
17    pediatricians, cardiologists, et cetera.
18          And so, we were doing this to learn
19    what consumers were looking for, from a
20    pediatrician practice, in -- in that part of       13:46:42
21    Pennsylvania.  Some of them were already
22    Geisinger patients.  Some of them were not
23    Geisinger patients.  Some of them didn't have
24    an ongoing relationship with a pediatrician.
25    It's -- it's the rust belt.  A lot of those        13:46:58
```

Page 156

1    people were pretty poor.

2            And -- and, you know, this was

3    something that Geisinger, at that time, really

4    wanted to put emphasis on -- into -- from a

5    marketing standpoint, was to build their          13:47:13

6    network, to build their system.  They

7    operated -- they operated seven or eight

8    hospitals throughout Pennsylvania and southern

9    New Jersey.

10           And it's sort of a vertically            13:47:28

11   integrated business, health care.  If you can

12   become a primary care physician or specialty

13   physician for a patient and that patient needs

14   to go to the hospital, they're going to end up

15   going to the system's hospital, more often than   13:47:41

16   not.

17        Q.  So would it be fair that the primary

18   purpose of those focus groups was unrelated to

19   the sale of any baby durable products?

20        A.  The purpose of those -- the ultimate     13:48:05

21   purpose of those focus groups was to develop a

22   advertising campaign to attract patients to

23   Geisinger's services.

24        Q.  Do you recall whether, in any of those

25   focus groups, anyone mentioned the Rock 'n Play   13:48:18

                                              Page 157

```
 1    sleeper product?

 2         A.  I do not -- I -- I really don't

 3    remember.  But I -- I -- I don't remember that

 4    happening.

 5         Q.  And we talked about the -- the focus        13:48:45

 6    groups you did for the -- was it baby cal,

 7    baby -- I forget the name of the project that

 8    you did for the State of California back in the

 9    90's?

10         A.  The -- there was -- one was "baby          13:49:00

11    cal."

12         Q.  Baby-Cal.  In any of those focus

13    groups, did the -- did SIDS ever come up?

14         A.  SIDS?  Yes, SIDS absolutely came up.

15    By the way, there were two programs -- and I       13:49:17

16    was trying to remember the name of the other

17    program.  The first was "baby cal," which

18    really was both prenatal and postnatal.  And

19    then, the second was called First 5.  And First

20    5 is still going.  Every once in a while, I see    13:49:36

21    advertising for it.

22              So First 5 was, as the name implies,

23    programs designed to help parents do a better

24    job -- hopefully a better job of being involved

25    with their children during the first five years   13:49:51
```

Page 158

```
 1    I don't -- I -- I'm not sure if that was

 2    alleged in the operative complaint or not.  I

 3    don't recall, but my focus -- as I've said, my

 4    focus had to do with whether or not this was a

 5    dangerous product for infants to sleep it.        14:49:16

 6        Q.  Do you recall any allegations in the

 7    operative complaint that said that the Rock 'n

 8    Play Sleeper was unsafe for all uses?

 9        A.  I don't recall.

10        Q.  Have you ever heard -- heard of the      14:49:36

11    Rock 'n Play Sleeper prior to taking on this

12    assignment?

13        A.  Actually, yes.

14        Q.  When did you first learn of the Rock

15    'n Play Sleeper prior to taking on this           14:49:44

16    assignment?

17        A.  The very first time I ever heard of

18    it, I have grandchildren and one of the

19    grandchildren, the oldest -- or excuse me, the

20    youngest of those grandchildren is now            14:49:56

21    7-years-old.  And I remember my -- my daughter,

22    the mother of the -- the grandchildren

23    mentioning that she had heard about the Rock 'n

24    Play Sleeper because her younger son was colic

25    and she -- we talked about that.  For some        14:50:22
```

Page 195

1    reason, my daughter thinks I may know a lot

2    more about -- about how to handle babies than I

3    do.  She likes to talk to her father.

4        Q.  Did your daughter purchase the Rock 'n

5    Play Sleeper?                                    14:50:43

6        A.  No, she did not.

7        Q.  How did she receive the Rock 'n Play

8    Sleeper?

9        A.  I just said she didn't bought -- she

10   didn't purchase it.                              14:50:52

11       Q.  Did she receive it as a gift?

12       A.  Oh.  She -- she did -- she has never

13   owned the Rock 'n Play Sleeper.

14       Q.  Has she owned any other kind of

15   incline sleeper product?                         14:51:02

16       A.  Not to the best of my knowledge, no.

17   I don't think so.  She's a -- she's a

18   registered nurse.  She's a -- and she's a big

19   researcher.

20       Q.  Do you know if she did any research in  14:51:19

21   connection whether or not to purchase a Rock 'n

22   Play Sleeper?

23       A.  I do not.

24       Q.  Do you know the reasons why she ended

25   up not purchasing the Rock 'n Play Sleeper       14:51:32

                                              Page 196

1    after she spoke with you?

2          MR. EUBANK:  Object to the relevance.

3          THE WITNESS:  I have no idea why she

4    didn't buy a product.  She sometimes tell me

5    why she does buy products.  She rarely tells me      14:51:45

6    about products she didn't -- didn't buy.

7    BY MR. KANNY:

8       Q.  Other than the single conversation

9    that you had with your daughter some time ago,

10   have you had any other conversations with          14:52:00

11   anybody about the Rock 'n Play Sleeper?

12      A.  I've had conversations about the Rock

13   'n Play Sleeper with the counsel for the

14   plaintiffs.

15      Q.  Outside of this litigation, sir?          14:52:17

16      A.  Outside of this litigation?  No, I

17   have no reason to do that.

18      Q.  Did you ever do any research in

19   connection with the Rock 'n Play Sleeper prior

20   to you being retained in this action?          14:52:34

21      A.  I may -- well, I'd just -- I'd be

22   speculating.  I can't -- I really can't answer

23   that.

24      Q.  For what purposes would you have been

25   doing research on the Rock 'n Play Sleeper?          14:52:53

Page 197

1        A.   If I was -- if I did any research on

2    it, it would have been after my initial

3    conversation with the attorneys, which goes

4    back to January of 2020.  I might have gone

5    online to see if I could learn little bit more        14:53:15

6    about the litigation.  I frequently do that

7    when I'm contacted by lawyers about a case.

8        Q.   You indicated that your daughter was a

9    registered nurse, and she does a lot of

10   research on buying products?                           14:53:32

11       A.   She -- she does a lot of homework,

12   yeah.

13       Q.   What -- what kind of homework does she

14   do -- do she do in connection with purchasing

15   products, if you know?                                 14:53:41

16            MR. EUBANK:  I'm going to say

17   objection to relevance and also objection that

18   this goes outside the scope of his assignment.

19   He was not asked to opine on what his

20   daughter's particular purchase habits are.            14:53:52

21            THE WITNESS:  Yes and I -- what my

22   daughter does, I don't see it as being relevant

23   to my testimony today.  And what I know of her

24   purchasing habits is between my daughter and I.

25   I don't believe that it -- that -- that           14:54:10

Page 198

```
 1    Fisher-Price or anybody else --
 2    BY MR. KANNY:
 3         Q.  Your assignment was to --
 4         A.  -- as a -- has a right -- has a right
 5    to ask me about that.                          14:54:20
 6         Q.  You were asked to opine as to what a
 7    reasonable consumer would consider material.
 8    Do you consider your daughter to be a
 9    reasonable consumer?
10         A.  I think my daughter is a -- is an     14:54:31
11    average consumer, yes.
12         Q.  And your daughter does a lot of
13    research in connection with purchasing
14    products; is that your testimony?
15         A.  I -- I don't think said "a lot of."   14:54:54
16    My daughter is a careful shopper.  Nurses don't
17    make that much money.  And so, she's careful
18    about what she purchases.  And where
19    appropriate, she tries to learn about the
20    products she buys.  She's not much of an       14:55:16
21    impulse purchaser.
22         Q.  And that's pretty consistent with the
23    reasonable consumer that you were evaluating in
24    connection with your assignment in this case;
25    right?                                         14:55:31
```

Page 199

1         A.   Not necessarily, no.   Average

2    consumers looking -- my definition of a

3    reasonable consumer is an average consumer.

4    And my testimony is not about what average

5    consumers do, but rather what a -- what an          14:55:48

6    average consumer would take away from the

7    messaging conveyed by Fisher-Price about the

8    Rock 'n Play Sleep -- Sleeper.   That's --

9         Q.   Right.

10        A.   That's very much --                        14:56:04

11        Q.   And --

12        A.   That's very much my expertise.

13        Q.   Right.   And I -- I get that, and we

14   talked about path of purchase and now you said

15   that your daughter is a reasonable consumer and    14:56:14

16   she does a lot of research prior to purchasing

17   products.   And so I do think it's relevant as

18   to what she does or doesn't do.   Do you know

19   whether she did any research in connection with

20   deciding whether or not to purchase the Rock 'n    14:56:31

21   Play Sleeper?

22            MR. EUBANK:   Matt, this whole entire

23   line of questioning is totally out of bounds to

24   get into what one particular person in his

25   family that's not connected with this at all,      14:56:44

Page 200

```
 1    what their particular decision-making process
 2    is, because one person is not indicative of the
 3    entire class of people or a reasonable
 4    consumer, generally.  I just don't see how this
 5    is --                                        14:57:02
 6            MR. KANNY:  I -- are you going --
 7    James, I'm running out of time.  So are -- if
 8    you're going to instruct, instruct.  If not,
 9    let me finish my questions.  I think it's
10    relevant because he's already testified that    14:57:11
11    his daughter is like a reasonable consumer as
12    those that he was evaluating in this case.
13            MR. EUBANK:  I -- I'll note for the
14    record and we -- we may file a motion to come
15    back later and strike this as getting -- A,     14:57:26
16    it's speculative as to what he thinks his
17    daughter might do because she is not the
18    reasonable consumer as a term, she is an
19    individual with her own individual drives and
20    motivations.  Beyond that, this is digging into  14:57:41
21    the personal life and family matters of an
22    expert witness, not even a lay witness who is a
23    plaintiff or fact witness in the case.  And
24    it's just totally out of bounds, in my opinion.
25            MR. KANNY:  Okay.  Well, instruct or    14:57:58
```

Page 201

CONFIDENTIAL

```
 1    not instruct, but let's get going.
 2           MR. EUBANK:  I mean, it's -- it's --
 3    it's not privileged and -- and it's not work
 4    product, so I am bound not to instruct him not
 5    to answer.  I can just apologize to              14:58:10
 6    Mr. Silverman and say I wish you didn't have to
 7    answer, but please go ahead and answer.
 8           MR:  KANNY:  The court reporter can
 9    read --
10           THE WITNESS:  So what question -- what   14:58:21
11    question do you want me to answer?
12           MR. KANNY:  If the court reporter
13    could read the last question before the
14    narrative.
15           THE CERTIFIED STENOGRAPHER:  Just a      14:58:32
16    moment.
17           (Record read.)
18           THE WITNESS:  The answer is I don't
19    know.
20    BY MR. KANNY:                                    14:59:14
21        Q.  She did contact you to talk about it;
22    correct?
23        A.  She didn't contact me.  We were
24    visiting their house, and the baby was crying.
25        Q.  And what did you discuss about the      14:59:25
```

Page 202

CONFIDENTIAL

```
 1    Rock 'n Play Sleeper with your daughter at the
 2    time?
 3              MR. EUBANK:  Objection.  Goes outside
 4    the scope of his assignment.
 5              THE WITNESS:  Boy, is it outside the       14:59:34
 6    scope.
 7              My daughter asked if I ever had -- if
 8    any of our -- if any of her siblings had --
 9    were difficult -- posed a difficult problem to
10    my wife and I, you know, as far as, you know,        14:59:49
11    screaming, crying all the time.  And my answer
12    was yes.  And she said what did you do.  And I
13    said we bought a baby swing.  Now, this is a
14    long time ago.  My children are all grown up.
15    BY MR. KANNY:                                        15:00:14
16         Q.  Anything else that you can recall in
17    that discussion about the Rock 'n Play Sleeper
18    with your daughter?
19         A.  No.  I think she -- I think she
20    mentioned something called a Rock 'n Play          15:00:21
21    Sleeper, but that's as far as it goes.
22         Q.  What is your understanding of
23    plaintiff's theory of liability in this case?
24         A.  My understanding of liability?  My
25    understanding of liability is -- is if             15:00:41
```

Page 203

CONFIDENTIAL

```
 1        A.   However, I have certainly been around.

 2        Q.   That wasn't an -- that wasn't a

 3   question I answered -- your counsel, at the end

 4   of this, can ask you follow-up questions.

 5        A.   Okay.                              15:59:43

 6        Q.   Let's go to step one of the process.

 7   You say, "identify and consider demographics

 8   and psychographics"; correct?

 9        A.   Yes.

10        Q.   What do you mean by "demographics"?   15:59:52

11        A.   Demographics defined as sex, age,

12   income, race, educational level, and geographic

13   location.

14        Q.   What do you mean by "psychographics"?

15        A.   Psychographics is a marketing term, an  16:00:15

16   advertising term and it speaks to understanding

17   the lifestyles and values of various consumer

18   groups so that if you combine -- if you start

19   to understand who the target audience is

20   demographically, and then refine that based on   16:00:32

21   lifestyle and values, you have a very good

22   sense of who the -- who the -- who this

23   audience is, not as an audience, but rather

24   thinking about them as an average consumer of

25   -- within this target audience.                  16:00:51
```

Page 243

```
 1        Q.  What do you understand the

 2   demographics and psychographics of the putative

 3   class members of this case to be?

 4        A.  I think the demographics can be

 5   anyone -- any -- any father and mother or          16:01:04

 6   mother and father or maybe just mother of -- of

 7   an infant child who has -- who is looking to

 8   solve a particular problem and that is do I --

 9   I want to get something for my infant child to

10   sleep in if they seem to need help.  There are    16:01:25

11   certainly other things that babies can sleep

12   in, like bassinets.  And from a demographic

13   standpoint, it really crosses almost anybody

14   who comes across -- in this case, comes across

15   this product and can afford to buy.               16:01:45

16        Q.  Is it your understanding that only

17   mothers and fathers are part of the putative

18   class?

19        A.  No.  I would imagine that the putative

20   class would be anyone who had purchased the       16:01:56

21   product, though not necessarily for their own

22   use.  I would imagine that, you know, this

23   product would be a good gift item for -- for an

24   expectant mother or newly -- or new parent.

25   Friends could be giving it.  Relatives could be   16:02:16
```

Page 244

| | |
|---|---|
| 1 | giving it.  Grandparents could be giving it. |
| 2 | So those people could be giving it as well. |
| 3 | It's a matter of finding out about it. |
| 4 | Q.  Are purchasers of the -- on the |
| 5 | secondary market part of the putative class?    16:02:29 |
| 6 | A.  I don't know. |
| 7 | Q.  Would they be -- would they fit in to |
| 8 | the same demographics and psychographics of a |
| 9 | purchasers who is purchasing it now? |
| 10 | A.  As I said, in my opinion, the    16:02:41 |
| 11 | demographic is were very, very broad here.  You |
| 12 | know, it's anybody who has either had a baby or |
| 13 | wants to buy a, in essence, a gift for someone |
| 14 | who recently had a baby.  The psychographics |
| 15 | are people who want to buy -- who kind of fit    16:03:01 |
| 16 | in to wanting to buy a -- a product that will |
| 17 | solve a particular problem for -- for the |
| 18 | mother and father of an infant. |
| 19 | Q.  You talk about, in step two, to apply |
| 20 | your knowledge of consumer purchasing behavior    16:03:22 |
| 21 | as to the product or service being advertised |
| 22 | in this case.  How did you apply your knowledge |
| 23 | in the way you specify in this particular case? |
| 24 | A.  I apply my -- in this case, I apply my |
| 25 | knowledge of consumers who are buying products    16:03:38 |

Page 245

CONFIDENTIAL

```
 1      for use by children or, for that matter, very
 2      small children, infants, babies.  What -- what
 3      matters to me is it almost doesn't matter what
 4      the product is.  It's what how consumers think
 5      about buying products for use by babies.          16:04:01
 6      Babies are very precious.  Parents,
 7      grandparents, friends all recognize that.  So
 8      they want to buy products that are safe and
 9      that will be helpful and useful, at least for a
10      period of time.  Babies -- my understanding of   16:04:20
11      this product is that babies outgrow this
12      product at a certain point.
13          Q.  And you have no experience, as we
14      talked about it extensively earlier today, in
15      durable baby products; correct?                   16:04:33
16          A.  Yes, I -- I -- I do.  I just have a
17      lot of experience with parents.
18          Q.  I'm sorry.  Let me just make sure I
19      get my answer clear.  We testified -- you
20      testified earlier that you have never worked on  16:04:52
21      a campaign or for manufacturers or retailers of
22      durable baby products; is that correct?
23          A.  That's correct.
24          Q.  Okay.  So you have no experience in
25      connection with baby -- durable baby products;   16:05:12
```

Page 246

```
 1    correct?
 2            MR. EUBANK:  Objection.  Vague.  What
 3    type of experience?
 4    BY MR. KANNY:
 5        Q.  You can go ahead and answer.              16:05:22
 6        A.  That's correct.
 7        Q.  Okay.  Let's go to step three.
 8    "Evaluate" -- so say you, then, "evaluate the
 9    strategic appropriateness and clarify --
10    clarity of the message as conveyed in the ad."     16:05:37
11    How do you conduct this evaluation?
12        A.  The evaluation is conducted -- I --
13    number 1, I use -- I use my experience to do
14    that.  The strategic appropriateness, if I was
15    working at an ad agency, I would have a           16:05:52
16    strategy that had been developed and approved
17    through the client.  In working on expert
18    witness cases like this, I have -- I have --
19    generally speaking, and in this case
20    specifically, I have information that actually    16:06:09
21    came from the advertiser.  And in this
22    instance, it's -- I was able to see that this
23    strategy was very, very clear.  And the
24    strategy was to position this as a product that
25    could solve a problem for the parents of         16:06:27
```

Page 247

```
 1      infants that were keeping them awake at night.

 2      So the strategy was all based on a problem, and

 3      this product was the solution to this problem.

 4      And -- and the --

 5          Q.   Would you agree with me --              16:06:46

 6          A.   And then the second part of that

 7      sentence deals with clarity of messages

 8      conveyed, and that's where my experience, you

 9      know, basically is, is this message clear, is

10      it simple, is it likely to confuse a consumer.   16:07:00

11      And I -- all of those, at least in my opinion,

12      I believe that the messages here were clear as

13      a bell.

14          Q.   Would you agree me that the intent of

15      the marketer doesn't necessarily mean that the   16:07:15

16      perception of the consumer is consistent with

17      that intent?

18          A.   Would I agree with that?  Are you

19      asking that in the abstract, or you asking

20      specific to this case?                           16:07:32

21          Q.   In the abstract.

22          A.   There are certainly -- I have

23      experienced advertisers who insist on telling

24      consumers what they want to say, as opposed to

25      focusing in on determining on what consumers     16:07:48
```

Page 248

CONFIDENTIAL

```
 1      want and need to hear or learn.  So you can
 2      sometimes get a disconnect.  Those are --
 3      typically, those are not very good clients.
 4      And typically clients that insist on
 5      advertising that works that way, more often      16:08:07
 6      than not -- not -- not 100 percent of the time,
 7      but more often than not the advertising that
 8      results from that is not as effective as
 9      another approach might be.
10          Q.  The fourth step is you considered the    16:08:19
11      totality of the advertisement is likely to
12      engage the consumers.  What standards do you
13      use to determine whether a consumer will find
14      the totality of the packaging engaging?
15          A.  Well, again, it's based on my            16:08:38
16      experience.  One of the things for sure in
17      advertising -- well,  I guess I should never
18      say for sure.  Consumers look at babies in
19      general.  They like to see babies.  But
20      especially people who are buying products for   16:08:55
21      babies like to see babies.  And they like to
22      see babies portrayed in a way that they would
23      hope their baby would sort of fit.  I think
24      everybody would love their baby to be pretty.
25      I think they would like their baby to look      16:09:13
```

Page 249

1    happy.  And especially I think for -- for

2    particularly infants, they would like to see

3    babies sleeping happily and like to see moms,

4    and sometimes moms and dads, enjoying that

5    experience.  So that kind of -- there's story        16:09:28

6    appeal in that.  And this is not an

7    intellectual reaction, it's an emotional

8    reaction that consumers have.  And emotionally,

9    they say, oh, I'm attracted to that package.

10   Now --                                               16:09:47

11       Q.  Right.  Mr. Silverman the question is

12   what standard?  Not -- not --

13       A.  Well, the standard --

14       Q.  Do you have an objective standard that

15   you use in connection in determining whether         16:09:53

16   consumers will find the totality of the package

17   engaging, or are you basing it on your years of

18   experience and opinions?

19       A.  I'm basing it on my years of

20   experience and what I was taught during my           16:10:05

21   years of experience.

22       Q.  And different ad executives could have

23   different opinions regarding the

24   appropriateness of the packaging; correct?

25           MR. EUBANK:  Objection.  Calls for           16:10:19

                                                          Page 250

CONFIDENTIAL

```
 1    me.
 2         Q.  And the highlighted sentence here,
 3    again, credits you with coining the term "Don't
 4    Leave Home Without It" for American Express; is
 5    that correct?                                  18:26:09
 6         A.  Yes.
 7         Q.  Okay.  Nothing further on those.
 8    There are many questions about whether or not
 9    you specifically worked in your marketing
10    career on infant and toddler or baby durable    18:26:28
11    products.
12         Do you recall those questions?
13         A.  Yes.
14         Q.  Well, not particularly working in
15    depth with marketing campaigns for baby         18:26:42
16    durables, you've done a lot of work for other
17    consumer products; is that correct?
18         A.  Most --
19         MR. KANNY:  Objection.  Vague.
20         THE WITNESS:  Most of my career has        18:26:52
21    been spent advertising consumer products and
22    services.
23    BY MR. EUBANK:
24         Q.  And you testified earlier that a lot
25    of those included products that were marketed   18:27:03
```

Page 324

```
 1      to be either consumed or used by children?

 2          A.   That is correct.

 3          Q.   Okay.  Would you say that it was

 4      consistent across -- well, I'll ask you:  Was

 5      safety a concern or -- or was it material in      18:27:21

 6      those categories that you worked in?

 7          A.   Yes.

 8          Q.   Any consumer products that you worked

 9      in on marketing or advertising for where people

10      just didn't care about safety at all?            18:27:42

11          A.   Gosh.  That's an interesting question.

12      I -- I'm not sure how much consumers worried

13      about safety when opening a Pabst Blue Ribbon

14      or Hamm's or Lone Star Beer or eating an ice

15      cream cone at Baskin-Robbins.  But in general,   18:28:05

16      consumers expect -- they want -- they want safe

17      products and they believe the products they buy

18      from well-known, well represented, effectively

19      rounded companies, generally speaking they

20      believe that -- those to be safe.                18:28:23

21          Q.   And consumers across those consumer

22      products that you worked on, did they expect

23      the product to be usable for the purpose stated

24      on the label?

25              MR. KANNY:  Objection.  Calls for       18:28:44
```

Page 325

```
 1   speculation.  Lacks foundation.
 2   BY MR. EUBANK:
 3        Q.  Based on -- based on your experience.
 4        A.  In my experience, if -- when consumers
 5   buy a product that has been positioned as being      18:28:52
 6   for specific purpose or primarily for a
 7   specific purpose, they expect that product to
 8   deliver on that specific purpose.
 9        Q.  And along those lines when we -- when
10   there was a discussion multiple times about         18:29:09
11   Double Stuf Oreos?
12        A.  Yes.
13        Q.  Do you recall those discussions?
14            And you stated, if I recall, that that
15   the doubled stuff is a material representation       18:29:19
16   to consumers; correct?
17        A.  I believe it was a material -- it was
18   an attribute that was a material benefit to
19   consumers.
20        Q.  Okay.  And does that attribute matter      18:29:31
21   to somebody who doesn't want a cookie?
22        A.  No.  It doesn't matter people that
23   don't want a cookie.
24        Q.  So whether it's Double Stuf or not,
25   it's the Oreo part that first gets the consumer      18:29:43
```

Page 326

CONFIDENTIAL

```
 1 │ STATE OF CALIFORNIA    )
   │                        ) SS.
 2 │ COUNTY OF LOS ANGELES  )
 3 │
 4 │
 5 │      I, BRUCE SILVERMAN, HEREBY CERTIFY UNDER
 6 │ PENALTY OF PERJURY UNDER THE LAWS OF THE STATE OF
 7 │ CALIFORNIA THAT THE FOREGOING IS TRUE AND CORRECT.
 8 │      EXECUTED THIS 19th DAY OF November_____,
 9 │ 2021, AT Studio City_____, CALIFORNIA.
10 │
11 │
12 │
13 │
14 │      _____
15 │           BRUCE SILVERMAN
16 │
17 │
18 │
19 │
20 │
21 │
22 │
23 │
24 │
25 │
   │                                    Page 367
```

CONFIDENTIAL

```
 1              ERRATA SHEET FOR THE DEPOSITION OF:

 2

 3     CASE NAME:        IN RE: ROCK 'N PLAY SLEEPER

                         MARKETING, SALES PRACTICES, AND

 4                       PRODUCTS LIABILITY LITIGATION

 5     CASE NUMBER:      1:19-MD-2903

 6     DEPO DATE:        THURSDAY, OCTOBER 28, 2021

 7     DEPONENT:         BRUCE SILVERMAN

 8

 9                       CORRECTIONS

10     PG. LN. NOW READS   SHOULD READ      REASONS
11     58  4   table       label            Reporter error
12     70  8   until       through          Misspoke
13     78  16  principle   principal        Reporter error
14     91  25  advertisement advertiser     Misspoke
15     92  6   advise      advice           Reporter error
16    134  20  interesting interested       Misspoke
17    150  6   is          was             Misspoke
18    159  18  parent      part             Reporter error
19    168  4   advertising advertisers      Reporter error
20    168  21  service     focus groups     Possibly misspoke
                                             or reporter error
21    185  14  financial   final            Reporter error
22    189  20  non-packing non-packaging    Reporter error
23             CONTINUED ON FOLLOWING PAGE

24

25     SIGNATURE _____  DATE  11/19/2021
```

Page 368

```
1              ERRATA SHEET FOR THE DEPOSITION OF:

2

3     CASE NAME:       IN RE: ROCK 'N PLAY SLEEPER

                       MARKETING, SALES PRACTICES, AND

4                      PRODUCTS LIABILITY LITIGATION

5     CASE NUMBER:     1:19-MD-2903

6     DEPO DATE:       THURSDAY, OCTOBER 28, 2021

7     DEPONENT:        BRUCE SILVERMAN

8

9              PAGE 2 OF CORRECTIONS

10    PG. LN. NOW READS   SHOULD READ        REASONS

11    190 12   Dennis       Kivetz          Reporter error

12    190 14   Dennis       Kivetz          Reporter error

13    254 22   product      package         Misspoke

14    269 22   insert "and" after "packaging"  Clarity

15    274 12   demand       define          Reporter error

16      THIS SPACE INTENTIONALLY LEFT BLANK

17    308 10   correct      connect         Reporter error

18    325 19   rounded      branded         Reporter error

19    337 16   sleep        slept           Reporter error

20    353 16   markets      marketers       Reporter error

21    ___ ___ _____ _____ _____

22    ___ ___ _____ _____ _____

23    ___ ___ _____ _____ _____

24

25    SIGNATURE _____  DATE 11/19/2021
```

                                              Page 368

CONFIDENTIAL

```
1          CERTIFIED STENOGRAPHER'S CERTIFICATE
2     STATE OF CALIFORNIA  )
                           ) SS.
3     COUNTY OF LOS ANGELES )
4
5          I, NATALIE PARVIZI-AZAD, HERBY CERTIFY:
6          I AM A DULY QUALIFIED CERTIFIED SHORTHAND
7     REPORTER IN THE STATE OF CALIFORNIA, HOLDER OF
8     CERTIFICATE NUMBER CSR 14125 ISSUED BY THE COURT
9     REPORTERS BOARD OF CALIFORNIA AND WHICH IS IN FULL
10    FORCE AND EFFECT.   (BUS. & PROF. § 8016)
11         I AM NOT FINANCIALLY INTERESTED IN THIS
12    ACTION AND NOT A RELATIVE OR EMPLOYEE OF ANY
13    ATTORNEY OF THE PARTIES, OR OF ANY OF THE PARTIES.
14    (CIV. PROC. § 2025.320(A))
15         I AM AUTHORIZED TO ADMINISTER OATHS OR
16    AFFIRMATIONS PURSUANT TO CALIFORNIA CODE OF CIVIL
17    PROCEDURE, SECTION 2093 (B) AND PRIOR TO BEING
18    EXAMINED, THE DEPONENT WAS FIRST PLACED UNDER OATH
19    OR AFFIRMATION BY ME.  (CIV. PROC. §§ 2025.320,
20    2025.540(A))
21         I AM THE CERTIFIED OFFICER THAT
22    STENOGRAPHICALLY RECORDED THE TESTIMONY IN THE
23    FOREGOING PROCEEDING AND THE FOREGOING TRANSCRIPT
24    IS A TRUE RECORD OF THE TESTIMONY GIVEN.  (CIV.
25    PROC. §  2025.540(A))
```

Page 369

CONFIDENTIAL

```
 1        I HAVE NOT, AND SHALL NOT, OFFER OR PROVIDE

 2   ANY SERVICES OR PRODUCTS TO ANY PARTY'S ATTORNEY

 3   OR THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

 4   ACTION WITHOUT FIRST OFFERING SAME TO ALL PARTIES

 5   OR THEIR ATTORNEYS ATTENDING THE PROCEEDING AND

 6   MAKING SAME AVAILABLE AT THE SAME TIME TO ALL

 7   PARTIES OR THEIR ATTORNEYS.  (CIV. PROC §

 8   2025.320(B))

 9        I SHALL NOT PROVIDE ANY SERVICE OR PRODUCT

10   CONSISTING OF THE CERTIFIED STENOGRAPHER'S

11   NOTATIONS OR COMMENTS REGARDING THE DEMEANOR OF

12   ANY WITNESS, ATTORNEY, OR PARTY PRESENT AT THE

13   PROCEEDING TO ANY PARTY OR ANY PARTY'S ATTORNEY OR

14   THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

15   ACTION, NOR SHALL I COLLECT ANY PERSONAL

16   IDENTIFYING INFORMATION ABOUT THE WITNESS AS A

17   SERVICE OR PRODUCT TO BE PROVIDED TO ANY PARTY OR

18   THIRD PARTY WHO IS FINANCING ALL OR PART OF THE

19   ACTION.  (CIV. PROC. § 2025.320(C))

20   DATED:  NOVEMBER 5, 2021

21

22

23

24

25        NATALIE PARVIZI-AZAD, CSR NO.14125
```

Page 370